No. 81-110

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

DUNCAN PEDER McKENZIE, JR.,

Petitioner and Appellant,

vs.

GLENN OSBORNE, Sheriff of
Cascade County, Montana,
JAMES BLODGETT, Acting Warden,
Montana State Prison et al.,

Respondent.

---

Appeal from: District Court of the Eighth Judicial District,
In and for the County of Cascade.
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellant:

Barney Reagan argued, Cut Bank, Montana
Charles L. Jacobson, Conrad, Montana
Timothy K. Ford, Seattle, Washington
John C. Boger, New York, New York

For Respondent:

Hon. Mike Greely, Attorney General, argued, and
 Chris Tweeten, Assistant Attorney General, argued,
 Helena, Montana
Douglas L. Anderson, County Attorney, Conrad, Montana

---

Submitted: June 8, 1981

Decided: October 29, 1981

Filed: OCT 29 1981

*Thomas J. Kearney*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal from an order of the District Court, Eighth Judicial District, Cascade County, denying the petition of Duncan Peder McKenzie, Jr. for relief under section 46-21-101, et seq., MCA (post-conviction relief) and section 46-22-101, et seq., MCA (habeas corpus).

Defendant Duncan Peder McKenzie, Jr. was convicted of the crimes of deliberate homicide and aggravated kidnapping by jury verdict in the District Court of Cascade County and thereafter was sentenced to death. The convictions and sentence were affirmed on appeal by this Court. State v. McKenzie (1977), 171 Mont. 278, 557 P.2d 1023 (hereafter McKenzie I).

Thereafter, the United States Supreme Court granted certiorari, vacated this court's judgment and remanded the cause to us for further consideration in light of Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281.

On remand to this Court, we gave consideration to the entire case, saying:

> "We have reconsidered the entire case, not only in the light of Patterson, but also on all issues raised in the original appeal to this Court. This opinion constitutes this Court's judgment in the entire case following remand." State v. McKenzie (1978), 177 Mont. 280, 288, 581 P.2d 1205, 1210 (McKenzie II).

Following our affirmance of the conviction and sentence in McKenzie II, the defendant sought relief under the Sentence Review Division of this Court, under the provisions of section 46-18-901, et seq., MCA. His petition for review there was denied. His attempted appeal of that decision to this Court was also denied, since no appeal is provided in our statutes from decisions of the Sentence Review Division.

Defendant again petitioned for certiorari to the United States Supreme Court, and it was granted. The case was again remanded to us for further consideration in the light of the United States Supreme Court decision in Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The remand citation is McKenzie v. Montana (1979), 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871.

When the case came to us on the second remand, this Court again gave full consideration to the case, again saying:

> "We have reconsidered the entire case, not only in the light of Patterson and Sandstrom, but also on all issues raised in the original appeal. This opinion constitutes this Court's judgment in the entire case following remand." 608 P.2d 428, 436, 37 St.Rep. 325, 328.

The report of our third consideration is in State v. McKenzie (1980), ___ Mont. ____, 608 P.2d 428, 37 St.Rep. 325 (hereafter McKenzie III).

Following McKenzie III, defendant again sought certiorari from the United States Supreme Court, but his petition was denied. McKenzie v. Montana (1980), ___ U.S. _____, 101 S.Ct. 626, 66 L.Ed.2d 507 (Justices Marshall and Brennan dissenting).

Having thus exhausted the appellate process, McKenzie on January 5, 1981, filed in the District Court of the Eighth Judicial District, his petition for post-conviction relief or habeas corpus. That is the petition with which we are now concerned. It is from the denial of that petition that we now enter upon McKenzie IV.

Counting the defendant, there are presently in Montana three persons facing the sentence of death following their criminal convictions by juries. All three cases have been before this Court on appeals from denials of post-conviction relief in recent months. Coleman v. Montana (1981), ___

Mont. \_\_\_, \_\_\_ P.2d \_\_\_, 38 St.Rep. 1352, and Fitzpatrick v. Montana (1981), \_\_\_Mont. \_\_\_, \_\_\_ P.2d \_\_\_, 38 St.Rep. 1448 (Fitzpatrick III), have already preceded this opinion. In the two other cases, some identical issues have been decided. We will rely on and refer to them to some extent in this opinion, where the discussions are pertinent.

One of the issues that has arisen in all three cases, and the first issue we come to here, is the extent of review to which the defendant is entitled under post-conviction relief on matters that have been raised and litigated in the course of the appellate process.

We state that the extent of review is the first issue, although in the briefs of both McKenzie and the State, the first question raised is whether this Court has jurisdiction of an appeal from a decision of the District Court in a post-conviction relief case, under section 46-21-101, et seq., MCA. Both parties concede that either party has a right to appeal from a district court order entered on such a petition under section 46-21-203, MCA. We agree that an appeal lies in this case.

With respect to the extent of our review, and indeed of the review of the District Court, McKenzie contends in this case that the District Court erred in refusing to review issues raised by McKenzie in his petition, by holding that the previous decisions of this Court in the McKenzie cases raised a "res judicata bar" and "that issues previously considered on direct appeal are not appropriately raised in this petition." McKenzie contends that the misapplication by the District Court of res judicata principles to the post-conviction action affected the entirety of the District Court's decision and for that reason should be reversed.

-4-

The State responds that McKenzie is relying on dicta found in earlier cases in this Court and the true rule is that this Court will refuse to reconsider issues on which it has previously ruled; that the Post-Conviction Relief Act is intended only to assure that a convicted felon has an opportunity, one opportunity, to present material issues affecting his conviction.

In the most recent Coleman case, supra, 38 St.Rep. at 1359, this Court held that res judicata cannot be applied to deprive a convicted defendant of his right to file a post-conviction petition, but the rule may be used to bar the rehearing of issues already litigated, citing Sanders v. United States (1963), 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148. Again, in the most recent Fitzpatrick case, this Court noted that the District Court had granted the State's motion to dismiss six of Fitzpatrick's claims on the ground that the claims had been previously decided on the merits and were res judicata. In Fitzpatrick, 38 St.Rep. at 1451, this Court held that the decision of the district judge not to review previously litigated issues would not be disturbed absent a clear showing of abuse of discretion, again relying on Sanders, supra.

McKenzie relies here upon dicta contained in State v. Standley (1981), ___ Mont. ___, 626 P.2d 248, 38 St.Rep. 522, and In Re McNair (1980), ___ Mont. ___, 615 P.2d 916, 37 St.Rep. 1487. In those cases, we stated that a petition for post-conviction relief under section 46-21-102, MCA, is not subject to objections based on res judicata, laches, or the statutes of limitation. Nonetheless, in those two cases, post-conviction relief was denied, in McNair for a delay of 8 1/2 years in asking for the relief, and in Standley

-5-

for a delay of 25 years. In McNair, we said such a delay raised the question of good faith on the part of the petitioner and in Standley, we pointed out the impracticability of retrial of Standley if his original plea of guilty were allowed to be withdrawn.

Nonetheless, in Spurlock v. Crist (1980), _____ Mont. _____, 614 P.2d 498, 501, 37 St.Rep. 1146, 1149, we refused to consider in a habeas corpus proceedings in this Court issues that had been previously argued and decided on appeal. In In Re Quigg (1976), 168 Mont. 512, 544 P.2d 441, cert.denied 425 U.S. 994, 96 S.Ct. 2207, 48 L.Ed.2d 818 on a petition for post-conviction relief, we refused to consider issues previously ruled on in the appeal.

The seeming double-mindedness of our stances on this point is more illusory than real. We cannot fault counsel for the defendants, whose duties are to explore every nuance of legal defense on the part of their clients, consonant with ethics and the proprieties of law, in raising such issues. It should be clear, however, that the broad statements made in McNair and Standley, supra, are not to be followed here. To be clear about it, we do not reject our statements in Standley and McNair, supra, that res judicata, laches and statutes of limitations are not a bar to post-conviction relief, or to habeas corpus, in a proper case. We do say that the concept of finality, when the appellate process has been exhausted, or the judgments of conviction have become final, must be respected as to issues which have been fully and finally litigated. Neither the district courts nor we are required to turn over ground already plowed, even in death penalty cases. Successive motions and petitions directed again and again to the same issues serve no judicial, social or individual purpose.

-6-

The problem of post-conviction relief as affected by the finality of judgments has not escaped the attention of the American Bar Association in its Standards for Criminal Justice (2d ed.). It has adopted a standard that deals with post-conviction applications in the same judicial system that conducted the original prosecution, as for example, a state prisoner seeking post-conviction relief in the state courts. Standard 22-6.1., ABA Standards for Criminal Justice (2d ed.). We adopt from that standard, as rules to be followed by district courts in this and like cases, and by us for decision in this case, the following:

(A) Any issue that has been fully and finally litigated in the proceedings leading to the judgment of the conviction should not be relitigated in post-conviction proceedings.

(B) An issue should be deemed fully and finally litigated when the highest court of the state to which a defendant could appeal his right has ruled on the merits of the question.

(C) Finality, when raised and shown by objection or affirmative defense on the part of the state is a bar to the relitigation of fully and finally litigated issues.

We will further follow the same ABA Standard by determining that claims advanced in post-conviction applications shall be decided on their merits, even though they might have been, but were not fully and finally litigated in the proceedings leading to judgments of conviction, unless barred because of abuse of process. Abuse of process occurs where an applicant raises in post-conviction proceedings a factual or legal contention which the petitioner deliberately or inexcusably failed to raise in the proceedings leading to conviction, or having raised the contention in the court, failed to pursue the matter on appeal. (ABA Standards for Criminal Justice (2d ed.) Standard 22-6.1.) Having stated

-7-

those rules, which we consider were implicit in our former rulings, it is clear that this Court should not and will not consider previously-litigated issues in this appeal and that we will sustain the District Court for refusing to consider fully and finally litigated issues in the post-conviction proceedings before it. See our discussion on this point in Fitzpatrick III, 38 St.Rep. at 1450-51.

Having so determined, we proceed to examine the issues raised in McKenzie's petition for post-conviction relief. It will be noted that some of the issues have been considered by this Court not once but two and three times. In all the annals of criminal justice in this state, we find no case in which a single defendant has received more tender legal care (using "tender" in the sense of careful and sensitive handling).

I. Search and Seizure

Petitioner contends that the District Court, in considering his application for post-conviction relief, did not address his factual allegations respecting: (1) unwritten sworn testimony purporting to support the issuance of search warrants; (2) the overbreadth or lack of specificity in the search warrant; and, (3) lack of probable cause for issuing the search warrants, and on those bases, contends he should have a hearing. The District Court refused to consider the issues further because of earlier decisions by this Court.

First we note that at the District Court level, in the criminal proceedings against him, defendant was granted a hearing on his motion to suppress the evidence produced by the search warrants and the order of suppression was denied. That denial of suppression was before this Court at all times when the McKenzie cases were being considered. We further note: (a) issue no. 1 under this heading was

considered, fully litigated and decided by this Court in McKenzie I, 557 P.2d at 1034, 1035; McKenzie II, 581 P.2d at 1211, 1212; and McKenzie III, 608 P.2d at 437. (b) issue no. 2 above was considered, fully litigated and decided by this Court in McKenzie I, 557 P.2d at 1035; McKenzie II, 581 P.2d at 1212, 1213; McKenzie III, 608 P.2d at 438. (c) issue no. 3 above was considered, fully litigated and decided by this Court in McKenzie I, 557 P.2d at 1034; McKenzie II, 581 P.2d at 1212; and McKenzie III, 608 P.2d at 437, 438, 439.

The claims of the petitioner with respect to the search and seizure category have been fully and finally decided on the merits. The District Court was correct in refusing to grant further hearings relating to those issues. We will not consider the issues further because of the finality of those earlier decisions.

The District Court noted in its order denying post-conviction relief that counsel for the petitioner had conceded at oral argument that further factual development was not required. Based on this concession, and the voluminous record in this case exploring these issues, the District Court found no denial of a full and fair hearing with respect to search and seizure. We agree.

II. Mental Defect--Trial Bifurcation--Instructions

In his application to the District Court, petitioner claims unconstitutional error against him in (1) the trial court's refusal to grant a bifurcated trial on the issue of his insanity/diminished mental capacity to commit the crime; (2) in refusing to appoint psychiatric experts to assist defense counsel and to testify for the defendant unless he submitted to an interview with an expert appointed by the court and unless reports of the interview by the experts

-9-

were submitted to the court before the testimony was presented; and (3) in admitting the testimony of the prosecution's psychiatric expert relating to petitioner's exercise of his Fifth Amendment rights to remain silent in such interview. Petitioner's brief in this Court expands those allegations to argue further (4) it was error for this Court to rely on instructions given to the jury to cure the alleged error in permitting the prosecution's psychiatric expert to testify that defendant had remained silent.

(a) The petitioner offers no authority under our law that a defendant as a matter of constitutional law is entitled to a separate jury trial on the issue of insanity or diminished mental capacity to commit the crime charged. Section 95-507(c), R.C.M. 1947, in effect at the time of petitioner's trial (now section 46-14-213(1), MCA), contemplates the issue to be decided "upon the trial." This Court held in State v. Olsen (1971), 156 Mont. 339, 343, 480 P.2d 822, 824, that a defendant who gives notice of insanity as a defense is not entitled to a bifurcated trial. We hold the same rule applicable to a defense of mental disease or defect.

(b) With respect to issue no. 2 in the above heading, there is a division of authority as to the right of an accused to expert investigation and psychiatric help under his Sixth Amendment rights, but the Ninth Circuit has held refusal of expert help does not violate due process through the Sixth and Fourteenth Amendments in state proceedings absent a showing of prejudice. Mason v. State of Arizona (9th Cir. 1974), 504 F.2d 1345. Here, petitioner has not alleged or shown any prejudice that resulted to him from the denial by the District Court in the criminal proceedings

of the motion to appoint psychiatrists to aid counsel in the defense.

(c) Under section 95-507, R.C.M. 1947, then in effect, (now section 46-14-213, MCA), it is provided that upon trial, any psychiatrist who reported under section 95-505, R.C.M. 1947, (now sections 46-14-202 and 46-14-203, MCA) may be called by either party. The statute provides that the jury may not be informed that the psychiatrist was designated by the court or by the superintendent of Warm Springs Hospital. In addition, both the prosecution and the defense may summon any other qualified psychiatrist to testify who has examined the defendant. In this case, during the criminal proceedings, when the court ordered the psychiatric interview, counsel for the defendant stated in open court that the defendant would exercise his right to remain silent as to any questions relating to the Lana Harding homicide. His silence was testified to by psychiatrists at the time of their appearances in court.

The District Court, in discussing this issue, in the application for post-conviction relief, noted that the psychiatric witnesses drew no inference as to guilt or innocence, nor did they suggest such inference to the jury. The court noted that one of the psychiatric witnesses testified that since the petitioner would shed no light on the incident, he presumed the petitioner innocent. The District Court also pointed out that during the petitioner's trial, in court's instruction no. 43, the jury was told that it was to draw no unfavorable inferences from the petitioner's silence. "In short," said the District Court, "nothing in the record shows that the State exploited the psychiatric testimony so as to burden the petitioner's Fifth Amendment right to remain silent." We agree and find no prejudice.

-11-

(d)  In connection with issue no. 4 in the above heading, it was not error for the District Court to require the defendant to submit to a psychiatric interview in this case. Under section 95-505, R.C.M. 1947, then in effect, (now section 46-14-202, MCA) it is provided that the court may order such an examination when a defendant has filed a notice of intention to rely on the defense of mental disease or defect excluding responsibility, or if there is reason to doubt his fitness to proceed, or if there is reason to believe that mental disease or defect of the defendant will otherwise become an issue in the cause. In those circumstances, a court may order a psychiatric examination and, as the District Court noted, we stated in State ex rel. Sikora v. District Ct. of 13th Jud. Dist. (1969), 154 Mont. 241, 245, 462 P.2d 897, 899, that the constitution does not "assure (a defendant) a right to so defend as to deny the state a chance to check into the truth of his position."

(e)  Further, with respect to issue no. 4 under this heading, whether it is error to rely on the general jury instructions to offset the effect of the psychiatrists testimony that the defendant remained silent during his examination, and the further contention that it is not sufficient to rely on such general instructions because there is an implied admission of guilt when a defendant relies on insanity/diminished mental capacity, in McKenzie III, 608 P.2d 455, 456, 457, this Court discussed fully the careful instructions given by the District Court in the criminal proceedings.  We have already noted that the District Court specifically informed the jury that no inference was to be drawn from the defendant's remaining silent during a psychiatric interview.  We therefore confirm

-12-

the holding of the District Court with respect to the issues raised under this heading on petitioner's application for post-conviction relief.

Before leaving this set of issues, however, we point out that in McKenzie I, 557 P.2d at 1041, 1042, 1043, and again in McKenzie II, 581 P.2d at 1215, this Court answered the petitioner's attacks on the constitutionality of our statutes relating to the notice required when a defendant intends to rely on an insanity/diminished mental capacity defense, and the procedures to be followed thereunder.

### III. Admitted Exhibits--Conduct of Trial

Petitioner's application for post-conviction relief also contended that he was denied constitutional rights in (1) the admission by the court into evidence in the criminal proceedings of inflammatory photographs of the victim, (2) in the District Court's changing of the order of trial and refusal to hold subpoenaed witnesses until the defendant's case in chief, (3) in permitting spectators to use recording devices in the courtroom, (4) in allowing an inflammatory and circus-like atmosphere to exist in the courtroom, and (5) in allowing family and friends of the victim to make emotional expressions toward the petitioner in the presence of the jury.

(a)  The contention with respect to inflammatory photographs was considered, fully litigated and decided by this Court in McKenzie II, 581 P.2d at 1218, and in McKenzie III, 608 P.2d at 443, 444.

(b)  This Court found no error in allowing FBI agents to give expert opinion testimony prior to the completion of the chain of evidence upon which the opinion was based, in McKenzie II, 581 P.2d at 1219, and in McKenzie III, 608

-13-

P.2d at 444. Petitioner's contention that the trial court in the criminal proceedings erred in failing to hold FBI agents for the duration of the trial was treated in McKenzie III, 608 P.2d at 446, 447. These issues have therefore been considered, fully litigated and decided.

(c) The tape-recording issue was considered, fully litigated and decided in McKenzie I, 557 P.2d at 1037; McKenzie II, 581 P.2d at 1124, 1125, and McKenzie III, 608 P.2d at 446.

(d and e) With respect to petitioner's contentions that a circus-like atmosphere prevailed in the criminal trial proceedings, and that the members of the family were allowed to give expression to emotional feelings and comments in the presence of the jury, we need only say there is no record in all the voluminous transcripts here to support those contentions, nor was a single objection advanced by the petitioner's counsel in the criminal proceedings on those points. The District Court, in considering the application for post-conviction relief, pointed out that the jury had been instructed to decide the case solely upon the evidence, without regard to sentiment, conjecture, sympathy or compassion, and nothing in the record discloses the jury failed to follow that instruction due to the conduct of the trial spectators. We find no error therefore, on these points raised without support in the record.

IV. Sandstrom Instructions

The petitioner contends that he was denied due process in that (1) the trial court's instructions to the jury directed the jury to find elements of the offenses charged by the use of "presumptions" and "inferences" which shifted the burden of persuasion to the defendant and allowed the jury to adopt inferences which did not follow beyond a

reasonable doubt from the facts on which they were based; (2) that the instructions contained numerous erroneous examples which (3) were designed to lead the jury to the inescapable conclusion of petitioner's guilt. In brief, petitioner contends that he has been treated inconsistently with our decision in State v. Wogamon (1980), ___ Mont. ____, 610 P.2d 1161, 1165, 37 St.Rep. 840, 846.

(a) In McKenzie III, 608 P.2d at 456, et seq., this Court fully reviewed petitioner's contentions that his conviction and sentence should be set aside in the light of Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The matter has been fully considered, litigated and decided by this Court.

(b) Petitioner's contentions that the instructions contained erroneous examples and were designed to lead inescapably to defendant's guilt were part and parcel of our consideration under the Sandstrom case and McKenzie III. Petitioner has not attempted to show in any way how the examples led the jury inescapably to his guilt and we find no such design, intentional or otherwise.

(c) We do not agree that the holding in McKenzie III is inconsistent with our holding in Wogamon. In Wogamon, we pointed out that the United States Supreme Court decision in Sandstrom had resulted in a spate of appeals to this Court claiming instructional error. We further showed in Wogamon that in all of the cases brought to us, except for the original Sandstrom decision and Wogamon, we had found no reason to set aside the convictions in those several cases on the basis of the Sandstrom instruction. Wogamon, 610 P.2d at 1164. Nor can it be said that we have given petitioner a different kind of legal treatment than we provided

-15-

<u>Wogamon</u>. In <u>Wogamon</u>, we applied the principles declared by the United States Supreme Court in- In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, and in Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508. We also declared that in finding harmless error in a <u>Sandstrom</u> instruction, "we must be able to agree as a Court that the offensive instruction could not reasonably have contributed to the jury's verdict." <u>Wogamon</u>, 610 P.2d at 1165.

In the petitioner's case, in <u>McKenzie III</u>, we found that the evidence of McKenzie's guilt was so overwhelming that the <u>Sandstrom</u> instructions could not possibly have contributed to petitioner's conviction and that therefore the instructions were harmless error. The position of this Court in <u>McKenzie III</u> was not disturbed when the United States Supreme Court refused certiorari from the decision in <u>McKenzie III</u> (1980), 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507. True, two United States Supreme Court justices disagreed in a dissenting opinion. Nonetheless the majority of the Supreme Court found no reason when certiorari was sought with respect to <u>McKenzie III</u> to disturb the reliance of this Court on Milton v. Wainwright (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1, to the effect that the constitutional infirmity is excluded where overwhelming evidence supports the conviction.

Therefore, the District Court did not err in denying the petitioner's contentions under the <u>Sandstrom</u> instructions.

V. Sufficiency of the Evidence

Under this contention, petitioner claims that this court improperly rejected in <u>McKenzie III</u>, 608 P.2d at 447-448, his claim that there was insufficient evidence that Lana Harding's death resulted from a kidnapping or that she was tortured prior to her death. He further contends in brief that the standard applied by this Court in making that

-16-

determination has been repudiated as a matter of federal constitutional law in Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

(a) Of course, the issue of the sufficiency of the evidence to support the verdicts that the defendant committed deliberate homicide by torture and that as a result of her aggravated kidnapping, Lana Harding died, has been fully considered, litigated and decided by this Court in McKenzie III. 608 P.2d at 447-448.

In Jackson, it was stated that based on In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the critical inquiry on review of the sufficiency of evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether record evidence could reasonably support a finding of guilt beyond a reasonable doubt. It was stated that the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond reasonable doubt, repudiating the "no evidence" rule. Jackson, 443 U.S. at 318-320.

The contention that in McKenzie III, this Court applied an incorrect standard in determining the sufficiency of the evidence is perhaps a new issue, though implicit in our earlier statements respecting the overwhelming evidence of criminal intent is a finding of the sufficiency of the evidence. It is painful to repeat, that in the light most favorable to the State, the testimony of Dr. Pfaff was that Lana Harding was initially assaulted by means of attempted strangulation with a rope. She lived from 30 to 90 minutes

-17-

thereafter, until she was struck on the head with a heavy object. The State contended the heavy object was the manifold that was found in the defendant's pickup. She died within 2 or 3 minutes of that blow, which opened her skull and exposed her brain tissue. In addition, there were five major and a number of minor wounds to the head which may have been inflicted by the same heavy instrument or a lighter one. Other lighter metal objects were found in petitioner's pickup. Dr. Pfaff testified that Lana Harding may or may not have been conscious after the initial attempted strangulation, but there are multiple wounds which give evidence that she was in fact conscious. She had received blows to the top of the head, over the front part of her face and on the right side. The backs of both of her hands were bruised which would indicate that she was attempting to ward off the blows of her assailant. These wounds, contusions and abrasions are evidence beyond a reasonable doubt to any rational trier of fact that she was indeed tortured.

That the aggravated kidnapping resulted in her death is equally evident from the testimony. Dr. Pfaff testified that the infliction of the major wound to her head which caused her death would have resulted in extensive bleeding. He also stated that the absence of a large amount of blood in an area would indicate that the large wound was not inflicted in that area. No appreciable amount of blood was found in the teacherage in which she resided. However, a large amount of her blood was found at a place near the teacherage where petitioner had parked his pickup on the night of January 21, 1974. Her blood and brain tissue were found in the back of the pickup. A drag trail led from the teacherage to the place where the pickup had been parked.

-18-

This is evidence beyond a reasonable doubt that Lana Harding, while still alive, was dragged from the teacherage to the pickup and killed in that area. Again, to any rational trier of fact, the evidence is overwhelming that her aggravated kidnapping resulted in her death.

We find no support for petitioner's contention that this Court has applied an insufficient constitutional standard under Jackson v. Virginia, supra, or under any other case that we are aware of.

### VI. Unanimous Verdict

Under this contention, petitioner argues he was denied the right to a unanimous verdict of the jury as to his guilt or innocence as to each of the offenses charged; and, that the trial court, by instructions of law submitted to the jury listing elements of the offenses in the alternative, permitted petitioner's conviction without unanimous agreement that he had committed any one of the specific acts which constituted the crimes with which he was charged. He contends that the trial court refused an offered instruction which would have required a unanimous finding of specific acts constituting a specific offense before a verdict of guilty could be rendered and that the trial court failed to submit proper verdict forms which would have allowed the jury to make a specific finding of guilt or innocence as to each of the specific crimes charged.

The District Court, in disposing of this contention, found no federal constitutional right to a unanimous verdict in criminal jury trials, and under the state constitution, Mont. Const., art. II, § 26, found that the unanimous jury verdict provision was complied with since the trial court instructed the jury that all 12 must agree to the "findings"

-19-

and "decisions" which constituted their verdict. The District Court further determined that each theory presented to the jury was supported by substantial evidence, so that no possibility existed that the evidence was insufficient to support either verdict. Under these circumstances, the District Court concluded, the failure to require the jury to specify the theory on which it convicted did not deprive the petitioner of his right to a unanimous verdict.

Here, the jury by its verdict, found the petitioner guilty of deliberate homicide, and found that homicide was by means of torture; in another verdict, it found petitioner guilty of aggravated kidnapping, and found that the aggravated kidnapping resulted in the death of the victim. The jury had been instructed that "all twelve jurors must agree to the decision, including the additional findings you are asked to make on the Guilty of Deliberate Homicide verdict form and on the Guilty of Aggravated Kidnapping verdict form." When the verdicts were returned, the jury was polled as to each verdict and each of the said findings at the request of defendant's counsel and each of the verdicts and findings were affirmed. These verdicts and findings are not within the ambit of United States v. Gipson (5th Cir. 1977), 553 F.2d 453, or State v. Green (1980), 94 Wash.2d 216, 616 P.2d 628, for the reason that in this case, as distinguished from the cases on which petitioner relies, the evidence is sufficient here to support the jury verdict under any and all possibilities under the instructions. It is idle to speculate in this case, under the instructions of the court and the overwhelming evidence, that there is any possibility that the verdicts or the findings in this case were less than unanimous.

-20-

## VII. Equal Protection

Petitioner claims denial of equal protection under the Fourteenth Amendment of the federal constitution, and like provisions of the state constitution, in that the trial court, the District Court on his application for post-conviction relief, and this Court have denied him the benefit of established rules of state law afforded to other criminal defendants in our decisions on search and seizure. Petitioner also objects to our use of the harmless error rule on the Sandstrom instructions. In brief, he contends that he has been further discriminated against in that his is the only case of a sentence of death under a statute now repealed or superseded.

Basically, petitioner is using the Fourteenth Amendment device to raise again issues which have otherwise been fully litigated in this cause and decided against him. We have upheld the validity of the arrest and search warrants, we have explained the application of the harmless error rule under the Sandstrom instructions and we have upheld the validity of the statutes which permitted the sentence imposed upon him. McKenzie III, 608 P.2d at 450. His contentions that his rights have been discriminated against, when compared to other defendants, or that he has been discriminatorily "classed" are simply without merit.

## VIII. Legality of the Death Sentence

Petitioner contends he was unconstitutionally sentenced to death in that: (a) his death sentences were imposed in violation of the Eighth and Fourteenth Amendments of the federal constitution, in that there were no standards to channel and guide the sentencing discretion of the trial court or to provide safeguards against arbitrary and dis- criminatory impositions of the sentence of death; (b) his

sentence was disproportionate to the sentence imposed in similar cases and he was given no opportunity to show the disproportionality of his death sentence; (c) his sentence of death for aggravated kidnapping which resulted in the death of the victim was constitutionally disproportionate because the jury was not required to find that he deliberately took the life of another; (d) expert testimony agreed that petitioner suffered from a "psychiatric disorder" which should have been a mitigating circumstance; (e) the sentencing court's findings of aggravating factors are unconstitutionally vague and no standards existed by statute or case law to guide the sentencing discretion; and, (f) this Court improperly upheld his sentence based on aggravating factors which were not listed by statute. Petitioner further contends that he should not be required to bear the burden of establishing mitigating circumstances; that he is entitled to a jury trial on the mitigating facts and the sentences; that his sentences were based on erroneous factual findings drawn from incompetent, unreliable evidence, with no opportunity to rebut; that the plea agreement was breached to his disadvantage; that he is the only person sentenced to death under the 1974 Montana capital punishment law; and, that the death penalty is discriminatorily applied in Montana against impoverished male defendants accused of killing caucasians, solely upon the grounds of race, poverty and sex. He asserts no legitimate state interest is served by the death sentence, that hanging is cruel and unusual punishment.

In McKenzie III, 608 P.2d at 448-451, we held that the statute under which petitioner was sentenced to death was constitutional when considered in the light of Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346,

-22-

and Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. The constitutionality of the statute has been fully considered and decided by us.

We turn now to consider the attacks made by McKenzie with respect to the sentence imposed upon him, the death penalty.

(1) McKenzie states again that the death penalty laws applicable in his case are arbitrary and unconstitutional in that his sentence was imposed under a statute which "explicitly permitted discretionary death sentencing, without standards to channel and guide sentencing discretion or any other safeguard against arbitrary and discriminatory imposition of the sentence of death . . ."

In McKenzie III, this Court discussed these claims by the petitioner, and we found that the Montana statutory scheme in existence at the time of the crimes herein afforded defendant the procedural safeguards necessary to protect his substantive rights to be sentenced without arbitrariness or caprice, and in accordance with the United States Supreme Court cases of Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and Gregg v. Georgia, supra. The issue therefore of the constitutionality of the sentencing statutory scheme has been fully litigated and decided. McKenzie III, 608 P.2d at 448-451.

(2) McKenzie claims there is no meaningful review provided in the Montana statutory scheme to guard against passion and prejudice, arbitrariness, or disproportionality in his sentencing.

In McKenzie III, we pointed out that prompt judicial review of his death sentence was provided both by appeal to

-23-

this Court and by review in the sentence review division of this Court. This issue has been fully considered, litigated and decided. McKenzie III, 608 P.2d at 450.

(3) McKenzie claims that in his review before the Sentence Review Division, he was given no opportunity to offer evidence and the Sentence Review had no standards to make such a review.

It is clear from the record that when he was before the sentence review division, McKenzie presented no evidence, nor offered to present any evidence with respect to the proportionality or arbitrariness of his sentence. Instead, he attacked the legality, rather than the appropriateness of his sentence. The function of the Sentence Review Division was to consider the appropriateness of his sentence with respect to him as an individual offender, and as to the particular offense involved. McKenzie III, 608 P.2d at 450.

Under section 46-18-904, MCA, the sentence review division is given full authority to review the judgment so far as it relates to the sentence imposed, to either increase or decrease the penalty. In reviewing the judgment, the division may consider other records, documents or exhibits relevant to such review proceedings. When McKenzie appeared before the Sentence Review Division, he requested only that the division obtain from all 56 District Court clerks the records of sentencing in every deliberate homicide and aggravated kidnapping case since 1972. The Sentence Review Division denied this request. The District Court, in considering the application for post-conviction review, held that a proportionality review is sufficient if the Sentence Review Division considers the records of appealed cases. The review division did so consider and we agree with the District Court's conclusion.

-24-

(4) McKenzie attacks his sentence on the ground that it is disproportionate to the crimes for which he was convicted and upon the further ground that the jury did not find that he had deliberately caused the death of another.

McKenzie contends that the death penalty is disproportionate to the offense of aggravated kidnapping. In State v. Coleman (1979), ____ Mont. ___, 605 P.2d 1000, 1017, 36 St.Rep. 1134, 1150, cert.denied, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831, we pointed out that the United States Supreme Court in Gregg, made it clear that "when a life has been taken by an offender [it cannot be said] the punishment [of death] is invariably disproportionate to the crime." 428 U.S. at 187, 96 S.Ct. at 2932, 49 L.Ed.2d at 882. We distinguished Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, as being relevant only to crimes for which the penalty has been imposed which did not result in the loss of a life. In McKenzie III, 608 P.2d at 459, as the District Court noted in considering petitioner's application for post-conviction relief, we found the evidence on the issue of intent to be overwhelming, uncontradicted, and permitting of but one rational conclusion-that McKenzie intended to kidnap and kill the victim.

(5) McKenzie claims that his sentence of death is disproportionate to sentences imposed in similar cases.

In Coleman, 605 P.2d at 1021, we noted that the crime of aggravated kidnapping has been a part of our statutory law only since 1973 and that we were necessarily confined to a review of cases since that time, which we found sufficient, though not large in number. This case was used in Coleman as a comparative case and we look to Coleman in this case as a comparative case. We also find State v. Fitzpatrick

(1980), ___ Mont. ____, 606 P.2d 1343, 37 St.Rep. 194, cert.denied, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 118, to be suitable for comparison. Again, in Fitzpatrick, 606 P.2d at 1361, this case was used as a comparative case in discussing the Fitzpatrick sentence of death. Our discussions of the similarity of these cases and the proportionality of the death sentence imposed as to Coleman and Fitzpatrick, as well as to McKenzie, and our discussion of State v. Buckley (1976), 171 Mont. 238, 557 P.2d 283, appearing in Fitzpatrick, 606 P.2d at 1362, indicate that McKenzie is under a sentence that is not disproportionate to sentences that have been imposed in similar cases.

(6) McKenzie attacks his death sentence on the ground that he was suffering from a mental disease or defect denominated a "psychiatric disorder" which he claims to be a mitigating circumstance.

The District Court in considering the post-conviction application, stated: "The presence of a personality disorder does not automatically immunize a defendant from the death penalty."

The overweighing factor against the petitioner on this contention is that the jury did not find that he had suffered from a mental disease which prevented him from forming the specific intent necessary for the charged offenses. Even so, the District Court's sentencing order in the criminal proceedings shows that the factor was considered and found to be insufficient.

(7) McKenzie attacks his death sentence upon the ground that it is based on findings of aggravating factors which are unconstitutionally vague and open-ended with no channel or guide to the sentencing discretion.

-26-

This is simply another way of attacking the constitu-
tionality of the Montana sentencing statutory scheme which
as we have indicated above is constitutionality sound.

The crime of "homicide by torture" as defined by the
court's instructions and approved by us in McKenzie III, 608
P.2d at 445, is sufficiently definite to prevent an overbroad
application of the factors. Substantial evidence showed
that the victim died as a result of an aggravated kidnapping.
McKenzie III, 608 P.2d at 447-48. There is no merit in this
contention.

(8) McKenzie attacks the sentence upon the ground that
the sentencing judge relied on the aggravating factors other
than those found in our statutes.

The District Court, in considering the post-conviction
application, stated that the jury had found two specific
statutory aggravating factors and saw no reason why the
sentencing court is required not to consider a wide range of
factors in determining whether the aggravating circumstances
are outweighed by mitigating factors. For this reason, the
District Court determined, in denying McKenzie's application
for post-conviction relief, that it was not improper for the
District Court to consider: (1) the petitioner's failure to
present evidence to "mitigate his conduct," (2) his conviction
for rape, (3) his purported "dangerousness," (4) his anti-
social behavior, (5) the small number of years he would be
required to serve if a 100 year sentence were given, (6)
whether rehabilitation of petitioner was not possible; and,
(7) whether he must be executed for the protection of society.

We agree with the District Court. All of these factors
considered by the sentencing court bear on the aggravating
factors found by the jury and properly relate to the propriety
of the sentence of death.

(9) McKenzie claims that his sentence of death is based on findings from incompetent evidence, some of which was not revealed to him before trial, and against which he had no opportunity for rebuttal.

In McKenzie III, 608 P.2d at 441, 442, we rejected these contentions as to the validity of his conviction. We similarly reject these contentions with respect to the validity of his sentence.

(10) McKenzie attacks his sentence upon the ground that the District Court ignored or violated a plea agreement for a lesser sentence.

In McKenzie III, 608 P.2d at 439, we found that no plea bargain or agreement existed. This issue has been fully litigated and decided and is not a bar to the sentence imposed upon McKenzie.

(11) McKenzie attacks his death sentence because of his claim that he will be the only person executed under the 1974 capital punishment law, and that there is no rational basis to distinguish his case from others.

Again we have repeatedly stated that the statutory scheme for capital punishment as applied to McKenzie was valid, and that his sentence is not disproportionate as to the facts, the crime or his character, and we therefore reject this contention.

(12) McKenzie's contention that the Montana legislature has subsequently amended the capital punishment provision so as to provide consideration of both aggravating and mitigating circumstances, and that no such provisions existed for his benefit, is again an attack upon the constitutionality of the statutory sentencing scheme in effect with respect to him which we have previously rejected.

-28-

(13)   McKenzie attacks the death sentence upon the ground that it is being imposed both in Montana and the United States against impoverished male defendants accused of killing caucasians upon the grounds of race, poverty and sex, in a discriminatory pattern and practice.

In Fitzpatrick III, 38 St.Rep. 1448, 1454, we discussed this issue.  We find no basis for this contention and petitioner has alleged none.  Nor has petitioner offered any proof of such contention.

(14)   McKenzie further attacks his sentence upon the ground that no valid state purpose is served in imposing the penalty upon him.

In Gregg, 428 U.S. at 183, two justifications for capital punishment were noted:  retribution and deterrence.  The applicability of these as justifications present complex issues, properly left for legislative determination, and it is with the legislature that this Court will leave that determination.  There is no basis on that ground for post-conviction relief.

(15)   McKenzie attacks the imposition of a death penalty by hanging as cruel and unusual punishment.

We discussed this issue in Coleman II, 605 P.2d at 1058-59.  The issue has been fully decided by this Court.

We come finally to conclude in this case that petitioner's application for post-conviction relief in the District Court was properly denied, and that on appeal to this Court, the decision of the District Court is hereby affirmed.  We remand this cause to the District Court in which the sentence upon the defendant was imposed, for such further proceedings as are necessary to execute the sentence imposed upon the petitioner.

-29-

_____
                    Justice

We Concur:

_____
        Chief Justice

_____

_____

_____

_____
              Justices

_____
Hon. Mark Sullivan, District
Judge, Sitting for Mr. Justice
John C. Harrison


Mr. Justice Daniel J. Shea and Mr. Justice Frank B.
Morrison, Jr., will file written dissents at a later
time.

No. 81-110

McKenzie v. Osborne, et al.

Mr. Justice Frank B. Morrison, Jr.,
dissent.

November 18, 1981

FILED

NOV 18 1981

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice B. Morrison, Jr., dissenting:

I respectfully dissent from the majority opinion.

Numerous issues have been raised in this post conviction review proceeding. One issue is dispositive.

The application for a search warrant did not satisfy constitutional requirements. Therefore, the fruits of the search should have been suppressed.

The Montana Constitution, Article II, Section 11, governs the issuance of a search warrant. That section provides:

> "The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing." (Emphasis supplied.)

The constitution specifically prohibits the consideration of oral testimony in establishing probable cause necessary for the issuance of a search warrant. The probable cause must be established by a statement under oath and in writing. The constitutional mandate is clear. There are no exceptions.

The magistrate who issued the search warrant in this case stated that he found probable cause based upon the county attorney's affidavit and the testimony of a deputy sheriff. The affidavit of the county attorney is questionable because the county attorney merely acknowledged that he signed the instrument. The acknowledgement fails to state that any of the facts stated in the instrument are true. Nevertheless, this discussion will proceed assuming that the county attorney did present an affidavit to the issuing magistrate.

The affidavit of the county attorney did not establish probable cause and it was necessary for the magistrate to consider the deputy's testimony. The magistrate conceded that the deputy's testimony was the basis for the search warrant. The Supreme Court of Montana concurred.

I here offer an excerpt from the majority opinion in State v. McKenzie (1978), 177 Mont. 280, ____ p.2d ____, for the purpose of showing factual considerations relevant to the issuance of a search warrant:

> "A summary of the testimony shows Justice of the Peace Wolf testified he customarily swears all witnesses -- though he did not recall swearing the county attorney, he considered him sworn. Deputy Hoover testified he came into town about 4:30 P.M. on January 22, 1974, with directions to go to the county attorney's office; that he helped the county prepare the affidavit and he then went before Justice of the Peace Wolf and gave sworn testimony in support of the issuance of the warrants. County Attorney Nelson testified he had been at the scene with the sheriff and his deputies during the afternoon and just prior to his coming to town to get warrants issued. At the hearing, he said in answer to a question as to what knowledge he had of the facts: 'Answer. Well, without looking at the affidavit now -- I think the first paragraph or two is my statement as to what I determined, that she was missing and may have been the victim of foul play but of what nature we didn't know at the particular time, and that she resided at the teacherage.'"

The basis for magistrate Wolf issuing the search warrant is found in the testimony he gave by deposition as follows:

> "Q. Based upon the testimony of Mr. Hoover and this affidavit, you issued a warrant of arrest; A. This is correct.
>
> "Q. And you issued a search warrant? A. That is correct.
>
> "Q. Was there any other testimony or information brought to your attention that was not included in the sworn statement of Mr. Jerry Hoover, the Deputy Sheriff, or in this affidavit? Was there any other evidence brought to your attention at that time? A. Not as far as I can remember."

-32-

The Supreme Court of Montana in State v. McKenzie, supra, found that the search warrant was properly issued and in support of this finding said:

> "In addition, the county attorney examined Deputy Hoover before the justice of the peace as to facts he learned during the investigation. Here, unlike Gray, there was, in effect, sworn testimony by the county attorney and deputy sheriff in addition to the affidavit, and the combination thereof established probable cause." (Emphasis supplied.)

Both the magistrate who issued the search warrant and the members of the Supreme Court majority who affirmed the issuance of the warrant did so based upon oral testimony. This is specifically prohibited by the constitution. The only evidence which can be considered to establish probable cause is that evidence which is under oath and "reduced to writing."

There are numerous issues in this case. One can debate the merits of those issues endlessly. It is questionable that there was an affidavit submitted by the county attorney. It is doubtful that a combination of affidavit and oral testimony established probable cause. It is doubtful that the items seized during the search were adequately described in the search warrant. At least these issues are justiciable controversies about which reasonable people can disagree. I would observe that the state must be liberally indulged if a reviewing court is to find there was probable cause and that the items seized were sufficiently described in the warrant. The affirmance of these two aspects of the warrant stretches the law but perhaps not to the breaking point.

A finding of probable cause based upon oral testimony cannot be sustained without violating the constitution. This case presents a very clear and trying test for the judicial conscience. The illegally seized evidence shows

-33-

that the defendant committed this act.  The act, as illustrated
by the photographs in evidence, is so debased that any
degree of judicial objectivity is difficult to maintain.

I approach this decision realizing that the suppression
of the illegally seized evidence may well result in freeing
a very dangerous individual.  I must confess that the human
temptation is to adopt the course taken by the majority.
Post McKenzie I and McKenzie II, lawyers, in analyzing the
two opinions, have determined that the cases enunciate a new
legal principle known as the "clearly guilty rule."  In
other words, the Court was countenancing a constitutional
violation because the defendant was "clearly guilty."

When I took this oath of office I swore to uphold the
constitution.  To sustain a finding of probable cause based
upon evidence which violates a clear constitutional mandate
would violate my oath of office and would place me, as a
Justice of the Montana Supreme Court, above the law.

What I have herein said is not meant as personal criticism
of my brethren.  I know them to be honorable men -- deeply
committed to principles of justice.  However, in my judgment,
in this case, they failed to follow the law.

With deep regret, knowing the defendant likely committed
this most heinous act and knowing that this decision, if upheld
by the federal courts, could result in the defendant going
free, I nevertheless must follow the clear constitutional
directive.  Therefore, I would reverse and remand with
directions to the trial court to proceed in conformity with
this dissent.

Justice

STATE V. McKENZIE

---------------------------------------------------------

No. 81-110

DISSENT OF MR. JUSTICE DANIEL J. SHEA

---------------------------------------------------------


Dated:   January 26, 1982


FILED

JAN 26 1982

Thomas J. Kearney,
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

I dissent. However heinous, however barbarous the actions of the defendant in this case, this Court is still obligated to give full and fair review to all issues raised on appeal. We have failed miserably in that obligation.

I. INTRODUCTION

Once again I find myself dissenting to a McKenzie decision. Since the present appeal was filed, I have carefully studied other issues that either I didn't know had been raised before, or that I didn't have time to closely study due to arbitrary time limits for issuing opinions.

I was not a member of this Court when McKenzie I was decided. In McKenzie II my dissent was devoted to the search and seizure issues and the death penalty issues that had been raised. In McKenzie III, although I touched on other issues, I concentrated primarily on what I considered the failure of this Court to properly apply the harmless error rule to eight unconstitutional Sandstrom-type jury instructions--instructions which had been expressly declared unconstitutional by the United States Supreme Court. I still admit that I have not thoroughly studied all the issues raised in the first and subsequent appeals, but I have concentrated on those issues in which I believe serious, reversible error to have occurred. I have also focused on those issues the majority has either omitted entirely from discussion or dealt with in a most perfunctory and unsatisfactory manner, in essence misstating the issues. I have also devoted a good part of this dissent to the death penalty issues raised by McKenzie in his petition for post-conviction relief and which had not been raised in previous appeals to this Court. Most of those issues center on the death penalty question.

In addition to this Introduction, I divide this dissent into 9 parts. In Part II, I disapprove of this Court's

-35-

adoption in midstream of an entirely different rule for
consideration of res judicata issues than was adopted and
applied in Coleman III, infra, and Fitzpatrick III, infra.
In Part III, I develop the evidentiary record for the plea
bargain issue, and this record convinces me beyond any doubt
that an enforceable plea bargain existed, and that the State
and the trial court violated that agreement.  In Part IV,
I discuss the charges filed and the instructions given on
homicide.  I am convinced that McKenzie was convicted and
sentenced to death for the commission of an offense not
defined by Montana statutes--deliberate homicide by means of
torture.  There is a high probability that the jury in fact
convicted McKenzie of this nonexistent offense.  In Part V,
I discuss the statutory language "deliberate homicide by means
of torture."  I conclude that this language is unconstitutionally
vague, especially since it involves an aggravating circumstance
which can trigger imposition of the death penalty.  I further
conclude, in any event, that strict construction of this
phrase requires the conclusion that the jury's finding that
the deliberate homicide was committed by means of torture was
not proved, and therefore, this finding cannot be the basis
for imposing the death penalty.

In Part VI, I discuss three areas raised by McKenzie,
in which he argues that this Court has denied him equal
protection of the laws:  the search and seizure, the lesser-
included offense instructions, and the application of the
overwhelming evidence standard in declaring the eight uncon-
stitutional Sandstrom-type instructions to be harmless error.

In Part VII, I focus on several issues at trial which
convince me that McKenzie was denied a fair trial.  The
cumulative effect of these errors requires that a new trial
be ordered.

In Part VIII, I focus on the jury instructions and the multiple alternative charges--the result being that McKenzie may well have been denied his constitutional right to a unanimous jury verdict. The reasonable possibility that he was denied a unanimous jury verdict in this, a death penalty case, requires that the convictions be reversed.

In Part IX, I focus on the death penalty issues raised by McKenzie, several of which were raised in previous appeals, but most of which were raised for the first time in his petition for post-conviction relief. The way this Court has disposed of these death penalty issues convinces me that a death penalty scheme cannot be fairly and rationally administered in this state. All that is needed for a death penalty to be imposed in this state is the right combination of prosecutor and trial judge. And once the decision is made to impose the death penalty, this Court will close its eyes to the issues raised on appeal. The United States Supreme Court has imposed a mandatory duty on the highest appellate court of each state to carefully review the trial record as well as the basis for the imposition of the death penalty. Yet, we have failed miserably in undertaking this obligation.

In Part X, I simply conclude by summarizing the issues this Court either ignored or stated to be different than what McKenzie actually raised in his appeal.

This is the longest dissent I have ever written, and doubtless it could be both shorter and better written. I could not begin to estimate the hours that I have devoted to studying this case and writing this dissent, but I nonetheless apologize for taking all the space that necessarily must be devoted to this dissent. This dissent, in which I have distilled the trial record on many important issues, will demonstrate the majority opinion to be manifestly in error

where it is stated that in all the annals of criminal law history in this State, no defendant has ever been given more "tender legal care." The care given on appeal cannot be measured by the number of appeals taken nor by the number of issues disposed of. Rather, the care must be measured by whether we, as the Court, have _fairly_ discussed each issue raised, and whether we have given McKenzie a fair and even-handed application of the law that must be given to all defendants in the courts of this State. Measured by that standard, our review of these four McKenzie appeals has been an abysmal failure. It is the most telling proof that a death penalty defendant cannot receive thorough and even-handed consideration of his case by the judiciary of this state.

II.  DENIAL OF EQUAL PROTECTION:  INCONSISTENT APPLICATION
OF RES JUDICATA PRINCIPLES AS THEY RELATE TO POST-CONVICTION
RELIEF

In his appeal, McKenzie raised three equal protection arguments which have been ignored in the majority opinion. He claims that in ruling in three areas of the law--search and seizure, lesser included offense instructions, and the application of a harmless error rule to the Sandstrom-type instructions--we have created special rules for McKenzie, denying him equal protection of the laws.  Now, in addition to these issues, the majority here has added yet another denial of equal protection of the laws by adopting American Bar Association standards for determining whether issues raised in a post-conviction relief petition are res judicata.  The fact is that just a short time ago this Court adopted standards which are designed to more effectively meet the issues on the merits.

Just recently this Court adopted the framework of Sanders v. United States (1963), 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, to determine whether an issue in a post-conviction relief petition is res judicata.  See Coleman v. State (1981), ___ Mont. ___, 633 P.2d at 629-31, 38 St.Rep. at 1357-59; and Fitzpatrick v. State (1981), ___ Mont. ___, ___ P.2d ___, 38 St.Rep. at 1450-52.  Because we adopted the three part analysis of Sanders to apply to Coleman and Fitzpatrick, it seemed logical to me that we would also apply it to McKenzie. Instead, the majority adopted the more restrictive rule promulgated by the American Bar Association, and used it as the analytical framework within which to assess whether most of the issues are res judicata.  The majority has denied review of many of McKenzie's claims on that ground that they have already been "fully and finally decided."  (See the American

Bar Association rule quoted by the majority, 38 St.Rep. at 1749.) Strangely enough, the majority opinion does not ever state why the recently adopted rules of Sanders were forgotten in this case.

Although the majority opinion would have one believe that the American Bar Association standards for res judicata implicitly always have been the rule in this state, the fact is that in Coleman III and Fitzpatrick III we adopted the less restrictive rules set forth in Sanders. Under the ABA standards for res judicata, the final inquiry is whether the issue has been fully and finally decided. On the other hand, under the Sanders rules, the final inquiry is whether the ends of justice would be served by again considering the issue on its merits. This Sanders rule permits the appellate court to again consider the issue to see not only if it was decided, but to see if it was correctly decided. Obviously, if it was not correctly decided the ends of justice would be served by correcting the mistake and deciding the issue properly. But that is precisely what the majority did not want to do in this case.

If, as the majority states, the ABA standards impliedly always have been the rule in this state, why did we adopt and apply the Sanders rules in Coleman III and Fitzpatrick III? And why, if the rules always have been the same, didn't the majority simply apply the Sanders analysis instead of the ABA analysis. The answer is that a Sanders analysis would require us to change our decisions on several of the issues, and the majority has no intention of doing that.

The majority has interpreted the ABA standards to mean that the end of review comes by a bland statement that the issue has been "fully and finally decided." The effect, as

applied here, is that even if a previously decided issue was decided incorrectly, the issue is, insofar as the majority is concerned, res judicata.

Of course, the merits of the Sanders rules over the ABA rules can be debated. But we have no right to change the rules in midstream in order to provide an excuse for again not reaching the issues on the merits. It is simply another demonstration that this Court cannot be consistent when applying the laws to McKenzie. The result is that we again have denied McKenzie equal protection of the laws. See the dissenting opinion of Justices Marshall and Brennan in McKenzie v. Montana (1980), ___ U.S. ___, 101 S.Ct. 626, 627, 66 L.Ed.2d 507, 508, where they strongly chastised this Court for its uneven application of the law to McKenzie.

I have always felt that death penalty cases require the closest scrutiny on appeal. I think it especially sad that in selectively applying the more restrictive ABA standards for considering res judicata claims in McKenzie's final appeal before this Court, we have excused ourselves from determining whether we have correctly applied the law to his case. We have simply buried the constitutions a little deeper than they were in the former McKenzie appeals.

III.  PLEA BARGAIN:  THE STATE AND THE TRIAL COURT BREACHED
AN ENFORCEABLE PLEA BARGAIN

The unrefuted record demonstrates that an enforceable
plea bargain existed and that the State, with the aid of
the trial court, breached that agreement.  Proper resolution
of this issue requires that the death sentences be vacated
and that on remand the trial court be instructed to enforce
the plea bargain.

I must admit that I am more than a little shocked by
how the majority has changed the basis of its decision in
McKenzie I, 557 P.2d at 1038, to that in McKenzie III, 608
P.2d at 438-39, even though both decisions are based on the
same record.

In McKenzie I, this Court clearly recognized that a
plea bargain existed, and, in fact, stated that the State had
acknowledged it.  557 P.2d at 1038.  This Court, however,
declared that the plea bargain was unenforceable either
because the agreement was subject to a condition that the
sheriff and the victim's parents consent to the plea bargain
or because the prosecutor called the deal off before McKenzie
had entered his plea.

However, in McKenzie III, 608 P.2d at 439, in an obvious
acknowledgment that this holding in McKenzie I could not
withstand careful scrutiny, this Court apparently changed its
mind, stating that a plea bargain never did exist because
McKenzie was aware of an express condition that before he
could enter a guilty plea, the prosecutor first had to obtain
the consent of the victim's parents and the local sheriff.
And then the majority adds that the trial judge resolved the
factual dispute of whether this express condition existed by
declaring that it did not exist.  Because there was never
a hearing before the trial court on this issue, I fail to

-42-

see how the trial court could resolve it. Furthermore, the unrefuted record supports McKenzie's contention that an enforceable plea bargain existed and must be specifically enforced.

The majority opinion leaves the impression that all the facts relating to the State's position were set forth in the record, that evidence was taken, and that the trial court resolved the factual issue in favor of the State. Nothing could be further from the truth. The State's position as stated in the majority opinion was taken entirely from the State's briefs, and possibly bolstered by statements made by counsel for the State during argument of McKenzie I before this Court.

Because the majority opinion has not set forth facts in the record, and because it is only from that record that we can determine what happened, it is necessary to explain what the record does state in regard to the plea bargain negotiations and the ultimate agreement reached by the parties which although approved by the trial court, was later repudiated when the prosecutor announced that the "deal was off." 557 P.2d at 1038.

A. THE FACTS IN THE RECORD SUPPORT ONLY THE CONCLUSION THAT THERE WAS AN ENFORCEABLE PLEA BARGAIN

On Sunday, December 22, 1974, counsel for both sides met in Conrad, in the law office of defense counsel Charles Jacobson. At this time, the trial judge gave counsel for both sides the preliminary instructions. All attorneys saw problems with those instructions--including the fact that many of them were unconstitutional. The attorneys met for an extended period of time and arrived at a plea bargain agreement to be presented the next day to the trial judge for his approval.

-43-

The plea bargain was that McKenzie would withdraw his pleas of not guilty and plead guilty to the offense of deliberate homicide committed in the course of committing felony aggravated assault with a heavy weapon, in exchange for a 50-year prison sentence. McKenzie would also plead guilty to another charge of felony aggravated assault committed with a weapon, and for this crime was to receive 20 years in prison. The sentences were to run concurrently.

All counsel met in Great Falls the next day, December 23, 1974, in the chambers of the trial judge. This meeting lasted for more than three hours. The judge expressed a certain displeasure with the agreement, especially with regard to the length of the prison sentences, but nonetheless he went along with the plea bargain. The judge and counsel all agreed that on December 30, 1974, McKenzie would withdraw his not guilty pleas and plead guilty to the two charges.

After the trial judge approved the agreement, defense counsel and the prosecutors proceeded to the O'Haire Manor in Great Falls. There, acting in reliance on the approved agreement, defense counsel divulged their theories of defense to the State, and further revealed all they knew concerning the weaknesses in the State's case, so that the prosecutors would be better able to explain to the press, the public, the victim's parents, and the local sheriff why the plea bargain agreement had been made.

But, suddenly, the "deal was off." On December 28, 1974, two days before McKenzie was to appear in court and change his pleas, the prosecutor contacted defense counsel and told them that he could not perform the plea bargain agreement. He told defense counsel that the victim's father had threatened

-44-

bodily harm to McKenzie, defense counsel, and the prosecutors if the plea bargain was carried out.

McKenzie, defense counsel, and the prosecutors all met as agreed with the trial judge on December 30, 1974. Defense counsel moved the trial court to accept withdrawal of the not guilty pleas and substitute guilty pleas to the two agreed-upon charges and moved that McKenzie receive the sentences agreed to by the State and the trial court. The prosecutor objected, but at no time stated that the parties had not made a plea bargain agreement. Nor did he ever state that the agreement was subject to the consent of the victim's parents or the sheriff.

Defense counsel filed an extensive affidavit setting forth the terms of the plea bargain, and made this statement for the record, the facts of which were never refuted or denied by the State:

> "They [the prosecutors] had originally advised us that it was their desire to go to the parents of this deceased girl, and to go to the sheriff, and try to make their peace with them, with sort of the understanding that if they could not, why then all of this matter would come to naught.
>
> "Of course, this left us in a position of having someone make a decision, prior, or after, we had presented this matter in court. As long as it was prior to presenting this matter in court, why we felt that there was no real damage done; however, at the request of the prosecution, we came down here, with them, with the understanding, that we would present this matter to the court, and see whether or not we couldn't resolve the entire situation. Now, as the court well knows what the decision was, and the court decided to go along with our bargain, and the bargain had been fully acceptable by the prosecution." (Emphasis added.)

The defense's affidavit which was filed on December 30, 1974, and served on the prosecutors, more explicitly detailed the circumstances leading to the plea bargain and its approval:

"It was the Special Prosecutor's avowed <u>initial intention</u> to present this [the plea bargain] to the said Sheriff and family of the deceased before making our mutual presentation to the Court; it was the apparent understanding of all concerned, and especially this affiant, that if the Prosecution could not secure the approval of said Sheriff and the family of the deceased, that there would probably not be any necessity of presenting the situation to the Court;

". . .

"<u>The Prosecution then deemed it more expedient</u> to approach the Court with this situation prior to any other consultation; that it was never the intention of your affiant, or his co-counsel, to ever allow the Sheriff of Pondera County or the family of the deceased, to have the power to 'veto' over the negotiations then taking place, but that since contact with them would be made <u>prior to</u> our mutual approach to the Court, no harm to Defendant would be done; however, your affiant's attitude as it related to their being consulted <u>after</u> the mutual contact with the Court was <u>opposite</u> . . . if the Court refused to accept the plea bargain, the matter would be halted, or if the court accepted the offer, the Prosecution's contact with the Sheriff and family of the deceased would be for the purpose of pro forma consultation for the purpose of courtesy and to attempt to reduce the possibility of these parties causing adverse public opinion within Pondera County against either the County Attorney or the Special Prosecutor.

"That your affiant and co-counsel left this meeting [with the trial judge] with the complete and unequivocal understanding that a final and complete bargain had been struck by all parties including the Court; that counsel for the Prosecution were then going to apprise the family of the deceased and the Sheriff of Pondera County of this agreed upon situation;" (Emphasis in original.)

The affidavit further explained why the prosecutors decided to call off the plea bargain--the prosecutors had told defense counsel that they and others had been threatened with physical harm if they followed through with the agreement, and implied that they had been in contact with other district court judges who had advised them not to follow through with

-46-

the agreement. The State at no time filed a counteraffidavit or made any statement into the record refuting or denying the facts set forth in defense counsel's affidavit. The State's only response at this time was that it did not have to follow through with the plea bargain, in effect, that it had the unilateral right to abrogate that agreement.

The trial court at no time entered findings or conclusions on this issue, even though it had previously approved the plea bargain after more than a three hour session in chambers on December 23, 1974. The trial judge's only response to McKenzie's contentions was: "Well, of course, this is plea bargaining, and if they [the State] don't want to go through with plea bargaining, I don't suppose they have to." Supplemental Transcript of December 30, 1974 Hearing, p. 5. See Appendix to Appellant's Brief, Vol. I, Specification of Error No. 2.

After stating that the prosecutor was under no duty to proceed with the plea bargain, the trial judge confirmed the existence of the plea bargain when he specifically asked the prosecutor: "Do you want to proceed the way that you agreed with counsel last Monday, the 23rd of December . . ." (Emphasis added.) Supplemental Transcript of December 30, 1974 Hearing, p. 5. See Appendix to Appellant's Brief, Vol. I, Specification of Error No. 2.

The prosecutor responded that he did not, and the court, without any further inquiry announced that the case would go to trial. Supp. Transcript of December 30, 1974 Hearing, p. 6. See Appendix to App. Brief, Vol. I, Specification of Error No. 2.

Therefore, the majority's conclusion that a plea bargain did not exist flies directly in the face of the unrefuted record.

On January 3, 1975, five days before the trial, McKenzie again filed a motion to compel the State to honor the plea bargain. As of this date, however, there is absolutely no evidence in the record that the State even contended that it

-47-

had given veto power of the plea bargain to the victim's parents or the sheriff. Yet, the trial court summarily denied the motion, stating in a written order:

> "On January 3, 1975 defendant, through his counsel, made, filed, served and presented his 'Motion to Enforce Agreement of December 23, 1975' to the Court;
>
> "The Court having fully considered the matter upon the merits and deeming there to be no good reason for delay in the issuance of its decision upon the Motion, finds said motion to be without merit and denies the request contained in the prayer;
>
> "Therefore, it is hereby ORDERED that said Motion is denied.
>
> "DATED this 3rd day of January, 1975." Order Denying Motion to Enforce Agreement of December 23, 1974. See Appendix to Appellant's Brief, Vol. I, Specification of Error No. 2.

The order, although claiming to deny the motion on the merits, fails to state what those merits were. Did the trial court decide that an enforceable plea bargain did not exist because it was expressly conditioned on the veto power of the victim's parents or the local sheriff, or did it decide that although a plea bargain existed, it was nonetheless unenforceable because there are no Montana laws recognizing a plea bargain?

Before the start of trial, defense counsel moved unsuccessfully to disqualify the trial judge. It was urged, among other grounds, that the trial judge had already demonstrated bias and prejudice toward McKenzie by the unconstitutional instructions he had prepared, that the instructions created the nonexistent offenses of deliberate homicide by means of torture and deliberate homicide by lying in wait or ambush.

On January 8, 1974, the morning the trial began, the prosecutors asked the trial judge for permission to add 58 more witnesses to the Information. McKenzie opposed this motion, arguing that it was prejudicial to him because,

among other reasons, the defense, in relying on the plea bargain agreement, had revealed its defense and the State's weaknesses. True to form, the trial judge permitted the additional 58 witnesses. Order Granting Motion for Endorsement of Names of Witnesses on Amended Information. See Appendix to Appellant's Brief, Vol. I, Specification of Error No. 7.

After McKenzie was convicted, but before his sentencing, defense counsel filed motions for a hearing on mitigation, and for a new trial. The motion for mitigation again requested the benefit of the abrogated plea bargain by asking the court in effect, to enforce the plea bargain by not sentencing McKenzie to any more than 50 years in prison. That motion was summarily denied. In the motion for a new trial, McKenzie alleged prejudice by the addition of 58 additional witnesses on the first day of trial, and that this prejudice resulted from the prosecutor's abrogation of the plea bargain. This motion was also summarily denied.

At sentencing McKenzie again asserted that he should receive the benefit of the plea bargain by receiving no more than 50 years in prison and his motion was also summarily denied.

That is the extent of the record on the plea bargain issue, and that is the record this Court should have relied upon in deciding the plea bargain issue. But to do so would mean that McKenzie would be given affirmative relief, a result that this Court did not want. Instead, this Court chose to ignore the record.

Although the State had ample opportunity to do so, it at no time during these proceedings made a record either refuting or denying McKenzie's detailed assertions that the State unilaterally abrogated an enforceable plea bargain. I am at a loss, then, to understand how this Court was able to

reach its decisions on this issue in McKenzie I, 557 P.2d at 1038; (the issue was omitted from the McKenzie II opinion) McKenzie III, 608 P.2d at 438-39; and now in McKenzie IV, 38 St.Rep. at 1761 (which expressly relies on the McKenzie III holding). The record is barren of even the suggestion by the prosecutors that an enforceable plea bargain did not exist, just as the record is also barren of any suggestion by the State that the plea bargain was expressly subject to veto power by the victim's parents or the sheriff. The only conclusion supported by the record is that an enforceable plea bargain existed and that the State unilaterally breached that agreement.

If, in the face of the actual record, this Court desired to fashion a remedy to enable the State to back away from an enforceable plea bargain, and therefore not interfere with McKenzie's appointment with death, it was first incumbent on this Court to state the facts as they appear in the record, and then somehow decide that McKenzie is not entitled to the benefit of the plea bargain. We have denied McKenzie even the most rudimentary appellate review, let alone the meticulous appellate review mandated by the United States Supreme Court for all death penalty cases.

B. THIS COURT'S DECISION IS NOT BASED ON THE TRIAL RECORD, BUT INSTEAD IS BASED ON UNSUBSTANTIATED STATEMENTS MADE FOR THE FIRST TIME IN THE STATE'S APPELLATE BRIEFS

As already stated, this Court, in McKenzie I, clearly recognized that a plea bargain existed. But, although the opinion is as vague as vague can be, it appears that the Court either held that the plea bargain was subject to an express condition that the State prosecutors obtain the consent of the victim's father and of the sheriff, or that the plea bargain was unenforceable because McKenzie had not

-50-

entered his plea when the prosecutor surprised defense counsel by announcing that the "deal was off." 557 P.2d at 1038.

Either holding is indefensible. A holding based on recognition of an express condition of third party consent to the plea bargain is contrary to the record in this case. And a holding that a plea bargain can be unilaterally cancelled by the prosecutor before the plea is entered ignores both the essential basis of a plea bargain and the fact that here McKenzie detrimentally relied on the plea bargain.

The opinion expressed in McKenzie III and IV is indefensible because it is based not on the record, but on contentions announced for the first time in the State's appellate briefs. The opinion is further indefensible because it states that the trial court found the issue of consent in favor of the State. This ignores the fact that there was neither a hearing nor findings on this issue. This Court has in effect, manufactured a case based on a record that does not exist.

The first two paragraphs of McKenzie III, 608 P.2d at 438-39, recite what this Court considered to be McKenzie's contentions, stating several times that the events were alleged to occur "according to the defendant." Yes, indeed, even though they did occur according to the defendant, the undeniable fact is that the record was absolutely unrefuted by the State.

The next two paragraphs of McKenzie III, 608 P.2d 438-39, are devoted to discussion of the State's contentions that: the plea bargain was initiated by the defendant; the State had always maintained that any plea bargain was conditioned upon a veto by the victim's parents and the sheriff; the State

-51-

could not meet with the victim's parents until December 26; because the State could not obtain consent from the victim's parents there was no further plea bargaining; and finally, the State's assertion that McKenzie did not detrimentally rely on the plea bargain because the information given the State by the defendant was either worthless or already known.  It may well be that these truly are the State's contentions--in their appellate briefs.  But if so, the record is absolutely barren of these contentions.  The State raised these contentions for the first time when it filed its brief responding to McKenzie's assertion that the State and the trial court had violated the plea bargain.

The next paragraph of the Court's opinion in McKenzie III, 608 P.2d at 439, disposes of the issue, stating:

> "This issue turns on the existence of the alleged plea bargaining agreement. The trial judge accepted the State's version of the situation and refused to enforce the alleged agreement contended for by defendants. We hold that where, as here, the existence of any plea bargaining agreement was disputed and there is substantial evidence that none was made, there is nothing to enforce and the trial court's actions in this regard were correct."  (Emphasis added.)

This language is entirely contrary to the record--upon which an appellate court is to base its rulings.  The only evidence in the record does support McKenzie's contention that an enforceable plea bargain existed; the only evidence in the record is that the prosecutor unilaterally abrogated that agreement; and, the only evidence in the record is that the trial court never ruled on any disputed versions--for McKenzie's version was not disputed.  The trial court simply refused to enforce the plea bargain.

It is sad indeed that this Court decided this issue solely on representations made by the State in its appellate briefs.

A plea bargain, in a case such as this where the death penalty is the real issue, certainly deserves more reliable consideration than this.

Finally, in an effort to undermine McKenzie's claim that he detrimentally relied on the plea bargain, the majority again absolutely misstates the record by concluding that there was neither the contention nor proof by defense counsel that the prosecution abrogated the plea bargain in bad faith. The opinion states:

> "As we understand it, there is neither contention nor proof of bad faith by the State in its discussion with defense counsel on a plea bargain or in its effort to secure the approval of the sheriff or the victim's parents . . ." 608 P.2d at 439.

This statement absolutely flaunts the record. At the January 3, 1975 meeting with the trial court and prosecutor, defense counsel stated:

> ". . . We dealt with them [the prosecutors] in good faith, and now we do feel that they have not dealt with us in good faith. We do feel that this is a violation of the canons of ethics, specifically as it relates to candor, and specifically as it relates to letting someone else, some outside lay person, make decisions, or make legal decisions, as it relates to their conduct of this trial." (Tr. of January 3, at 16.)

The affidavit defense counsel filed and served on the prosecution before this hearing stated loudly and clearly that the prosecution had violated the Canons of Professional Ethics by acting in bad faith:

> ". . . your affiant believes, and has reason to believe, that the counsel for the State, both the County Attorney and Special Prosecutor, have misled counsel for Defendant, violated, or are attempting to violate, the rights of Defendant, and have engaged in unethical conduct in violation of the Canons of Professional Ethics and the Code of Professional Responsibility (See Canons, 5, 6, 7, 8, 9, 15, 16, 22, 24, 25, 31, 32, 35, and 41 of the Canons of Professional Ethics.)" (Defense counsel's affidavit at 5.)

-53-

The majority has simply misstated the record in order to justify its next statement that defense counsel's detrimental reliance argument is unfounded. The majority states:

> ". . . Under these circumstances any statements of defense counsel concerning weaknesses in the State's case or defense positions in connection therewith were gratuitous and premature. In any event, a trial is not a sporting contest in which the verdict turns on nondisclosure of such matters. Discovery procedures are designed and operated to remove this element and had been extensively and exhaustively utilized at the time in question." (Emphasis added.) 608 P.2d at 439.

Again, the unrefuted record demonstrates that after a 3-hour long meeting with the trial court on December 23, 1974, and after a plea bargain had been made, defense counsel met with the prosecutors at the O'Haire Manor in Great Falls and revealed their defense and the weaknesses in the State's case. This was done specifically in reliance on the plea bargain in an effort to permit the prosecution to better explain to the public, including the victim's parents and the sheriff, why the plea bargain was necessary. The details of this meeting and the reliance placed on the agreement are stated again in the unrefuted affidavit of defense counsel:

> "Subsequent to this meeting with the Court, counsel for the Prosecution and the Defendant met in the O'Haire Manor; pursuant to the tacit agreement to aid the Prosecution control the '[sic] influencing of public opinion by the Sheriff of Pondera County, your affiant outlined the strategy and those facts that would have been emphasized by the defense had this matter gone to trial; that your affiant explained to the Prosecution its problem areas of proof as visualized by counsel for the defense; that this information was provided to justify the agreement heretofore entered into and to explain to the Sheriff that it was through his own ineptitude that put the Prosecution to the problem of possibly not being able to get certain pertinent evidence before the jury, and where certain assumptions being made by the Sheriff and Prosecution were fallacious;

> "That your affiant and co-counsel left this meeting with the complete and unequivocal understanding that a final and complete bargain had been struck by all parties including the Court; that counsel for the Prosecution were then going to apprise the family of the deceased and the Sheriff of Pondera County of this agreed upon situation; . . ." (Emphasis added.)

Beyond these unrefuted allegations of detrimental reliance and good faith, I also find the majority's statement ridiculous that what the defense had revealed to the State was gratuitous, worthless, or already known. If the State had already known the weaknesses in its case, it would not have moved the court to add 58 more witnesses to the Information on the morning of trial. I have never heard of granting such a motion under such circumstances.

> "An agreement between the parties which is approved by the trial judge cannot be turned aside simply because of the exigencies of the moment. Public pressure and publicity certainly cannot justify the breach of an agreement, no matter how ill-considered the agreement may appear to have been . . . No attorney in the state could in good conscience advise his client to plead guilty and strike a bargain if that attorney cannot be assured that the prosecution must keep the bargain and not subvert the judicial process through external pressure whenever the occasion arises.

> "A plea bargain is a binding agreement between the defendant and the state which is subject to the approval of the court. When the prosecutor breaks the plea bargain, he undercuts the basis for the waiver of constitutional rights implicit in the plea. In Santobello v. New York, supra, 404 U.S. at 263, 92 S.Ct. 495, the United States Supreme Court noted that there are two alternative forms of relief available to the defendant under these circumstances. The court can permit the accused to withdraw his plea and be tried anew on the original charges, or grant specific performance of the agreement . . . In a concurring opinion, Justice Douglas emphasized that 'a court ought to accord a defendant's preference considerable, if not controlling, weight inasmuch as the fundamental rights flouted by a prosecutor's breach of a plea bargain are those of the defendant, not of the State.' Santobello v. New York, supra at 267, 92 S.Ct. at 501." State v. Tourtellotte (1977), 88 Wash.2d 579, 564 P.2d 799, 802-03.

I can only conclude that this Court's holding contrary to the undisputed record that there was no plea bargain is but another example of the arbitrary manner in which this State handles those cases where the underlying issue is whether a person is going to live or die. If this had been

a run of the mill case, I have no doubt that this Court would have given this issue more careful consideration and concluded that there was an enforceable plea bargain. But somehow, this Court has adopted the policy that upholding a death sentence is more important than carefully scrutinizing the record to determine whether the defendant's rights were protected. What we have done to McKenzie by misstating the record on this plea bargain issue is absolutely indefensible. I cannot believe that a federal court will agree that we have given McKenzie the meaningful, mandatory appellate review which we have been ordered to give to all death penalty cases.

IV. McKENZIE WAS CONVICTED OF DELIBERATE HOMICIDE BY
MEANS OF TORTURE--A CRIME NOT DEFINED IN MONTANA LAW

McKenzie claimed in his first appeal to this Court
(App. Brief, issue no. 12, Vol. II, at 178-92) and in each
of his subsequent appeals that he was convicted of
"deliberate homicide by means of torture"--a crime which is
not defined by statute in Montana. This Court, however,
has failed to address that issue in any of its opinions.
Perhaps the McKenzie IV opinion can be excepted from this
statement in the sense that it does not appear that McKenzie
again raised the issue before the District Court in his
petition for post-conviction relief  that he was convicted
of a nonexistent crime.

Nonetheless, this issue is so important, so fundamental,
that this Court cannot be excused from mentioning and
deciding the issue in either McKenzie I, McKenzie II, or
McKenzie III. This Court had an unequivocal duty to declare
either that McKenzie was not convicted of a separately
defined offense of deliberate homicide by means of torture,
or that deliberate homicide by means of torture is a crime
expressly defined by statute in Montana. This Court did
neither, but left the issue undecided. It would appear,
however, that the Court, in writing the opinion, proceeded
on the assumption that it is a substantive offense defined
by statute. On at least four occasions the majority opinion
states that McKenzie was convicted of the offense of deliberate
homicide by means of torture. See  608 P.2d at 434, 436,
438 and 457.

When I dissented to McKenzie II and III, I was unaware
that McKenzie had previously raised the issue that he had
been convicted of a nonexistent crime. However, in reviewing
the instructions in preparing a dissent to the majority's handling

-57-

Of the unconstitutional Sandstrom-type instructions in McKenzie III, it became clear to me that McKenzie may well have been convicted of a nonexistent crime which added even more to the specter of unfairness which has permeated the handling of this cause at trial and on appeal. During the present appeal, I have taken the time to examine the record more thoroughly and I am now convinced that McKenzie was convicted of and has been sentenced to hang for the crime of deliberate homicide by means of torture--a nonexistent offense in this state.

Section 94-5-101, R.C.M. 1947 (now section 45-5-101, MCA), states that "[a] person commits the offense of deliberate homicide if he purposely, knowingly or negligently causes the death of another human being." That statute then classifies criminal homicide into three categories--deliberate homicide, mitigated deliberate homicide, or negligent homicide. Section 94-5-102(1), R.C.M. 1947 (now section 45-5-102(1), MCA) states that ". . . criminal homicide constitutes deliberate homicide if (a) it is committed purposely or knowingly; or (b) it is committed while the offender is engaged in or is an accomplice in the commission of, an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape or any other felony which involves the use or threat of physical force or violence against any individual." It is obvious that neither statute mentions a substantive offense called deliberate homicide by means of torture.

Subsection (2) of section 94-5-102, R.C.M. 1947 (now section 45-5-102(1)), MCA, provides that "[a] person

convicted of the offense of deliberate homicide shall be
punished by death or life imprisonment as provided in
section 95-2206.6 through 95-2206.15, R.C.M. 1947 [now
sections 46-18-301 through 46-18-310, MCA]. . . ." The only
statutory reference to "deliberate homicide by means of
torture" is found in a sentencing statute (section 94-5-
105(1)(d), R.C.M. 1947, now section 46-18-303(a), MCA) which,
at the time of McKenzie's trial, provided:

> "(1) When a defendant is <u>convicted of the
> offense of deliberate homicide</u>, the court shall
> impose a sentence of death in the following
> circumstances, unless there are mitigating
> circumstances:
>
> "(a) The deliberate homicide was committed
> by a person serving a sentence of imprisonment
> in the state prison; or
>
> "(b) The defendant was previously convicted
> of another deliberate homicide; or
>
> "(c) The victim of the deliberate homicide
> was a peace officer killed while performing
> his duty; or
>
> "(d) <u>The deliberate homicide was committed
> by means of torture</u>; or
>
> "(e) The deliberate homicide was committed
> by a person lying in wait or ambush; or
>
> "(f) The deliberate homicide was committed
> as a part of a scheme or operation which, if
> completed, would result in the death of more
> than one person." (Emphasis added.)

The emphasized aggravating circumstance contained in
subsection (d) is that which the trial judge changed into
a substantive offense.

The Information in this case charged McKenzie with
seven counts of deliberate homicide. The first count
charged that McKenzie purposely and knowingly caused the
death of the victim. The second count charged that he
purposely and knowingly caused the death of the victim by
means of torture. The third count charged that he purposely

-59-

and knowingly caused the victim's death while committing the crimes of sexual intercourse without consent (count 4), aggravated assault causing serious bodily injury (count 5), aggravated assault causing bodily injury by use of a weapon, namely a rope (count 6), and aggravated assault causing bodily injury by use of a weapon, namely a heavy object (count 7).

The issue of whether the prosecution could charge McKenzie with one count of deliberate homicide by means of torture, and another count (among others) of deliberate homicide by means of lying in wait or ambush, was raised in this Court for the first time before McKenzie ever went to trial. See, State ex rel. McKenzie v. District Court (1974), 165 Mont. 54, 525 P.2d 1211. This case involved a petition for a writ of supervisory control, requesting that the trial court limit the charges to only those charges in which probable cause had been shown. This Court expressly ruled that the charges of deliberate homicide by means of torture and deliberate homicide by lying in wait or ambush do not constitute substantive offenses. This Court stated:

"We believe these seven counts of deliberate homicide should be reduced to two, in accordance with the alleged facts and the statutory definition of the crime. The statute tells us there are two kinds of unmitigated deliberate homicide . . . The first kind is committed when the offense is committed 'purposely or knowingly.' The second kind is committed when the offense is committed '. . . while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape or any other felony which involves the use or threat of physical force or violence against any individual.' The first count should be similar to the first count in the present information; i.e. it should simply allege that the crime was committed 'purposely and knowingly.' The second count should allege alternatively that the crime was committed while the relator was engaged in other felonies. These could include aggravated assault, sexual intercourse without consent and aggravated kidnapping.

> "It is neither appropriate nor necessary to
> base separate counts on torture or lying in
> wait, counts 2 and 3. Section 94-5-105,
> Criminal Code of 1973, deals with sentencing
> and does not define a specific crime. If
> torture or lying in wait, or both, are alleged
> as part of the second count, the defendant is
> sufficiently notified of what the prosecution
> intends to prove. If justified by the evidence,
> the court may instruct on these two features and
> ask for a special verdict on them to assist in
> fixing the penalty." State ex rel. McKenzie v.
> District Court (1974), 165 Mont. 54, 64-65, 525
> P.2d 1211, 1217. (Emphasis added.)

It appears that the prosecutor dismissed counts 2 and 3 after that ruling, but then amended the Information so that McKenzie was charged with:

> ". . . DELIBERATE HOMICIDE, a felony,. . . by
> purposely or knowingly causing the death of the
> said LANA HARDING:
>
> "1. by means of torture; or
>
> "2. by lying in wait or ambush;. . ."

I think it is fair to assume that the prosecutor intended to charge McKenzie with deliberate homicide and then additionally alleged his theories relating to the methods by which that homicide occurred. The trial judge, however, ignored this Court's ruling in State ex rel. McKenzie v. District Court, supra, and in fact, instructed the jury at both the beginning and the end of the trial that McKenzie was charged with the crimes of deliberate homicide by means of torture and deliberate homicide by lying in wait or ambush.

Both the defense counsel and the prosecutors objected to these instructions before the trial began, and they filed written objections to the instructions. The prosecutors' written objections stated:

> "That said PRELIMINARY INSTRUCTIONS include
> misstatements of the law, and are confusing
> and redundant.
>
> "That said Preliminary Instructions give no
> citation as to source or authorities.

"[Instruction no. 23] That the title 'Deliberate Homicide by Means of Torture' incorrectly states the crime charged, which is 'Deliberate Homicide' Section 94-5-102. The matter of torture arises under the punishment statute, Section 94-5-105 (1)(d). That the use of the title 'Deliberate Homicide By Means of Torture' is misleading.

"[Instruction no. 24] That the title 'Deliberate Homicide By Means of Lying in Wait or Ambush' incorrectly states the crime charged, which is 'Deliberate Homicide,' Section 94-5-105(1)(e). That the use of the title 'Deliberate Homicide by Means of Lying in Wait or Ambush' is misleading. That the use of the terms 'killing' and 'kill' is improper. Such terms are not found in any applicable statute. That the proper term is 'causes of death of,' as cited in Section 94-5-101." (Emphasis added.)

Notwithstanding the prosecutors' and defense counsel's objections to the court's proposed 'Preliminary Instructions,' the trial court determined nonetheless to give them exactly as proposed.

At the beginning of the trial, just before the trial started and the court was to give its 'Preliminary Instructions,' defense counsel again objected to the instructions creating the offense of deliberate homicide by means of torture and deliberate homicide by means of lying in wait or ambush. The following exchange took place between court and defense counsel:

"Defense counsel: Will you give us the statutory place that you find deliberate homicide by means of torture offense?

"The Court: This is punishable by death, period. They said it is a punishment offense. If they say it is a punishment offense it is an offense. In the statute you will find in the common law and in the case law, that is the only place you are going to find it." (Tr. at 183; emphasis added.)

Defense counsel lodged the following objection:

"At this point may the record indicate we object to all the instructions which any place indicate that there is an offense named deliberate homicide by means of torture, deliberate homicide by lying in wait, since we find no statute which says that such a thing exists." (Tr. at 183; emphasis added.)

-62-

The pertinent instructions which were read to the jury before the presentation of the evidence, and then taken by the jury to the jury room at the time the case was submitted to the jury, read as follows:

Instruction No. 22. Deliberate Homicide Defined.

"In this case, insofar as we are concerned with the offense of deliberate homicide, you are instructed:

"Deliberate homicide is one kind of criminal homicide. Homicide is deliberate homicide if:

"(a) it is committed either purposely or knowingly;

"(b) it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit kidnapping, or any other felony which involves the use or threat of physical force or violence against the individual.

"Proof that the defendant acted both purposely and knowingly is not required. Proof of either of said mental states is sufficient."

Instruction No. 23. Deliberate Homicide by Means of Torture Defined.

"Deliberate homicide by means of torture insofar as we are concerned with the definition thereof in this case is:

"Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:

"(a) extort anything from such person;

"(b) or to persuade such person against his or her will, or

"(c) to satisfy some untoward propensity of the assailant,

"and in so doing the assailant causes the death of the person he assaults, in the law is guilty of the offense of Deliberate Homicide by Means of Torture, whether or not it was the purpose or intention of the assailant to cause such death.

"'Untoward propensity' means any perverse, wrong, bad or corrupt inclination or tendency."

Instruction No. 24. Deliberate Homicide by Means of Lying in Wait or Ambush Defined:

"Deliberate Homicide by means of lying in wait
or ambush, insofar as we are concerned with the
definition thereof in this case is:

"Whoever conceals himself, and watches and waits
for another with the particular purpose of taking
such person unawares, and killing him, and he does
kill him is Guilty of Deliberate Homicide by means
of lying in wait or ambush."

By these instructions, the trial court unequivocally

told the jury that McKenzie was charged with three substantive

homicide offenses--deliberate homicide (instruction no. 22);

deliberate homicide by means of torture (instruction no. 23);

and deliberate homicide by means of lying in wait or ambush

(instruction no. 24). I note, however, that the charge of

deliberate homicide by means of lying in wait or ambush is

not a direct factor in the error committed in this case,

because that charge was dismissed at the conclusion of the

trial because of insufficient evidence to support it.

In instruction no. 29, the trial judge <u>distinguished</u>

the mental states that the jury must find to have accompanied

the charged acts of deliberate homicide and deliberate

homicide by means of torture. That instruction stated:

". . .

"I.

"The offense of Deliberate Homicide requires that
the voluntary act (the Killing) have been
committed by the defendant either knowingly or
purposely or that it was committed in the commission
of a forcible felony.

"II.

"<u>The offense of Deliberate Homicide by Means of
Torture</u> requires that the voluntary act (the
physical infliction of cruel suffering) be done
purposely and in addition thereto that it was done
for the particular purpose of enabling the
.assailant either:

"(a)  to extort something from the person assailed;
or

"(b)  to persuade the assailed against his or her
will;

"(c)  to satisfy some other untoward propensity
of the assailant. . . ." (Emphasis added.)

-64-

The last sentence of paragraph II told the jury that
it need not find that McKenzie intended to kill the victim
in order to find him guilty of deliberate homicide by means/
                                                    of torture.

Paragraph III of this instruction sets forth the mental
state the trial judge decided was necessary for a con-
viction of deliberate homicide while lying in wait or ambush.
However, the trial judge crossed out paragraph III with a
large X and wrote "Dismissed-Disregard" near it.

One of the final instructions to the jury (instruction
no. 54) directed the jury to first consider the charge of
deliberate homicide by means of torture before deciding any
of the remaining charges. It states in pertinent part:

> "If you adopt the Guilty of Deliberate Homicide
> verdict form you are asked to find on that form
> whether the Deliberate Homicide was by Means of
> Torture as this is the most serious of the remaining
> charges of deliberate homicide made against the
> defendant." (Emphasis added.)

Notwithstanding the fact that the trial court instructed
the jury that the charge of deliberate homicide by means of
torture was the most serious of the remaining charges (the
charge of deliberate homicide by means of lying in wait or
ambush had been dismissed), the trial court also instructed
the jury that McKenzie need not have the intent to kill his
victim in order to be convicted of the offense of deliberate
homicide by means of torture:

> Instruction No. 34. Methods of Proof Applicable
> to Deliberate Homicide by Means of Torture:
>
> "The mental state of purposely assaulting another
> physically to inflict cruel suffering upon that
> person for a particular purpose cannot be proved
> by using the legal presumptions you have been
> directed to use in the proof of deliberate
> homicide, and must be proved by the use of
> inferences alone.
>
> "Therefore, if you find from the evidence beyond
> a reasonable doubt that the defendant, on or
> about January 21, 1974, in Pondera County, Montana,

purposely assaulted Lana Harding physically
and inflicted cruel suffering upon her and in
so doing caused her death, you are permitted
to infer, that is, deduce or reason from the facts
and circumstances which are proved in connection
therewith, that he did so for one or more of the
particular purposes; either,

"(a)  to extort something from her, or

"(b)  to persuade her to do something against her
will, or

"(c)  to satisfy some other untoward propensity
of the defendant.

"And if you find one or more of said particular
purposes to have been proved beyond a reasonable
doubt and that the defendant killed her while
purposely so inflicting cruel suffering upon
her, he has committed the offense of Deliberate
Homicide by Means of Torture, whether it was
or was not his intention to kill her." (Emphasis
added.)

The problem with these confusing instructions becomes
abundantly clear when the verdict forms are considered.
The trial judge provided the jury with only one guilty
verdict form for deliberate homicide.  That verdict form
provided:

"A.  We the jury in the above-entitled cause
find the defendant guilty of the offense of
Deliberate Homicide as charged.

"B.  We further find that the Deliberate
Homicide (was) (was not) by Means of Torture.

"(Strike out the bracketed word or words which
do not apply."

In order to complete this verdict form, it was necessary
for the jury to refer to instruction no. 23 (defining
deliberate homicide by means of torture), instruction no.
29 (defining requisite mental state for deliberate homicide
by means of torture), and instruction no. 34 (methods of
proof applicable to deliberate homicide by means of torture).
Reference to these instructions established that (1) McKenzie
could be convicted of a separate offense called deliberate
homicide by means of torture, and (2) the jury could convict

for this offense <u>whether</u> <u>or</u> <u>not</u> <u>it</u> <u>was</u> <u>McKenzie's</u> <u>intent</u> <u>to</u> <u>kill</u> <u>the</u> <u>victim</u>.

The homicide conviction can be upheld against an attack that the jury convicted him of a nonexistent crime, only by a declaration of an appellate court that the erroneous jury instructions were harmless error. To reach that judgment here an appellate court would have to conclude beyond a reasonable doubt that the jury, despite the erroneous instructions, nonetheless found <u>all</u> of the elements to exist to sustain a conviction for deliberate homicide. The essential facts are not the same, however, and there is no basis to determine this question. Contrary to the deliberate homicide instructions, which require that the jury find an intent to kill the victim, the deliberate homicide by means of torture instructions permitted the jury to convict McKenzie of this offense "<u>whether</u> <u>it</u> <u>was</u> <u>or</u> <u>was</u> <u>not</u> <u>his</u> <u>intention</u> <u>to</u> <u>kill</u> <u>her</u>."

Under even the most lenient test of appellate review, an appellate court would be compelled to declare that the instructions creating and defining a nonexistent crime of deliberate homicide by means of torture were not harmless error, and in fact, that the probability is that the jury convicted McKenzie of this nonexistent crime. Because, however, this is a death penalty case, I believe that the stringent test for harmless error, as set out in Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, must be applied. Under this test, an appellate court must be prepared to declare beyond a reasonable doubt that the jury verdict was correct despite the erroneous instructions. To make that declaration/ in this case an appellate court would have to bury its head in the sand.

The jury verdict, insofar as the death penalty is concerned, is defective because a death sentence must be based on a jury decision that the defendant possessed the purpose of killing the victim. I agree with Justice White that it is violative of the Eighth Amendment to impose the death penalty without such a jury finding. Lockett v. Ohio (1978), 438 U.S. 586, 624, 98 S.Ct. 2954, 2983, 57 L.Ed.2d 973, 1002, (White, J., concurring). Instructions expressly permitted the jury to find McKenzie guilty of that offense "whether it was or was not his intention to kill" the victim. Because of these instructions, in order to uphold the death penalty, an appellate court would have to state that despite the instructions, the jury found that McKenzie did intend to kill the victim. The record in this case forecloses such a declaration.

The United States Supreme Court has made abundantly clear that any procedures at trial which diminish the reliability of the guilt determination can invalidate the imposition of a death penalty. In Beck v. Alabama (1980), 447 U.S. 625, 638, 100 S.Ct. 2382, 2389-2390, 65 L.Ed.2d 392, 403, that Court stated:

> "To insure that the death penalty is . . . imposed on the basis of 'reason rather than caprice or emotion,' [the courts] have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination." (Emphasis added.)

What can be a better case to apply this rule than here where the trial judge created and instructed the jury on a substantive offense not defined by statute, where there is the highest of probabilities that the jury convicted McKenzie of that offense--deliberate homicide by means of torture, and where the jury was also told to decide the question of

-68-

intent by the use of eight unconstitutional <u>Sandstrom</u>-type

instructions? The jury's verdict, and the sentencing court's

death sentence based on that verdict, is so unreliable that

due process requires not only that the death penalty be

vacated but that the conviction be reversed.

V.  THE EVIDENCE IS INSUFFICIENT TO SUPPORT A FINDING
THAT THE VICTIM DIED BY MEANS OF TORTURE

An issue raised in all of McKenzie's appeals, and which goes to the heart of whether a death sentence can be imposed, is his contention that there is not substantial evidence to support the jury's finding that the victim met her death by means of torture.  Nowhere in any of the four opinions issued in this case has this Court set forth the evidence which would support this finding.  The evidence discloses that the victim had been choked with a rope around her neck, and that at some point the pressure of the rope around the neck was somewhat released.  The evidence establishes that the victim's death was caused by a brutal beating with a heavy instrument which laid open the right side of her head.  However appalling the circumstances are, these facts do not establish that the victim met her death "by means of torture."

Before discussing this issue as it relates to the imposition of the death penalty, I must first preface my remarks with the horrible, procedural problems which have followed this case from beginning to end--procedural problems that belie even the suggestion that McKenzie received a fair trial.  I have already concluded in part IV of this dissent, that the jury most likely convicted McKenzie of a nonexistent crime--deliberate homicide by means of torture.  Assuming this to be the case, it matters little whether substantial evidence supports the jury's finding that the victim met her death "by means of torture." If McKenzie was convicted of a nonexistent crime, he cannot be punished for that crime, and therefore, that conviction must be reversed and dismissed.

Assuming that the jury did convict McKenzie of deliberate homicide under either section 94-5-102(a) or (b), R.C.M. 1947 (the only permissible methods by which a deliberate homicide could be charged and a conviction upheld), and further assuming

that the trial court properly instructed the jury on the definition of deliberate homicide "by means of torture," the question becomes: <u>was</u> <u>the</u> <u>victim</u> <u>tortured</u>? If substantial evidence supports the jury's finding, then the sentencing court did have a legal basis for imposing the death penalty, but if there is not substantial evidence, then the sentencing court had <u>no</u> legal basis for imposing the death penalty.

McKenzie raised this issue in his first appeal, but it was not mentioned in <u>McKenzie</u> <u>I</u> nor specifically discussed in either <u>McKenzie</u> <u>II</u> or <u>III</u>. Undoubtedly, the author of <u>McKenzie</u> <u>II</u> and <u>III</u> relied on the issues as they were stated in <u>McKenzie</u> <u>I</u>.

The only facts concerning the manner in which the death occurred were set forth in a general factual statement in <u>McKenzie</u> <u>I</u>, 557 P.2d at 1027, and repeated in <u>McKenzie</u> <u>II</u>, 587 P.2d at 1-10, and in <u>McKenzie</u> <u>III</u>, 608 P.2d at 435:

> "On the morning of January 23, Wednesday, the body of Lana Harding was found at a location called the 'drill site' in the area of K & K Wholesale Seed & Co. The body was clothed only in a shirt, sweater and bra and it was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow was one that was delivered to the head and laid open the right side. A rope was tied around her neck and there was evidence she had been strangled with it but pressure had been released so she did not die of strangulation. Entangled in her hair was a coil of wire, later shown to have come from a roll of wire found in the back of the Dodge pickup." 557 P.2d at 1027.

The Court, however, states no facts which actually support the finding that the deliberate homicide occurred by means of torture.

The Court did not elaborate in <u>McKenzie</u> <u>II</u>. The same essential facts were stated and the substantial evidence question was decided later in the opinion. The Court stated the issue as follows:

"Defendant argues the evidence is insufficient to justify the verdicts against him. He specifically argues that the evidence is insufficient to support the verdicts that defendant committed deliberate homicide by torture and that as a result of her aggravated kidnapping, Lana Harding died." 581 P.2d at 1226.

The Court did not bother to discuss the evidence supposedly supporting each of these findings. Instead, it lumped the issues together and concluded that substantial evidence did indeed exist. The Court held:

"In this case, the evidence presented to the jury did not mislead them, nor was any of it ever misrepresented to them. The evidence was sufficient to justify the jury's finding that Lana Harding was killed by means of torture and that she died as a result of her aggravated kidnapping by defendant." (Emphasis added.) 581 P.2d at 1226.

This constitutes the Court's entire analysis of the evidence and law on two issues absolutely vital to imposition of the death penalty.

Finally, in McKenzie III, 608 P.2d at 447-48, this Court again relied on the same statement of facts used in McKenzie I and II. Then, in another part of the opinion, the substantial evidence issues are again decided. In reviewing these two jury findings that are absolutely vital if a death sentence is to be upheld, the Court states:

"Defendant argues the evidence is insufficient to justify the verdicts rendered against him. He specifically argues that the evidence is insufficient to support the verdicts that defendant committed deliberate homicide by means of torture and that as a result of her aggravated kidnapping, Lana Harding died. This borders on the frivolous.. . .

"In this case, the evidence presented to the jury did not mislead them, nor was any of it ever misrepresented to them. The evidence was sufficient to justify the jury's finding that Lana Harding was killed by means of torture and that she died as a result of her aggravated kidnapping by defendant.

-72-

> "The rule is that if substantial evidence is
> found to support the verdict, it will stand.
> (Citations omitted.) Such is the case here."
> (Emphasis added.) 608 P.2d 447-448.

This again constitutes the Court's entire review of the jury's two findings.

This review of these vital questions falls far short of the careful scrutiny mandated by the United States Supreme Court in all death penalty cases.

Deliberate homicide "by means of torture" is not a self-defining term. I am uncertain whether this requires that the death actually be caused "by means of torture" or whether it is sufficient that the victim was tortured at some time before death, even though the torture did not cause the death. This language, then, fails to contain the explicit guidelines necessary to meet the exactitude required of a death penalty statute. Especially because this is a death penalty statute, I would declare it unconstitutional for vagueness. I find it strange indeed that the majority opinion has ignored the clear ambiguity of the statute. It would seem that this statute, to be constitutional, must have either one meaning or the other, but here its meaning has still been left in doubt.

A necessary corollary to the ambiguity of this statute, assuming that the statute is not unconstitutional, is that it is at least ambiguous on its face and therefore requires judicial construction to give meaning to the statute. This judicial construction, because it is a death penalty case, must be based on the premise that the statute is to be strictly construed against the State. Applied here, the State must prove not only that the victim was tortured, but also that the victim's death was caused by that torture. The evidence falls far short of this requirement.

The jury's verdict fails to disclose the basis for its decision--that is, what acts constituted the torture, and what conduct was relied on in inferring that McKenzie had the intent to torture the victim. The sentencing court's findings (based primarily on the jury's verdict) are equally vague. The only two findings on this issue state:

"4. The evidence in the case, and as found by the jury, discloses a brutal, conscienceless, <u>torture</u>, rape and deliberate killing of a human <u>being</u>.

". . .

"6. That the jury rejected the verdict form finding the defendant not guilty by reason of a mental disease or defect which excludes responsibility for criminal conduct which was submitted to them and <u>correctly</u> found <u>the</u> <u>defendant</u> <u>guilty</u> <u>of</u> <u>deliberate</u> <u>homicide</u> which <u>was</u> <u>by</u> <u>means</u> <u>of</u> <u>torture</u>, and guilty of Aggravated Kidnapping which resulted in the death of the victim." (Emphasis added.)

These findings reflect that the trial court relied on the jury's verdict. The findings are devoid of any evidence from which the trial court could conclude that the victim was in fact tortured. The jury's verdict, the trial court's findings, and this Court's three opinions fail to set forth evidence supporting a finding of deliberate homicide "by means of torture." What acts show that McKenzie <u>intended</u> to torture? What evidence shows that the victim suffered extreme pain? In fact, what evidence shows that the victim was <u>conscious</u> when any of the injuries were inflicted?

As I stated before, the term "deliberate homicide by means of torture" is not self-defining. Nor do any Montana cases or statutes define "torture." Two factors, however, are essential to "torture," and this is particularly so where the "torture" is considered to be an aggravating circumstance which may trigger imposition of the death penalty. First, the essential question is whether the defendant <u>intended</u> the

-74-

victim to suffer extreme pain before death. I find absolutely no evidence in the record that McKenzie intended to torture his victim.

Second, the death penalty statute is silent on whether it requires the State to prove that the victim did in fact suffer extreme pain before death. Torture obviously implies extreme pain, and therefore I believe that, in the absence of legislative direction, strict construction of the statute against the State requires the State to prove that the victim suffered extreme pain as a result of the torture. The legislature had the right to explicitly define the term "deliberate homicide by means of torture," but instead left the statute ambiguous. Because of the ambiguity of this statute, a doubt arises, and an appellate court must, in construing the statute in a death penalty case, give the benefit of that doubt to the accused. Beck v. Alabama (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392; Andres v. United States (1948), 333 U.S. 740, 68 S.Ct. 880, 92/ L.Ed. 1055. Strict construction demands that we require proof that the victim suffered extreme pain as a direct result of torture before her death. As I have already stated, the record does not support such a determination.

Another requirement is that the torture must have caused the victim's death. A pathologist testified that death was caused by massive blows to the head. These blows cannot be called torture, nor can it be inferred that by these blows that McKenzie intended to torture his victim. The only possible evidence of torture is the fact that a rope was wrapped around the victim's neck and at one time the pressure of the rope on the neck was somewhat released. The pathologist, however, could not establish that the victim was conscious at the time this was done, and, more importantly, he testified that death was not caused by strangulation, but by massive blows to the victim's

head.  This evidence clearly does not support a finding that death was caused "by means of torture."

Nor does the evidence establish that McKenzie _intended_ to torture the victim.  The only evidence is indirect evidence—the condition of the victim's body and the manner in which the assault took place.  It cannot be doubted that the body was savagely beaten, but murder by torture cannot be inferred either from the condition of the body or from the manner in which the assault took place.

In People v. Wiley (1976), 133 Cal.Rep. 135, 18 Cal.3d 161,  554 P.2d 881, the State of California, in seeking to uphold a murder by torture conviction, argued that torture could be inferred from the condition of the victim's body and from the manner of the assault.  In rejecting this argument, the California Supreme Court stated:

> ". . . She [the appellant] correctly notes that murder by torture cannot be inferred solely from the condition of the victim's body. (_People_ _v._ _Beyea_ (1974), 38 Cal.App.3d 176, 201, 113 Cal.Rptr. 254), or from the mode of assault or injury suffered (People v. Tubby (1949)  34 Cal.2d 72, 77, 207 P.2d 51), _but_ _other_ _evidence_ _of_ _intent_ _to_ _cause_ _suffering_ _is_ _also_ _required_.  [Citations omitted.]" (Emphasis added.)  554 P.2d at 884.

That situation applies here.  Evidence established that the victim had been savagely beaten, but the condition of her body did not establish that she was tortured.  Nor can the fact that she was choked affirmatively establish that McKenzie intended to torture her.  In People v. Bender (1945), 163 P.2d 8, 16, the California Supreme Court, in reviewing a contention that strangulation establishes the fact of torture, stated:

> "The evidence does not, as the People contend, compel the inference that the killing was murder of the first degree perpetrated by means of torture. [Citations omitted.]  Whether or not the two wounds on deceased's head, the immediate cause of death, were the result of defendant's striking her  with a blunt instrument, the evidence, as a matter of law is insufficient to prove torture.

> The killer who, heedless of the suffering of his
> victim, in hot anger and with the specific intent
> of killing, inflicts the severe pain which may
> be assumed to attend strangulation, has not in
> contemplation of the law the same intent as one
> who strangles with the intention that the victim
> shall suffer.. . ."

The Court also expressly rejected any implication in People

v. Duggan (1943), 61 Cal.App.2d 379, 143 P.2d 88, that

choking constitutes torture as a matter of law.  163 P.2d at

16.  The holding in Bender is especially applicable here

because we are interpreting a death penalty statute which must

be strictly construed against the State.  Strict construction

of the statutory language--"deliberate homicide by means of

torture"--requires an appellate court to hold that choking

does not, as a matter of law, establish torture.

Even a disagreement as to whether the statute is uncon-

stitutionally vague on its face must give way at least to a

conclusion that it must be strictly construed against the

State.  Here the evidence is insufficient to support the jury's

finding, no matter which interpretation is used.  The evidence

does not establish that McKenzie intended to cause and did in

fact cause the victim's death by means of torture.  Nor does

the evidence establish that McKenzie tortured the victim before

he caused her death by means other than torture.  Nonetheless,

strict construction requires the statute be interpreted to mean

that the death was caused by "means of torture."  The torture

must cause the death.  Here there is no evidence that any of

McKenzie's actions which might be characterized as torture by

even the most liberal interpretation of the evidence, caused

the death of the victim.  The blows to the head which caused

death are not the kind of blows which can be characterized as

torture.

Clearly, then, the finding of "deliberate homicide by

means of torture" is not supported by substantial evidence,

and therefore, a necessary prerequisite to the imposition of the

death penalty has failed.

VI.   DENIAL OF EQUAL PROTECTION OF THE LAW:   SEARCH AND
SEIZURE, LESSER-INCLUDED OFFENSE INSTRUCTIONS, AND SANDSTROM
INSTRUCTIONS

Because this Court has so inadequately dealt with the
issues raised, and has glossed over the real issue, I
quote from McKenzie's brief where he argues he has been
denied--by this Court--equal protection of the laws:

> "As discussed above, the law this Court applied
> in Petitioner's case at trial and on appeal was
> wholly inconsistent with established Montana
> authority:   on the tests and procedure for obtaining
> warrants, on submission to the jury of lesser
> included offenses clearly supported by the evidence,
> and on the harmless error test in Sandstrom violations,
> among other issues.   From the outset of this case,
> Petitioner has been placed in a class by himself on
> these points, while he has been tried under an outdated
> and unconstitutional statute applicable only to one
> case, his.

> "With all respect, Petitioner submits this Court has
> shifted the grounds for its decisions, acting con-
> sistently only in affirming Petitioner's conviction
> and death sentences.   Petitioner and Petitioner alone
> has been permitted to (be) [sic] tried by a jury
> instructed on the law so erroneous under Sandstrom
> that both he and the prosecution objected--through
> application of a 'harmless error' test uniquely
> used in this case.   Only in his case has a search
> warrant been allowed to be based on unrecorded
> 'testimony.'   Only in his case has a judge been
> allowed to refuse to instruct on a lesser included
> offense clearly warranted by the evidence submitted
> in his defense, the offense of mitigated deliberate
> homicide (see Defendant's Proposed Instruction No.
> 21, 25--an error of constitutional dimension affecting
> the reliability of his conviction.   Cf., Beck v.
> Alabama, 48 U.S.L.W. 4801 (June 20, 1980).   Only in
> his case has the repealed Montana Death Penalty Law
> been allowed to remain in force after a new law, with
> different protections, was enacted.

> "This allegation is not based on Petitioner's
> observation alone.   Cf., State v. McKenzie, supra,
> 608 P.2d at 459-488 (Shea, J., dissenting).   Petitioner
> has not been fairly and equally treated in this case.
> He is entitled to the same rights afforded any other
> criminal defendant tried in this State.   The failure
> to afford him those rights, and this death sentence
> imposed under this one-case set of legal rules,
> constitutes a fundamental denial of equal protection
> of the law."   Petitioner's Brief, pp. 20-21.

In congratulating itself on the review given to McKenzie,
the majority opinion states:

". . . It will be noted that some of the issues
have been considered by this Court not once but
two and three times. In all the annals of
criminal justice in this state, we find no case
in which a single defendant has received more
tender legal care (using 'tender' in the sense
of careful and sensitive handling)." 38 St.Rep. at 1749.

If what has happened in this case is the majority's
idea of tender legal care, I doubt that anyone in this
state would like to have his case similarly considered.
To an offer of this Court of such "careful," and "sensitive"
treatment, any person in his right mind would unhesitatingly
respond: "Thanks, but no thanks."

A. SEARCH AND SEIZURE

McKenzie's allegations on the search and seizure issues
are simple, direct, and correct. He argues that rules on
search and seizure must be applied uniformly. But he contends
that instead he has been isolated and special rules on search
and seizure have been applied to him that have not applied to
other defendants. I must agree. I state first that I adhere
to my dissent in State v. McKenzie (1978), 177 Mont. at 333,
581 P.2d at 1235, on the search and seizure questions. There,
I set out just how we had violated the Montana and United
States Constitutions in holding the search and seizure to
be valid.

But McKenzie now raises the same issues in a different
context. He contends, of course, that his constitutional
rights were violated. But his claim now is that in addition
to violating his rights directly, we have also violated his
rights because we have denied him equal protection of the
law by selecting him as the only person who does not have
constitutional rights. (McKenzie's brief on appeal, pages
5-7, 20-22.) The majority has ignored this issue except

to say that the issues are res judicata. The issue of denial of equal protection is not res judicata, however, and the majority has failed to answer it.

McKenzie first contends that the majority violated the four-corners rule, contrary to all previous and all later decisions of this Court, by permitting unwritten (and possibly even unsworn) testimony in support of an application for a search warrant. McKenzie is absolutely correct. I dissented on this issue in McKenzie II, 177 Mont. at 337, 581 P.2d at 1237, and I need not repeat that dissent here. The facts speak for themselves.

I note, furthermore, that Justice Morrison, not on this Court in any of the previous McKenzie appeals, has also decided that the search warrant application violated the constitution.

But now the majority has relied on a new res judicata rule to deny each of McKenzie's claims relating to illegal search and seizure. In denying review of these issues, we have effectively denied him equal protection of the law. The facts are irrefutable that we have applied different constitutional standards to McKenzie than to any other criminal defendant.

McKenzie's second argument contends that the application for the search warrant, and the search warrant itself were overbroad, lacking the specificity required and consequently that the search was converted into an unconstitutional general search--a dragnet operation. Again, I agree. I dissented on this issue in McKenzie II, 177 Mont. at 333, 581 P.2d at 1236, and I need not repeat that dissent here.

And just as surely, the majority cannot take refuge in the special McKenzie res judicata rule applied here.

Never has this Court permitted a search warrant, and never has this Court permitted a search as broad and general as was undertaken in this case. We have singled out McKenzie as one who cannot assert that the search was converted into a general dragnet operation devoid of any constitutional restraints.

Third, McKenzie argues that even assuming probable cause evidence could be received beyond the confines of the search warrant application, probable cause still did not exist for the issuance of a search warrant. Again, I agree. I dissented on this issue in McKenzie II, 177 Mont. at 382, 581 P.2d at 1263, and I need not repeat that dissent here.

This issue has never been fully and finally decided because the majority never set forth the evidence contained in the application for a search warrant. A general conclusion as to sufficiency cannot be substituted for a factual statement setting forth the evidence contained in the application. In failing to set forth this evidence, the majority has again applied different constitutional standards to McKenzie than to any other criminal defendant, and he has been denied equal protection of the law.

Fourth and finally, McKenzie has raised a search and seizure issue which this Court has steadfastly refused to mention in its opinions. Even assuming that the four-corners rule did not apply to search warrant applications, McKenzie argues that all of the evidence or testimony presented to the justice of the peace still did not establish that there were seizable items at the places to be searched. McKenzie is again correct. The application for search warrant only

describes the places to be searched, it does not state any evidentiary basis by which it can be concluded that the seizable items would be found there. Nor do any of the unrecorded statements establish a basis to conclude that seizable items would be found at the places described in the search warrant application. In fact, there is not even an attempt to establish this necessary constitutional nexus. I dissented on this issue in McKenzie II, 177 Mont. at 378, 581 P.2d at 1260, and again I need not repeat that dissent here.

Because the majority has never decided McKenzie's claim that in applying for the search warrant the State made absolutely no showing that seizable items would be found at the places to be searched, I fail to see that this issue is precluded even by this Court's application of its special McKenzie res judicata rule. How can an issue be fully and finally decided if it has been entirely ignored?

It has always been fundamental and axiomatic to constitutional law that probable cause to obtain a search warrant must include probable cause to search the place or places described in the application for the search warrant. If a reasonable basis is not provided for the magistrate to believe that seizable items are located at the place to be searched, there cannot be a search, it is as simple as that. Zurcher v. Stanford Daily (1978), 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525. See also Carroll v. United States (1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; and Brinegar v. United States (1949), 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

-82-

But here the search warrant applications made absolutely
no attempt to show a reasonable basis to believe that
seizable items would be found at the places to be searched.

Even this Court has recognized this axiomatic principle
of search and seizure law. In State v. District Court (1921),
59 Mont. 600, 198 P. 362, this Court quoted some fundamental
principles of search and seizure law from Cooley on Constitu-
tional Limitations:

> ". . . But as search warrants are a species of
> process exceedingly arbitrary in character, and
> which ought not to be resorted to except for
> very urgent and satisfactory reasons, the rules
> of law which pertain to them are of more than
> ordinary strictness; and if a party acting under
> them expects legal protection, it is essential that
> the rules be carefully observed. In the first
> place, they are only to be granted in the cases
> expressly authorized by law, and not generally in
> such cases until after a showing made before a
> judicial officer, under oath, that a crime has been
> committed and that the party complaining has
> reasonable cause to suspect that the offender, or
> the property which was the subject or the
> instrument of the crime, is concealed in some
> specified house or place. And the law, in requiring
> a showing of reasonable cause for suspicion, intends
> that evidence shall be given of such facts as shall
> satisfy the magistrate that the suspicion is well
> founded; for the suspicion itself is no ground
> for the warrant except as the facts justify it."
> (Emphasis added.) 198 P. at 365.

The situation before us is not a question of determining
how much evidence is sufficient to provide the magistrate with
reasonable grounds; rather, the situation here is that the
search warrant applications provided absolutely no basis for
the magistrate to independently determine that seizable items
were located on the premises to be searched. Because of this
major defect in the search warrant application, all items
seized pursuant to the execution of that search warrant were
illegally seized.

I have no hesitation in stating that this Court, by
denying McKenzie the fundamental constitutional protections

guaranteed by the state and federal constitutions, by its selective application of search and seizure law, has added another constitutional violation to the long list already existing--we have denied him equal protection of the laws.

B. SANDSTROM-TYPE INSTRUCTIONS

Although the Sandstrom-type instruction issue has been previously litigated, McKenzie's contention in this appeal is that in the manner we have applied the harmless error rule to the instructions, we have denied him equal protection of the laws. He says we have chosen a standard of harmless error to apply to him that we have never applied to any other defendant. To that I must agree. Not only did the majority in McKenzie III adopt a harmless error test that should never be applied to instructions, but it is true that we have never applied that test to any other defendant. That, call it by whatever other name you like, is a denial of equal protection of the laws.

Intent was an issue at the trial of this case. In Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, the United States Supreme Court held that an instruction stating that "a person is presumed to intend the consequences of his voluntary act" is unconstitutional because it shifts the burden to the defendant on an essential element of the crime--intent. The Supreme Court remanded Sandstrom to this Court to determine whether the unconstitutional instruction may have been harmless. We promptly ruled that the error was not harmless, and that Sandstrom was entitled to a new trial because we could not say beyond a reasonable doubt that the instruction had no effect on the jury's decision. State v. Sandstrom (1979), ___ Mont. ___, 603 P.2d 244, 35 St. Rep. 744.

-84-

Although the United States Supreme Court decided the
issue in _Sandstrom_, the issue had been raised by McKenzie
at his trial in January 1975 and in all of his appeals since
then.  It just so happened that because of the procedural
morass that the _McKenzie_ case has been involved in, the
United States Supreme Court first directly decided the
constitutionality of the instruction in _Sandstrom_.  After the
_Sandstrom_ decision, the United States Supreme Court (even
though McKenzie had raised many meritorious constitutional
issues other than the _Sandstrom_ instruction issue) remanded
the _McKenzie_ case back to this Court to determine whether the
_Sandstrom_-type instructions given at the _McKenzie_ trial were
harmless error.

Oddly enough, only one unconstitutional instruction was
given in the _Sandstrom_ case.  But in the _McKenzie_ case eight
of these unconstitutional jury instructions were given to the
jury.  Notwithstanding this situation, this Court, in deciding
_McKenzie III_, held that the unconstitutional instructions
were harmless error because of the overwhelming evidence of
guilt.  State v. McKenzie (1980), ___ Mont. ___, 608 P.2d
at 457, cert.den. ___ U.S. ___, 101 S.Ct. 626, 66 L.Ed.2d
507 (1980).  In my dissent to _McKenzie III_, I concluded that
the eight unconstitutional instructions could not be harmless
error.  Intent was an issue in the case and McKenzie presented
evidence that he did not have the required mental state to
be held responsible for the crime.  Surely, where intent is an
issue in the case, it cannot be stated beyond a reasonable
doubt that eight unconstitutional instructions stating
that a person is presumed to intend the consequences of his
voluntary act  are harmless error.  I further stated that

-85-

the overwhelming evidence test for harmless error cannot legitimately apply to jury instructions which have been declared unconstitutional. And finally, I pointed out that on previous occasions, in assessing the impact of the unconstitutional Sandstrom-type instruction, we had never applied the overwhelming evidence test.

After our decision in McKenzie III, McKenzie then for the third time petitioned the United States Supreme Court for a writ of certiorari--raising many important constitutional issues that this Court erroneously decided. Without comment, a majority of the members of the United States Supreme Court denied his petition for certiorari, stating only that "[t]he petition for a writ of certiorari is denied." But Justices Marshall and Brennan dissented. In an opinion stating why they would grant certiorari, they strongly criticized this Court for the way we had treated the McKenzie case. 449 U.S. 1050, 1056, 101 S.Ct. 626, 630, 66 L.Ed.2d 507, 510. In particular, they were highly critical of the method by which this Court had decided the Sandstrom issue.

In stating why certiorari should be granted on the Sandstrom issue, the dissent stated:

> ". . . A state court's analysis of harmless
> error in a typical case may not present a
> question worthy of full review by this Court,
> yet, where, as here, the death penalty is the
> result, close scrutiny is required. Because
> I find the court's analysis of harmless error
> lacking of even-handed treatment, I dissent
> from this Court's denial of certiorari." 449
> U.S. at 1051.

In describing the effect of this Court's use of this erroneous overwhelming evidence harmless error test as applied to unconstitutional jury instructions, the dissent stated:

> "The result [reached by the Montana Court]
> was perhaps inevitable once the state court
> selected the 'overwhelming evidence' of guilt

standard to analyze whether the constitutional error was harmless. For whatever value that standard may have in reviewing a verdict following introduction of evidence in violation of constitutional guarantees, see, e.g., Milton v. Wainwright, 407 U.S. 371 (1972), use of the standard actually precludes effective review of the prejudicial impact of unconstitutional jury instructions. Where isolated, tainted evidence is at issue, the reviewing court may exclude that evidence from its assessment of whether the remaining evidence supports the conviction. But where the constitutional error occurred in the jury instructions, no isolated portion of the record can be eliminated from the judicial assessment. Nor can the effect of the instructions be evaluated by examining the evidence alone, and ignoring the unconstitutional instructions. For the precise issue in such cases is the manner in which the jury could have assessed the evidence as a whole, not the importance of any particular piece of evidence to sustain the verdict. In selecting the 'overwhelming evidence' standard on the theory that 'an appellate court should review the case as a whole in assessing harmless or prejudicial error,' ___ Mont. at ___, 608 P.2d at 458, the state court neglected to review the possible effect of the unconstitutional instructions on the jury's verdict." (Emphasis added.) 449 U.S. at 1054.

The dissent then described how this Court had selectively treated the McKenzie case in applying the overwhelming evidence test to the unconstitutional Sandstrom-type instructions, and then summed up its criticism of this Court's majority opinion in McKenzie III:

"It appears that only in petitioner's case is the Montana court unwilling to apply this analysis. This seems to be yet another case in which a court sanctions 'egregious violations of the constitutional rights of criminal defendants by blandly reciting the formula 'harmless error.' Briggs v. Connecticut, 447 U.S. 912, 915 (1980), (MARSHALL and BRENNAN, JJ., dissenting). However unpleasant the facts of this or other cases may be, the courts are obligated to protect the constitutional rights of the defendant. Due to concern that petitioner's rights have not been preserved, this Court has already remanded this case twice. I can understand the Court's reluctance to entertain this case yet again, for we presume that lower courts adhere to the purposes of remands from this Court. Yet the Montana court has failed to fulfill its obligation to carry out the mandate of our decisions. Therefore, I would grant certiorari and set the case for plenary consideration." 449 U.S. at 1056-7.

The message of this dissent is crystal clear. This Court adopted an erroneous standard of harmless error in deciding the impact of the Sandstrom-type instructions. And this Court denied McKenzie equal protection of the laws by selecting him as the only recipient of the "overwhelming evidence" test as applied to unconstitutional instructions.

It is in the light of how this Court applied the harmless error analysis to one unconstitutional instruction in other cases, and how this Court then applied the harmless error analysis to eight unconstitutional Sandstrom-type instructions in his case, that McKenzie now claims this Court has denied him equal protection of the law.

McKenzie bases his equal protection argument on precisely what Justices Marshall and Brennan stated in their dissent. When McKenzie later filed his petition for post-conviction relief, he raised the equal protection argument, but the District Court totally failed to answer that argument, and now this Court has also failed to meet that issue.

The assumption of the majority is simply that the United States Supreme Court, implicitly at least, approved of this Court's application, of the overwhelming evidence test to apply to unconstitutional instructions. Although the opinion mentions that "two United States Supreme Court justices disagreed in a dissenting opinion," the opinion fails to mention that the issue raised by Justices Marshall and Brennan in their dissent is precisely the issue now raised here by McKenzie.

The majority would have the denial of certiorari to be a pronouncement on the merits. The majority states:

". . . The position of this Court in McKenzie
III was not disturbed when the United States
Supreme Court refused certiorari from the decision
in McKenzie III (1980), 449 U.S. 1050, 101 S.Ct.
626, 66 L.Ed.2d 507. True, two United States
Supreme Court justices disagreed in a dissenting
opinion. Nonetheless the majority of the
Supreme Court found no reason when certiorari was
sought with respect to McKenzie III to disturb
the reliance of this Court on Milton v. Wainwright
(1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1,
to the effect that the constitutional infirmity is
excluded where overwhelming evidence supports the
conviction." 38 St.Rep. at 1754.

The majority position is wholly unsupported by the law.
I have no idea why the United States Supreme Court denied
the petition for certiorari. The petition raised many valid
constitutional issues other than the Sandstrom-type instruction.
The order denying certiorari states only that, "[t]he petition
for a writ of certiorari is denied." By this ruling, I
cannot fathom how this Court can state that the United
States Supreme Court has ruled favorably on our adoption of
the "overwhelming evidence" test of harmless error to be
applied to unconstitutional instructions. If it has, that
Court has descended to a real low in constitutional inter-
pretation, for it then has abandoned any meaningful test of
harmless error.

I am aware of no United States Supreme Court decision
which holds that a denial of certiorari is an affirmative
ruling on the merits in favor of resolving all issues the
same way the lower court decided them. If this were so, a
denial of certiorari would also have the effect of creating
a res judicata defense to any petition brought in federal
court for a writ of habeas corpus or other post-conviction
relief. Furthermore, language of Supreme Court decisions
indicates that a denial of certiorari is not a ruling on the
merits.

In 1950, in State v. Baltimore Radio Show (1950), 338
U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562, Justice Frankfurter

stated that a denial of certiorari is not a determination on the merits. Whether he was truly speaking for the Court when he made this statement, I do not know. But if he was not, the United States Supreme Court has never, to my knowledge, made any pronouncements contrary to what was stated by Justice Frankfurter. And the general assumption is, based on Justice Frankfurter's statement, that a denial of certiorari is not a ruling on the merits.

In the February 1971 issue of Judicature, The Journal of the American Judicature Society, Vol. 64, No. 7, page 326, citing as authority Justice Frankfurter's statement in State v. Baltimore Radio Show, speaks to the effect of a denial of certiorari by the United States Supreme Court:

> "The Court has consistently articulated one such self-imposed rule: That the Justices decide whether a case should be reviewed not on the basis of their agreement or disagreement with the outcome between the parties in the lower court, but on the basis of their assessment of the intrinsic importance of the issues in controversy. A denial of review, therefore, does not mean that the Court agrees with the outcome of the case in the lower court, and a denial carries no significance as a legal precedent. As Frankfurter explained: 'It simply means that fewer than four members of the Court deemed it desirable to review a decision of the lower court as a matter of "sound judicial discretion."'" (Emphasis added.)

See also, Supreme Court Practice, Stern and Gressman (1978), pages 353-360, where the authors state that the denial of certiorari is not an affirmative statement that the lower appellate court was right.

For my part, I am sure I will always remain mystified as to why, when the United States Supreme Court states no reasons for denial, a petition for certiorari was denied. In fact, more than any case in which I have been involved or have become aware of, I am totally mystified as to why, long ago, the United States Supreme Court did not grant full

review to McKenzie on all the constitutional issues he
has raised.  Never have I seen a case, in all its aspects,
so lacking in fundamental due process.

C.  FAILURE TO GIVE LESSER-INCLUDED OFFENSE INSTRUCTION
ON THE CHARGE OF DELIBERATE HOMICIDE

An issue in each of McKenzie's appeals is his claim
that the trial court erred in refusing to give a lesser-
included offense instruction to the charge of deliberate
homicide.  Specifically, he alleged that psychiatric testimony
was introduced which, if believed, would support a conviction
of mitigated deliberate homicide rather than deliberate
homicide.  The psychiatrist testified that McKenzie was
incapable of forming the requisite criminal intent or conforming
his conduct to the requirements of the law.  If the jury
accepted his testimony, it could have found McKenzie guilty
of the lesser-included offense.  But the trial court refused
to give the instruction offered by McKenzie's counsel.  The
majority, for totally unfounded reasons, decided against him
on this issue  in McKenzie I, 557 P.2d at 1043; McKenzie II,
581 P.2d at 1224; and McKenzie III, 608 P.2d at 446.  Although
I did not dissent on this issue in any previous decision because
I concentrated on other issues and I did not have the time to
sufficiently study all claimed errors, I have now studied
this issue and am convinced that McKenzie is right.

In his petition for post-conviction relief, McKenzie
alleged not only that the trial court and this Court had
already erred in not recognizing that a lesser-included
offense instruction should have been given, McKenzie also
alleged that this Court, in holding against him, deprived him
of equal protection of the law.  He alleges, and with good
cause, that we have set McKenzie up as the lone defendant who

-91-

would not be entitled to such an instruction under the factual issue presented to the jury. He alleges we have set up special rules to apply to him in order to uphold the conviction. McKenzie is right.

It has long been the law of this state, and I am sure it is the law of most states, that a defendant charged with a crime is entitled to an instruction on any theory of defense as long as there is support in the evidence for his theory. This same law applies to a defendant's right to a lesser-included offense instructions. For example, see State v. Bouslaugh (1978), 176 Mont. 78, 576 P.2d 261, State v. Buckley (1976), 171 Mont. 238, 557 P.2d 283; and Keeble v. U.S. (1973), 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844.

McKenzie presented evidence through a psychiatrist that McKenzie was incapable of forming the intent necessary to commit the crimes charged. Based on this testimony he was certainly entitled to a lesser-included offense instruction.

Unfortunately, the majority, in each of the decisions on this issue, never mentioned the evidence existing in support of a lesser-included offense instruction. The majority's decision, in stating that no such evidence existed to justify a lesser-included offense instruction, ignores the testimony of the psychiatrist who testified for McKenzie. In effect, the majority became the finder of fact, rather than the jury. See McKenzie I, 557 P.2d at 1043; McKenzie II, 581 P.2d at 1224; McKenzie III, 608 P.2d at 446. The jury was entitled to believe the psychiatrist if it chose to do so, but it was prevented from even considering a lesser-included offense because of the trial court's failure to give appropriate instructions.

In taking the position that the evidence justified the giving of a lesser-included offense instruction, I am

fully aware that my conclusion that the jury convicted

McKenzie of deliberate homicide by means of torture--a

nonexistent offense--may appear to be inconsistent. Obviously,

a lesser-included offense instruction could be given only in

relation to the deliberate homicide charge, that is, the

jury would be instructed that it could convict McKenzie of

the lesser-included offense of mitigated deliberate homicide

(section 94-5-103, R.C.M. 1947). The deliberate homicide by

means of torture offense, however, being a creation of the

trial judge, has no lesser-included offense for the jury to

refer to. I emphasize this fact only to show how horribly

wrong the jury instructions are in this case--they are an

absolute nightmare.

VII.  McKENZIE WAS DENIED A FAIR TRIAL

McKenzie raised many issues relating to the conduct of
the trial and the instructions given to the jury. He argues
that if none of the errors are sufficient themselves to
grant a new trial, the doctrine of cumulative error certainly
requires that there be a new trial.  I have no doubt that
McKenzie should have been given a new trial even without the
benefit of the cumulative error doctrine.  On the other
hand, if ever there was a case in which to apply the doctrine
of cumulative error in granting a new trial, this is it--
this case is full of error.

A.  INFLAMMATORY AND GRUESOME PICTURES

The trial court permitted the State to introduce the
most gruesome and inflammatory pictures that can be con-
ceived. McKenzie contends that the pictures were not needed
to establish any fact, and that in any event, they were so
inflammatory and prejudicial they outweighed any possible
probative value they may have had.  I agree.  In McKenzie I,
171 Mont. at 320, 557 P.2d at 1046, (I was not then a
member of this Court), Judge Boyd, sitting for Justice
Castles, dissented on this issue and concluded that this
evidentiary error by itself entitled McKenzie to a new
trial.  Judge Boyd stressed that the pathologist testified
he did not need the pictures to explain his opinion on any
matter on which he testified, including the cause of death.

Nonetheless, the trial court admitted the pictures,
despite the fact that it and the prosecutor had agreed that
the pictures were gruesome and inflammatory, and despite the
fact that the trial court had previously instructed the
prosecutor not to offer the pictures if the pathologist did
not need them to explain his testimony.

-94-

Before the pictures were marked in front of the jury and offered as evidence, defense counsel moved in chambers to exclude the pictures. The trial court agreed that the colored picture of the victim's body at the place it was found was "gruesome" and "inflammatory." (Tr. at 519.) The prosecutors also admitted that the pictures were gruesome. (Tr. at 510-511.) The trial court specifically directed the prosecutors to ask the pathologist if he needed the pictures to explain his testimony. The court concluded by stating: "If he doesn't need it, don't offer it." (Tr. at 520.) The pathologist, being questioned by defense counsel on preliminary examination, stated in no uncertain terms that he did not need the pictures to explain his testimony. Notwithstanding this testimony and the directive of the trial court, the prosecutor nonetheless offered the gruesome pictures into evidence despite the defense counsel's objections, and the trial court admitted them.

The State made absolutely no showing that the pictures were probative or that the prejudice inherent in showing these pictures to the jury far outweighed any possible probative value. I agree with Judge Boyd, especially because this is a death penalty case, that the pictures were so inflammatory that a new trial is required.

B. ERRORS IN INSTRUCTIONS DEMAND A NEW TRIAL

The trial court, in an unusual action, gave many preliminary instructions to the jury before testimony started. McKenzie argues that it was improper in any case to give preliminary instructions, but more importantly, that these preliminary instructions were gross misstatements of the law. He also contends that many of the instructions given to the jury at the conclusion of the trial were also gross misstatements of the law, and that many were unconstitutional.

-95-

In a proper case I see no harm, and perhaps even good, in giving some preliminary instructions to the jury, particularly instructions relating to the evaluation of testimony and evidence. But here the instructions went far beyond this purpose. In fact they were so bad that the prosecutors, as well as defense counsel, objected to them.

On January 3, 1975, the prosecutors filed general written objections which can be summarized as follows:

> "The instructions are misleading and would tend to deny defendant his right to a fair trial.

> "The instructions place undue emphasis on presumptions and inference and therefore would detract the jury from properly listening to testimony and observing the exhibits admitted into evidence (these presumptions were later declared unconstitutional by the United States Supreme Court in Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed. 39).

> "The instructions are redundant and confusing to the jury, as well as being misstatements of the law.

> "The instructions fail to disclose the trial court's source for this instruction.

In addition, there were further specific objections to the instructions which can be summarized as follows:

> "There is no statutory authority for reading to the jury the Counts in the Information as part of the statement of the case.

> "The title on the charge denominated as 'Deliberate Homicide By Means of Torture" incorrectly stated the crime charged (deliberate homicide), and that the considerations of torture arises only under a punishment statute, and that this title is misleading.

> "The charge denominated as 'Deliberate Homicide By Means of Lying in Wait or Ambush' incorrectly stated the crime charged and that the consideration of whether the defendant was lying in wait or ambush arises only under a punishment statute, and that the use of this title is misleading."

The State's written objections contained many more than those I have summarized, but what I have set forth sufficiently illustrates that the State had serious, meritorious objections

to the instructions given. Notwithstanding the State's and McKenzie's objections, the trial court proceeded to give 29 preliminary instructions, including definitions for its two newly-created capital offenses: deliberate homicide by means of torture and deliberate homicide by means of lying in wait or ambush. The majority's analysis of the issues raised concerning the preliminary instructions omits even a reference to the new capital crimes created by the trial court:

> "Defendant contends the extensive preliminary instructions given by the court were erroneous, that it was error to give them prior to the introduction of evidence, and that the remaining instructions given after the presentation of evidence were wrong.

> "The preliminary instructions were the usual instructions given on the role of the jury. In addition, included were a number of instructions which set out the elements of the various crimes of which defendant was accused, and set out statutory definitions of terms used.

> "Montana's criminal code is written in clear plain language which serves well as the basis for instructions to the jury." (Emphasis added.) 608 P.2d at 444.

Had the majority properly studied the issues raised and the instructions given, it would have realized that several instructions were not only misstatements of the law, but that the instructions defined two deliberate homicide charges not defined as substantive offenses by Montana law--deliberate homicide by means of torture and deliberate homicide by means of lying in wait or ambush. Furthermore, had the majority bothered to read its own earlier case of State ex rel. McKenzie v. District Court, supra, it would have realized that the trial court instructed the jury precisely in the manner in which it was told not to do. The trial court instructed on deliberate homicide by means of torture and deliberate homicide by means of lying in wait or ambush even though this Court stated in State ex rel. McKenzie v. District Court of Ninth J.D.:

> "It is neither appropriate nor necessary to
> base separate counts on torture or lying in
> wait . . . Section 94-5-105, Criminal Code
> of 1973, deals with sentencing and does not
> define a specific crime." 525 P.2d at 1217.

And this Court further stated that references to the penalty

provisions of the Code are "unnecessary, redundant and

inflammatory." 525 P.2d at 1218.

In facing these clearly erroneous instructions, this

Court had three choices: First, this Court could have

refused to recognize the issues raised and therefore leave

them undecided, but create the appearance that they had

been decided. Second, this Court could have recognized

the issue and then engaged in an extensive analysis of

whether the instructions, although clearly erroneous, were

harmless error. Third, this Court could have done what it

should have done and granted a new trial because of the

instructions defining nonexistent capital crimes. Sadly,

this Court made the first choice and avoided the issue.

Add to this the fact that eight of the instructions

were, in one fashion or another, carbon copies of the

instructions held unconstitutional by the United States

in Sandstrom v. Montana, supra. And aside from this, the

instructions as a whole are beyond any doubt the most

confusing and inconsistent set of instructions I have ever

seen.

Errors in instructions alone require that McKenzie

have a new trial.

C. VII. THE TRIAL COURT ERRED IN REFUSING DEFENSE
COUNSEL THE RIGHT TO VOIR DIRE THE JURY ON THE ISSUE OF
MENTAL DISEASE OR DEFECT

The trial court was unjustified in refusing defense

counsel the right to question prospective jurors concerning

their attitudes on the defense of mental disease or defect.

Defense counsel did not refuse to give notice of this intent merely out of obstinacy; but refused to do so in order to preserve the issue for appeal. He had already challenged the constitutionality of the statute requiring that he give such notice, and the trial court had already ruled against him. He did not later give a formal, written notice because he wanted to, and in fact, did present the issue to this Court in an appeal. Because McKenzie dared to challenge the constitutionality of the statute, he was denied the basic right to question prospective jurors on the basic issue of the trial. The trial court's ruling can be viewed only as the punishment for challenging the constitutionality of the statute requiring that a defendant give such notice. I cannot imagine any ruling more prejudicial to a defendant at that stage of the trial. The fact that this is a capital case only adds to the error and prejudice.

The majority ruling upholding the trial court's decision ignores the facts. At no time did the State assert it was surprised by defense counsel's request to question jurors on their attitudes toward the defense of mental disease or defect; the record shows that virtually from the inception of his case, the State and trial court knew that McKenzie would be asserting this defense. In fact, several issues raised and decided in McKenzie's appeals directly relate to the issue of mental disease or defect.

First, McKenzie claimed that the State cannot constitutionally require him to give notice that he will rely on the defense of mental disease or defect, but the majority held against him. 608 P.2d at 440-441. This issue alone should have foreclosed the majority from relying on the trial court's ruling that this voir dire was not allowed due to

McKenzie's refusal to give notice. Second, McKenzie claimed that the trial court erred in refusing defense counsel's request that a psychiatrist be permitted to sit with and aid defense counsel while the State's psychiatrists were testifying, but the majority decided against him. 608 P.2d at 440. Third, McKenzie claimed that the trial court, by making his alleged diminished capacity an affirmative defense, shifted the burden to McKenzie to disprove an essential element of the offenses charged. On this issue, the United States Supreme Court vacated the judgment of this Court and remanded for a determination of whether the procedures and burdens of proof violated the principles of Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. The majority again held against McKenzie. 608 P.2d at 452-456. And fourth, McKenzie claimed that the trial court erred by refusing certain instructions he offered relating to mental disease or defect, and the majority again held against him. 608 P.2d at 440.

The situation at trial then, is that the State and the trial court were fully aware that McKenzie would rely on the defense of mental disease or defect, even though he had not given formal, written notice. And they were fully aware that McKenzie would rely on the defense of diminished capacity by contending he could not have formed the intent to commit the crimes charged. McKenzie did, in one form or another, rely on both these defenses. Surely, the trial court knew it would be error to refuse McKenzie the right to present evidence on these issues, yet it refused McKenzie's counsel the right to question prospective jurors concerning their attitudes to these defenses. Jurors could have sat on this case with a fixed belief that mental disease or defect is

an illusory and much used technical defense designed only to protect the guilty. I would presume prejudice in any case where such a fundamental right is denied, and because this is a capital case, I would consider the prejudice to be conclusive. Therefore, I would reverse and grant a new trial.

D. THE TRIAL COURT ERRED BY GRANTING THE STATE'S MOTION ON THE FIRST DAY OF TRIAL TO ADD 58 MORE WITNESSES

In my dissent, I have explained the background of the plea bargain issue (Part III), after suddenly realizing the weaknesses that defense counsel exposed in the State's case, the State knew it had to add 58 more witnesses. In any major case, it must be presumed prejudicial where defense counsel is suddenly confronted with the need to prepare for the testimony of 58 more witnesses, but certainly, a presumption of prejudice must attach in a death penalty case.

Nonetheless, the majority rationalizes its holding by a four-part analysis: First, there was no plea bargain and therefore McKenzie was not justified in relying on a plea bargain; second, through discovery and its own investigation and preparation, the State knew that it had to add the additional witnesses; third, in any event, not all of the witnesses testified and the prejudice was thereby minimized; and fourth, defense counsel waived any right to complain by not requesting a continuance in order to better prepare for all of these witnesses.

I have no doubt that a plea bargain existed, and so I must disagree with the first reason. Clearly, the defendant relied on the plea bargain in disclosing his own strategy and in revealing the weaknesses in the State's case. As to the second rationalization, there is not a scrap of evidence

in the record indicating that the State had obtained discovery from the defendant, and there is no evidence in the record that the State had independently determined that it had to add 58 more witnesses--on the first morning of trial. I also find it difficult to believe that if the State knew beforehand of the need to add 58 more witnesses, it would have waited until the start of trial before moving to do so. In fact, if this were the case, due to the State's lack of diligence, the trial court should have denied the motion.

The majority's third rationalization that not all of the 58 witnesses testified, although true, ignores the impact on defense counsel of suddenly having to prepare for the testimony of 58 more witnesses. The addition of 58 witnesses certainly must have had an impact on defense counsel's trial strategy, and certainly must have meant long hours of preparation for the testimony of these witnesses, even though they may not actually have testified. Adding these witnesses on the first day of trial undoubtedly impaired the defense counsel's ability to conduct a proper defense.

And while it is true that defense counsel did not ask for a continuance even though it could have done so, a request for a continuance would have been meaningless. The trial court, by this time, had amply demonstrated prejudice against McKenzie and his counsel, and undoubtedly would have denied a motion for a continuance. Assuming furthermore, that defense counsel had moved for a continuance, and that it had been denied, the sad record of this Court in conducting fair review in this case convinces me that the majority of this Court would have held nonetheless that McKenzie was neither prejudiced by the addition of the 58 more witnesses nor by the trial court's refusal to grant a continuance.

Nor does an order granting defense counsel the right to interview a witness immediately before that witness testifies cure any prejudice arising because of the eleventh hour addition of witnesses to the trial witness list. An interview conducted under the hectic circumstances of a trial already in progress does not give defense counsel sufficient time to prepare for either direct examination or cross-examination of the witnesses.

The majority again has been caught up in one of its many inconsistencies. If, as the majority states, the State knew from its investigation and preparation of the need to add 58 witnesses, then the State was in bad faith waiting until the first day of trial to request to add them to the list of trial witnesses and the trial court should have denied the State's motion. On the other hand it was defense counsel who, in relying on the plea bargain agreement, apprised the State of the weaknesses in its case necessitating the addition of witnesses, this situation supports a finding that McKenzie detrimentally relied on the plea bargain and had a justifiable expectation that it would be enforced.

I am convinced that a plea bargain existed and that the need to add most or all these witnesses was disclosed to the State by defense counsel in reliance on a plea bargain agreement. The errors in this case are only compounded where the State can breach a plea bargain agreement and then obtain the added benefit of bolstering its case for trial based on the disclosures of defense counsel who acted in reliance that plea bargain agreement.

For these reasons, it was reversible error for the trial court to permit addition of 58 more witnesses on the first day of trial.

E.    THE TRIAL COURT ERRED BY REFUSING TO ALLOW A PSYCHIATRIST TO SIT WITH DEFENSE COUNSEL WHILE THE STATE'S MEDICAL EXPERTS WERE GIVING THEIR TESTIMONY

In holding that the trial court properly denied defense counsel's request that a psychiatrist be allowed to sit at counsel table while the State's medical experts were testifying (608 P.2d at 447), the majority has omitted an important fact. One of the reasons that defense counsel made this request was because one of the State's psychiatrists had a pronounced Cuban-Spanish accent which made it exceedingly difficult to understand him.  He was the key psychiatric witness for the State.  For this reason, defense counsel thought it imperative to have the aid of a psychiatrist when this witness testified.

McKenzie's defense rested on mental disease or defect or diminished capacity, that is, whether he had the capacity to form the intent required to commit the crimes charged. Obviously, it was vital that defense counsel understand the nature of the examinations conducted by the State's psychiatrists and the opinions given by these psychiatrists.  Although in a normal case this might not be error, the error is manifest where, as here, the defendant is on trial for his life.

The trial court's ruling also was unfair because it did not confine the rule of exclusion of witnesses to rebuttal witnesses.  The defendant was compelled to go first by putting on its expert testimony relating to McKenzie's mental condition.  Because the State's psychiatrists were rebuttal witnesses, the trial court's ruling did not prevent them from listening to the testimony of McKenzie's expert witnesses. And even if they did not do so, the State surely had the means to convey the essence of this testimony to the State's experts before they were called to testify.

-104-

Under the circumstances, I would hold it was error to refuse defense counsel's request. Especially since his client was on trial for his life, the request was a reasonable one and should have been granted.

F. THE CUMULATIVE ERROR DOCTRINE HAS NO BASIS FOR EXISTENCE IF IT IS NOT INVOKED IN THIS CASE TO REVERSE THE CONVICTIONS

Throughout this dissent and my last two dissents, I demonstrated that McKenzie's trials were riddled with error, not merely technical error, but error affecting his substantial rights. I need not again detail that error in concluding that the cumulative error doctrine has no basis for existence if it is not invoked here to reverse the convictions. The majority could reach a contrary conclusion only by closing their eyes to the errors committed and apparently, that is what they have chosen to do.

VIII.  UNANIMOUS VERDICT REQUIREMENT

McKenzie claims that the jury's failure to disclose the basis of its verdict, since the case was based on multiple and alternative theories of criminal responsibility, denied him of the unanimous jury verdict as guaranteed by the United States and Montana Constitutions.  The majority has concluded that this right was not violated under the Montana Constitution and that there is no such right under the United States Constitution.  I believe, however, that McKenzie was denied this fundamental right under both constitutions. I fully recognize that the United States Constitution does not guarantee a unanimous verdict in a state criminal prosecution, but because this is a death penalty case I believe the United States Supreme Court would impose such a requirement in all state criminal prosecutions--it is the only way of assuring the necessary certainty before a death penalty can be imposed and upheld.

Because I do not believe that this Court can state beyond a reasonable doubt that the jury reached a unanimous verdict on any one or more the alternative theories of criminal responsibility, under the harmless error rule set forth in Chapman v. California, supra, the convictions must be reversed.

I first raised the possibility of a non-unanimous jury verdict when I dissented to McKenzie III on the issue of the unconstitutional Sandstrom-type instructions.  See 608 P.2d at 463, 474 and 482.  Similar unanimous jury verdict issues were raised in both Coleman III and Fitzpatrick III, and I filed dissents in both cases, concluding that they were denied a unanimous jury verdict.  The basis for my

conclusions is equally applicable here and therefore I shall not repeat that reasoning nor case analysis here. It is sufficient to say that the majority here has not fairly distinguished United States v. Gipson (5th Cir. 1977), 553 F.2d 453, or State v. Green (Wash. 1980), 616 P.2d 628. Further, the majority apparently has now abandoned any reliance on our own case of State v. Souhrada (1949), 122 Mont. 377, 204 P.2d 792. See Fitzpatrick III, 38 St.Rep. 1465D-65M.

A. THE HOMICIDE CONVICTION--UNANIMOUS VERDICT REQUIREMENT

Because I have concluded that the jury convicted McKenzie of deliberate homicide by means of torture--a nonexistent offense, my analysis of the unanimous jury verdict requirement must first take this conviction into account. Assuming that the jury convicted McKenzie of this offense, the conviction must nonetheless be reversed, even if the jury was unanimous. Obviously, a conviction for a crime that does not exist cannot be affirmed, regardless of whether the jury was unanimous in reaching its verdict.

On the other hand, if it can be concluded that the jury did not convict McKenzie of deliberate homicide by means of torture, but rather, of deliberate homicide, then a unanimous verdict problem is triggered. McKenzie was accused under section 94-5-102(a), R.C.M. 1947, of "purposely or knowingly" causing the death of Lana Harding, but he was also charged in the alternative under subsection 94-5-102(b), R.C.M. 1947, with causing the death of Lana Harding while committing, engaging in, or withdrawing from the commission of either sexual intercourse without consent or aggravated assault. The problem is that the jury verdict fails to reveal under which subsection of that statute it convicted McKenzie.

Furthermore, if the jury applied subsection (b), which felony did the jury find he was committing?

The underlying certainty required for any conviction that may result in a death penalty requires that the sentencing authority know precisely which theory the jury used in reaching its verdict. But here that is impossible. Neither the sentencing judge, or the judge who presided over the petition for post-conviction relief, or this Court, can determine from the record which theory of homicide the jury convicted on. The jury was not instructed that if it applied subsection (a) or that if it applied subsection (b) (and one or more of its subtheories) it must be unanimous in doing so. All doubts as to unanimity must be resolved in favor of the accused. Beck, supra; Andres, supra. The doubt here was created by the State due to the manner in which it charged McKenzie, and it was also caused by the trial court due to the manner in which it instructed the jury. McKenzie's counsel offered jury instructions and verdict forms which were more explicit, but the trial judge insisted on giving the jury the ones he had prepared. The verdict (assuming again that the jury did not convict McKenzie of deliberate homicide by means of torture) must be reversed under the harmless error test of Chapman v. California, supra.

One effect of the jury's failure to specify the basis for its verdict is that the death penalty cannot be imposed. Not only all doubts as to unanimity, but all doubts affecting the substantial rights of the accused in a death penalty case, must be resolved in favor of ~~against~~ the accused. It must be assumed therefore that the jury applied the felony-murder rule in finding McKenzie guilty. Such a finding does not carry with it a finding that McKenzie had the

purpose to kill the victim. Such a finding is necessary to the imposition of the death penalty. <u>Lockett</u>, supra. Accordingly, the death penalty cannot be imposed because of the absence of an essential <u>jury</u> finding.

B. THE AGGRAVATED KIDNAPPING CONVICTION--UNANIMOUS VERDICT REQUIREMENT

McKenzie was also charged with multiple, alternative theories of criminal responsibility on the aggravated kidnapping charge. The instructions given and the verdict form which the jury was required to use do not reveal, however, the basis it used to determine which theory it applied in reaching its guilty verdict. The jury was provided with only one guilty verdict form and one not guilty verdict form. The guilty verdict form provided that the jury make two findings: first, was McKenzie guilty of the crime of aggravated kidnapping (in essence a general verdict) and, second, did the aggravated kidnapping result in the victim's death. The jury was instructed only that its verdict and findings must be unanimous.

It can be assumed that the jury was unanimous. The jury was instructed that its findings must be unanimous and there is no basis in the record to determine otherwise. However, the validity of this finding rests in turn on the validity of the underlying aggravated kidnapping conviction. There is absolutely no basis in the record to determine which theory or theories the jury applied in convicting McKenzie of aggravated kidnapping, nor is there any basis in the record to determine whether the jury was unanimous on one or more of the theories it applied in finding McKenzie guilty.

McKenzie was charged with two counts of aggravated kidnapping, and each of these had two subcounts of criminal

responsibility. It is clear, therefore, that the jury could have split in two or more ways on the theories of criminal responsibility it applied.

For example, in Count 3, McKenzie was charged with kidnapping for the specific purpose of committing sexual intercourse without consent or for the specific purpose of committing aggravated assault. He was also separately charged with the distinct crimes of sexual intercourse without consent and with aggravated assault. However, the trial court also instructed the jury that if it convicted McKenzie of aggravated kidnapping, the jury did not have to reach a verdict on whether he was guilty of sexual intercourse without consent or guilty of aggravated assault. The jury was instructed that these were included offenses. Because, however, the jury did not reach verdicts on these separate charges, it can only be speculated whether the jury applied either the first or second theory of Count 3 in reaching its guilty verdict. And it is equally speculative as to whether the jury was unanimous on one or both the alternative charges contained in Count 3.

The same situation exists with relation to the aggravated kidnapping charge contained in Count 4. Under the third theory the jury was required to find that McKenzie knowingly or purposely restricted or secreted the victim for the specific purpose of inflicting bodily harm or of terrorizing her. Under the fourth theory, the jury was required to find that McKenzie knowingly or purposely used or threatened the use of physical force on the victim for the specific purpose of inflicting bodily injury or for terrorizing her. Again, the record is silent on whether the jury applied the third or fourth theories in Count 4, or whether it applied both in finding McKenzie guilty of

aggravated kidnapping. Nor can it be determined as to whether the jury was unanimous in applying one or both the alternative charges contained in Count 4.

The net result is that nobody can tell whether the jury found McKenzie guilty by applying the first or second theory in Count 3, or the first or second theory in Count 4. Nor can it be determined if the jury was unanimous on any one theory it may have applied in reaching its verdict. Where the overriding effect results in the death penalty, this is not an acceptable result--the certainty required in death penalty cases by the United States Supreme Court requires more than this. See Beck, supra; and Andres, supra.

I next discuss the substantial evidence question as it relates to the multiple alternative charges on which the jury was to base its verdict. I state from the outset that I have not reviewed the record--because the record was not before this Court for review.

C.   THE SUBSTANTIAL EVIDENCE QUESTION

An assumption commonly made by appellate courts is that it does not matter which theory the jury used as a basis to convict as long as it can be determined from the record that substantial evidence existed on each of the theories presented to the jury. The unstated basis for these decisions seems to be that a defendant should not worry whether the jury unanimously agreed in fact upon a single theory of criminal responsibility as long as the jury unanimously agreed that the defendant was guilty of the general crime. That is the approach taken by the majority of this Court in Coleman III, and Fitzpatrick III, to which I dissented.

-111-

In one broad statement, the majority has, without indicating what the theories are or what the evidence is, stated that substantial evidence supports each of the theories charged for each of the crimes charged. The court disposes of the issue by stating:

> ". . . These verdicts and findings are not within the ambit of United States v. Gipson (5th Cir. 1977), 553 F.2d 453, or State v. Green (1980), 94 Wash.2d 216, 616 P.2d 628, for the reason that in this case, as distinguished from the cases on which petitioner relies, the evidence is sufficient here to support the jury verdict under any and all possibilities under the instructions. It is idle to speculate in this case, under the instructions of the court and the overwhelming evidence, that there is any possibility that the verdicts or the findings in this case were less than unanimous." 38 St.Rep. at 1756.

I admit that I have not reviewed the trial record to determine whether substantial evidence exists for each of the alternatively charged theories of aggravated kidnapping and for each of the alternatively charged theories of homicide. When McKenzie's appeal of the denial of post-conviction relief was heard and decided, we did not have before us the transcripts of the trial record. The reason is that a petition for post-conviction relief is an entirely new proceeding and therefore only the transcript pertaining to that proceeding for post-conviction relief was sent to this Court. Neither the District Court nor the counsel for either side thought to have the trial transcripts sent to this Court.

A transcript of the trial does exist, however, in the State Historical Society's archives. But I have no knowledge that any member of this Court in preparation for the writing of this opinion went to the Historical Society to comb the trial transcript in an effort to determine whether there is substantial evidence to support all the theories charged.

Because this Court did not have a transcript during the consideration of <u>McKenzie</u> <u>IV</u>, I am reasonably confident that the record was not specifically reviewed to determine whether each of the theories of criminal responsibility was supported by substantial evidence. A death penalty case deserves better appellate review than this.

IX. DEATH PENALTY ISSUES

A. UNCONSTITUTIONALITY OF STATUTORY DEATH PENALTY
SCHEME

When McKenzie was charged, convicted, and sentenced,
only two statutes were in effect which had a direct bearing
on the death penalty--sections 94-5-105 and -304, R.C.M.
1947, enacted in 1973. There were no statutes setting forth
what were considered to be either aggravating factors or
mitigating factors. There were no statutes which provided
for mandatory, expedited review of a death penalty sentence.
In fact, there were no statutes which expressly provided for
any kind of review of a death sentence. Needless to say,
then, neither were there any statutes which provided the
method by which proportional review was to be conducted by
the state's highest appellate court.

As I stated in my dissent to McKenzie II, 581 P.2d at
1266 to 1277, I read the following cases to require that these
statutory procedures be followed before a death penalty
scheme can be declared constitutional on its face. Gregg v.
Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859;
Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49
L.Ed.2d 913; Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct.
2950, 49 L.Ed.2d 929; and Furman v. Georgia (1972), 408 U.S.
238, 92 S.Ct. 2726, 33 L.Ed.2d 346. Because Montana did not
have these statutory procedural protections, I concluded
that the statutory scheme for imposition of the death penalty
in this state was unconstitutional.

Despite these defects in the Montana statutory scheme,
the majority in McKenzie I, II, and III, consistently refused
to give effect to the mandates of the United States Supreme
Court. By the strangest logic and by the most tortured
statutory interpretation, the majority has papered-over several

-114-

non-death penalty statutory schemes, and out of them
created by judicial fiat, a new statutory scheme for
capital crimes. In this appeal, the majority has avoided
reviewing what the sentencing court did, and what the
majority did in McKenzie I, II, and III, by invoking the
special McKenzie post-conviction relief rule that the issues
have already been decided.

The opinion simply states: "[t]he constitutionality of
the statute has been fully considered and decided by us."
38 St.Rep. at 1758. The constitutionality of the statutes has
certainly been decided, but the constitutionality of the
statute has never been fully considered.

In McKenzie II (I was not a member of this Court when
McKenzie I was decided), I dissented to the majority's
gymnastics in making McKenzie subject to a hanging edict.
See 581 P.2d 1266 to 1277. I adhere to those views today.

I summarize here my dissent in McKenzie II, and also
comment here on the effect of an order handed down by this
Court in the Coleman case, declaring that sentence review
before the Sentence Review Board was never contemplated by
the sentence review statutes.

The majority holding in McKenzie I, II, and III, that
McKenzie could avail himself of the sentence review statutes
and ask the Sentence Review Board to review his death sentence,
is a papered-over attempt to save an obviously unconstitutional
review system. (I will have more to say in part IX of this
dissent on just what transpired at the hearing before the
Sentence Review Board.) I quoted and analyzed the sentence
review statutes in McKenzie I, and concluded that they were
never intended to apply to a defendant seeking review of a
death sentence. The sentence review scheme is devoid of

-115-

language indicating that a death penalty defendant can obtain review of that sentence before the Sentence Review Board. In fact, the statutes do not even refer to the death penalty or to a death sentence, and it is manifest that the legislature did not contemplate that the Sentence Review Board would be reviewing death sentences. (See my dissent in McKenzie II, 581 P.2d at 1273.)

Assuming, furthermore, that the Sentence Review Board had the statutory authority to review and therefore to change a death sentence to one less than death, the statutory scheme is still constitutionally deficient because this Court is not permitted to review a decision of the Sentence Review Board. The United States Supreme Court held in Gregg, Proffitt, and Jurek, supra, that a death sentence must be reviewed by the state's highest appellate court. The Sentence Review Board is not even an appellate court, much less the state's highest appellate court.

The majority opinion in McKenzie III states that the Sentence Review Board is a branch of this Court. That is not true at all. We did not create the Sentence Review Board, it was created by the legislature, and just as it was created by the legislature so can it be abolished by the legislature. On the other hand, this Court is one of the three branches of government established by the Montana Constitution and, although at times I am sure it would like to do so, the legislature cannot abolish this Court as it can abolish the Sentence Review Board.

I engage in this analysis only to demonstrate the undeniable fact that the Sentence Review Board is not the highest appellate court in this state, that its actions are

-116-

not reviewable by this Court, and, therefore, that the statutory scheme created by the majority opinion solely to uphold the constitutionality of the sentencing court's death edict  cannot possibly comply with the United States Supreme Court mandate that the state's highest appellate court must finally pass on the proportionality of the sentence.

I further note that this Court finally was caught in the web of its own logic when it was asked to determine whether Coleman was also entitled to have his death sentence reviewed by the Sentence Review Board.  After this Court affirmed in Coleman II, 605 P.2d 1000, Coleman, relying on the majority decision in McKenzie I, II, and III that McKenzie could have his death sentence reviewed by the Sentence Review Board, Coleman also applied to the Sentence Review Board for review of his death sentence.  The Board turned him down, and properly so, stating in its order of denial that it had no jurisdiction to review a death sentence.

After the Sentence Review Board denied Coleman's request, Coleman then applied to this Court for an order to compel the Sentence Review Board to review his death sentence.  As authority, he cited McKenzie III.  But this Court, in an unpublished opinion and order, upheld the Sentence Review Board, and held that the Sentence Review Board had no jurisdiction to review a death sentence.  I agreed with this holding and signed the order because it affirmed exactly what I have always been contending-- that the Sentence Review Board has no authority to review a death sentence.

That order in Coleman was handed down before McKenzie III was handed down.  In my dissent to McKenzie III, I cited and quoted from the Coleman order in support of my position that the Sentence Review Board had no jurisdiction to review

a death sentence and therefore that those statutes could not be relied on as being part of the constitutional statutory scheme relating to the death penalty. Of particular interest in the Coleman order is the statement quoted in the McKenzie III dissent and repeated here, that:

> ". . . It would not only be extra-statutory but an anomaly were we to hold that the conclusions of this Court on review of death sentences were subject to later review by the Sentence Review Division of this Court." 608 P.2d at 487.

With that I wholeheartedly agree. That is my position now and it has always been my position. And it is precisely why this Court should now review its holding that the Sentence Review Board can review the McKenzie death sentences. Sentence review before the Sentence Review Board was as anomalous for McKenzie as it was for Coleman. Yet the majority has avoided a reconsideration of this issue, even though it is demonstrably wrong, by the use of its special McKenzie post-conviction rule. To review this Court's erroneous decision would mean a favorable decision for McKenzie, and that is precisely what this Court does not want.

I have again emphasized this matter here because it vividly demonstrates the way in which the majority has twisted the law to uphold what would otherwise be a constitutionally infirm death sentence. A federal court would have to be blind and utterly insensitive to the law if it did not see through what the majority has done to McKenzie in each of his appeals. The death penalty statutory scheme is, on its face, patently unconstitutional. And the special creation of the death penalty scheme by the majority is also patently unconstitutional as applied.

B. UNCONSTITUTIONALITY OF DEATH PENALTY STATUTES MANDATING DEATH "UNLESS THERE ARE MITIGATING CIRCUMSTANCES"

Sections 94-5-105, R.C.M. 1947 (deliberate homicide) and 94-5-304, R.C.M. 1947 (aggravated kidnapping where the kidnapping results in the death of the victim) both mandated the death penalty "unless there are mitigating circumstances." It appears, however, that the trial court concluded that since there was only one victim involved it could not impose two separate death sentences. (Conclusion no. 1.) Nonetheless, the sentencing court found that there were no mitigating circumstances and therefore imposed the death penalty.

McKenzie argues that the language "unless there are mitigating circumstances," gives the sentencing court unbridled discretion to determine whether there are mitigating circumstances, and that the United States Supreme Court has invalidated statutes which give this uncontrolled discretion to the sentencing authority. I believe that this wording does precisely that. It is also an abrogation of legislative responsibility to fail to set guidelines for both the mitigating factors that must be considered by the sentencing court and the weight to be given these mitigating factors.

The deliberate homicide statute, section 94-5-105, R.C.M. 1947 (1973 Supp.) sets forth a list of six aggravating circumstances. The finding that one or more of these circumstances existed mandates the death penalty "unless there are mitigating circumstances." (See McKenzie III, 581 P.2d at 1227, where this statute is set out in its entirety.) The sentencing court found that an aggravating circumstance was fulfilled, that is, that "the deliberate homicide was committed by means of torture." In sentencing McKenzie to death, it appears that the court relied on the jury's special interrogatory finding that the victim was dead as a result of the torture. The court then concluded that no mitigating circumstances existed, and therefore sentenced McKenzie to hang.

-119-

The aggravated kidnapping statute, section 94-5-304, R.C.M. 1947, contained a similar "unless there are mitigating circumstances" clause. That statute provided:

> "A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct unless there are mitigating circumstances."

Yet, there was no statute which enumerated what the legislature considered "mitigating circumstances" to be. In Godfrey v. Georgia (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, the United States Supreme Court held that a death penalty statute must contain "clear and objective standards" and "specific and detailed guidance" for the sentencing authority. Measured by this declaration, the language of both statutes-- "unless there are mitigating circumstances"--has neither clear and objective standards nor specific and detailed guidelines. The judge's discretion to find mitigating circumstances is absolute.

The United States Supreme Court has vacated death sentences imposed under statutes which provide the sentencing court with the same unbridled discretion as do the Montana statutes. See Tilford v. Page (1972), 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed.2d 761; Williams v. Kentucky (1972), 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759; and Herron v. Tennessee (1922), 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756. These decisions were essentially based on the holdings of Furman, supra and Gregg, supra. The Montana statutes are in effect no different. They enumerate no mitigating circumstances and thus give the sentencing judge unguided discretion to impose or to withhold the death penalty according to his own whims. Discretion cannot be broader than that.

Under the Montana statutes, if the judge chooses to recognize a mitigating circumstance, he can do so, and thereby

withhold a death sentence, but, as was done here, if he chooses not to recognize a mitigating circumstance, he can thereby assure that the defendant will receive a death sentence. The United States Supreme Court has found similar statutes to be unconstitutional since they give the sentencing judge uncontrolled discretion to impose the death penalty according to his own whims.

Assuming, then, that McKenzie was not entitled to a new trial (minimum due process standards dictate that he _is_ entitled to a new trial), I would vacate the death sentences that were imposed for deliberate homicide and aggravated kidnapping and direct that on resentencing the death penalty is not to be considered.

C. FAILURE TO ACCEPT MENTAL DISEASE OR PSYCHIATRIC DISORDER AS A MITIGATING FACTOR UNDER SECTIONS 95-5-501(1), AND 95-5-304, R.C.M. 1947

Still another argument is that even though the statutes set forth no mitigating circumstances, a mental disease or psychiatric disorder was proved at the trial and as a matter of law it must be accepted as a mitigating circumstance, thereby precluding the death penalty for either conviction. McKenzie also attacks the sentencing court's order which balanced the mitigating factors against the aggravating factors, and determined that the aggravating factors clearly outweighed any mitigating factors. McKenzie claims, and correctly so, that section 95-5-304, R.C.M. 1947, does not permit a weighing of aggravating factors against mitigating factors. Rather, he argues that if a mitigating factor is found to exist as a matter of law, then a death sentence cannot be imposed.

The trial court sidestepped the issue and so did this Court. In ruling on McKenzie's petition for post-conviction relief, the trial court held that the sentencing court had

found McKenzie's mental disease to be "insufficient to outweigh the aggravating circumstances found by the jury." And the majority here, in seizing on this ruling, agreed with the trial court that the existence of a mental disease or psychiatric disorder "does not automatically immunize a defendant from the death penalty." 38 St.Rep. at 1760. Both decisions evaded the issue raised by McKenzie.

Neither statute says anything about the sufficiency of a mitigating circumstance; neither statute requires balancing the aggravating factors against mitigating factors. Each statute clearly mandates the death penalty "unless there are mitigating circumstances." Here we have a situation where the sentencing court found that a mental disease or psychiatric disorder did exist as a mitigating factor, but nonetheless it rewrote them and declared that the aggravating factors outweighed the existence of any mitigating factors.

This is a patently unconstitutional construction of a death penalty statute, for all death penalty statutes must be strictly construed against the state with the benefit of all doubts going to the defendant. Beck, supra; Andres, supra.

Here the sentencing court improperly expanded the death penalty statute in order to impose the death penalty.

McKenzie further supports his argument by contending that the existence of a mental disease or psychiatric disorder is universally recognized by the courts as a mitigating factor. Lockett, supra. In this case, the State has not disputed that a mental disease or psychiatric disorder was proved at trial. The dispute goes only to the nature of that disease or disorder, rather than to its existence. McKenzie argues that the sentencing court was not only required to recognize this as a mitigating factor, but that once it did so, the plain statutory

-122-

language of sections 94-5-304 and -501(1), R.C.M. 1947,--

"unless there are mitigating circumstances"--mandated that

the death penalty not be imposed.

The question is not, as the trial court and the

majority have stated, whether such a condition "automatically

immunizes a defendant from the death penalty," but whether

the statutes involved permit the sentencing court to nonetheless

impose the death penalty once a mental disease or psychiatric

disorder is found to exist. Since death penalty statutes must

be strictly construed against the State, this Court must hold

that the sentencing court had no statutory right to impose the

death penalty. The sentencing judge clearly went beyond his

statutory powers by weighing the aggravating factors against

the mitigating factors. This is still another reason for

vacating the death sentence and remanding this case for

resentencing with directions that the sentencing court not

consider the death penalty.

D. SECTIONS 94-5-304 and -501(1), R.C.M. 1947, UNCON-
STITUTIONALLY SHIFTED THE BURDEN TO DEFENDANT TO PERSUADE THE
SENTENCING COURT TO SPARE HIS LIFE

McKenzie alleged in section 10(g) of his petition for

post-conviction relief that sections 95-5-304 and -501(1),

R.C.M. 1947, unconstitutionally shifted the burden to him to

dissuade the sentencing court from imposing the death penalty.

The majority's failure to mention this as one of the issues

undermines still more its statement that in all of the annals

of criminal case history in the state, never has there been

a case treated with more "tender legal care."

The United States Supreme Court has not yet decided

the issue raised by McKenzie. In Lockett, supra, the Court

expressly declined to rule on this issue because it chose to

vacate the death sentence for other reasons.

-123-

In both Coleman III and Fitzpatrick III, I dissented on this issue, stating that this burden of persuasion should never, in a capital case, be shifted to the defendant. The burden of proving why a defendant's life should be taken should always rest with the State. The reasons given in Coleman III and Fitzpatrick III also apply here--the statute is worded differently, but the effect is precisely the same.

The majority has evaded this issue altogether. The trial court, however, considered this issue, but decided it improperly. The trial court held that the sentencing order did not on its face indicate that the sentencing court had placed the burden on McKenzie to dissuade the court from imposing the death sentence. Yet, that is precisely the effect given to the statute by the sentencing court. In holding that any mitigating factors did not operate to offset the aggravating factors, the sentencing court impliedly ruled that it was McKenzie's burden to convince him to the contrary. Furthermore, the statutory language "unless there are mitigating circumstances," imposed an impossible burden on McKenzie. He not only had to persuade the sentencing court that mitigating factors offset any aggravating factors, but he also had to be a mindreader to determine what the sentencing court would consider as a mitigating factor and what effect the court would give it. That is an unacceptable situation at any sentencing hearing and it is intolerable where a death sentence may result.

In Fitzpatrick III, 38 St.Rep. at 1460 (and impliedly in Coleman III), the majority held that the statute was not unconstitutional, even though it did indeed shift the burden of persuasion to the defendant. I dissented to both cases. See Coleman III, 633 P.2d at 659; Fitzpatrick III, 38 St.Rep. at 1464NN. The statute challenged by both Coleman and Fitzpatrick, section 46-18-305, MCA, provides in part that

-124-

". . . the court . . . shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency."

Insofar as the burden of persuasion is concerned, this statute is no different in effect than the statutes challenged here by McKenzie. In each instance, the burden is shifted to the defendant facing a possible death sentence to dissuade the sentencing court from imposing it. In fact, the statutes applied to McKenzie are worse because they further impose on the defendant the burden to read the mind of the sentencing judge in order to determine what that judge may consider as mitigating circumstances and what weight he will give to them.

Assuming again that the issues raised in this appeal do not require a reversal of the convictions and a new trial, the unconstitutional statutes applied to McKenzie require that the death sentences be vacated and that the case be remanded for resentencing with instructions that the death penalty is not to be considered.

E.   IMPROPER EXPANSION OF DEATH PENALTY STATUTES TO INCLUDE NONSTATUTORY AGGRAVATING FACTORS TO BE WEIGHED AGAINST MITIGATING FACTORS--FAILURE TO GIVE NOTICE TO DEFENDANT

In imposing the death penalty, the sentencing judge did not confine himself to the aggravating circumstance of torture that was found to apply to McKenzie, but he also added seven nonstatutory aggravating factors and then weighed the aggravating factors against the mitigating factors.

McKenzie argues that the sentencing court impermissibly expanded the scope of the sentencing inquiry and that he was prejudiced because the court had not given him notice that it would do so. McKenzie irrefutably claims that he

-125-

did not know the sentencing court was going to consider nonstatutory aggravating factors. McKenzie further claims that the sentencing judge came to the sentencing hearing with his findings, conclusions, and order of death already prepared and ready to be filed at the conclusion of the hearing. It was only when this order was filed that McKenzie learned that the court expanded the scope of the aggravating circumstances statute (section 94-5-105, R.C.M. 1947) and had added seven nonstatutory aggravating circumstances as reasons for imposing the death penalty. McKenzie argues that this expansion violated his Eighth Amendment rights, and that the court's failure to give notice of what it would consider violated his due process rights under the Montana and United States Constitutions. (Strangely enough, the sentencing judge in Coleman also arrived at the sentencing hearing with his findings, conclusions and order of death already prepared.)

The sentencing court had no right to expand the scope of the inquiry by adding nonstatutory aggravating factors. The death penalty statutes must be self-contained if they are to have any meaning at all, and the judge's conduct is therefore impermissible. But assuming that the court had the right to consider these nonstatutory aggravating factors, it had the duty of notifying McKenzie in advance of the hearing that it would be expanding the scope of the inquiry, and had a further duty to tell McKenzie exactly what additional factors would be considered. Only by this procedure could McKenzie receive a meaningful opportunity to present evidence on each of the nonstatutory aggravating factors. The fact that the court came to the sentencing hearing armed with a sentence of death is clear evidence of an intent to deny McKenzie even a semblance of due process.

I must state again that the majority opinion has failed to address the fundamental and underlying issues raised. The majority, with no statement of its reasoning, held it was proper for the sentencing court to consider the seven nonstatutory aggravating factors, but the majority fails to mention that McKenzie nonetheless argues he was entitled to notice so that he could present evidence on the factors the sentencing court would consider. The majority's self-laudatory statement that McKenzie has been given the most "tender legal care" in all the annals of Montana criminal justice again becomes meaningless in this case.

On this issue also I would vacate the death sentence and remand with instructions that the death penalty is not to be considered as one of the options for the sentencing court.

F. IMPROPER EXPANSION OF DEATH PENALTY STATUTES TO INCLUDE NONSTATUTORY AGGRAVATING FACTORS TO BE WEIGHED AGAINST MITIGATING FACTORS--FAILURE TO GIVE NOTICE TO DEFENDANT

The jury made no findings that McKenzie deliberately took the victim's life, and McKenzie therefore argues that the imposition of the death penalty violates the Eighth and Fourteenth Amendments. He argues against the homicide conviction on the assumption that the jury found him guilty of deliberate homicide, rather than the trial court's offense of "deliberate homicide by means of torture." With this assumption, however, McKenzie argues that the jury may have applied the felony murder rule in finding him guilty of deliberate homicide (see section 94-5-102, MCA) and therefore it did not make the finding that he deliberately took the victim's life. As to the aggravated kidnapping conviction, the jury also found that the kidnapping resulted in the victim's death, but the jury made no finding that McKenzie deliberately took her life.

-127-

On the day set for sentencing, the trial court came to court with its findings and conclusions and death sentence already prepared. The trial court expressly relied on the jury's findings in imposing the death sentence. The court referred twice to what it considered the jury's findings to be. Finding no. 4 stated: "The evidence in the case, as found by the jury discloses a brutal, conscienceless, torture, rape and deliberate killing of a human being." (Emphasis added.) Finding no. 6 stated:

> "That the jury rejected the verdict form finding the defendant not guilty by reason of a mental disease or defect which excludes responsibility for criminal conduct which was submitted to them and correctly found the defendant guilty of deliberate homicide which was by means of torture, and guilty of Aggravated Kidnapping which resulted in the death of the victim." (Emphasis added.)

But the jury did not expressly find that McKenzie deliberately took the victim's life--this is true in relation to both convictions. To assume that the jury impliedly found that McKenzie deliberately took the victim's life it must be assumed further that the jury convicted McKenzie of "purposely or knowingly" causing Lana Harding's death rather than causing it in a felony-murder situation. The jury was instructed alternatively on the deliberate homicide charges, and thus, there is no basis to determine from the record which theory the jury used in convicting McKenzie.

The aggravated kidnapping conviction is similarly defective. The instructions did not require the jury to find that McKenzie, in committing the aggravated kidnapping, deliberately took the victim's life. And the returned verdict reveals only that the victim died as a result of the kidnapping-- the jury made no finding that McKenzie deliberately took her life.

-128-

Unfortunately, the majority opinion omitted any reference to the homicide conviction and deals only with the aggravated kidnapping conviction.

AGGRAVATED KIDNAPPING: ABSENCE OF A JURY FINDING THAT McKENZIE DELIBERATELY TOOK THE VICTIM'S LIFE

The jury returned the following aggravated kidnapping verdict:

"A. We, the jury, in the above-entitled cause, find the defendant Guilty of the offense of Aggravated Kidnapping as charged.

"B. We further find that Lana Harding (did) (d̶i̶d̶ n̶o̶t̶) die as a result of said Aggravated Kidnapping.

"(Strike out bracketed word or words that do not apply.)"

This verdict shows that the jury was not asked to find that McKenzie deliberately took the victim's life. This returned verdict cannot support the conclusion that the jury made that determination. Whether the jury believed that McKenzie deliberately took the victim's life is another question altogether. It is sufficient to say that no such finding appears in the record. The finding that the aggravated kidnapping resulted in the death of the victim is not equivalent to a finding that McKenzie deliberately took the victim's life.

Nor did the trial court make independent findings on this question. Rather, in imposing the death penalty, it expressly relied on what it believed the jury had found. (Finding no. 4, supra.) But in denying post-conviction relief to McKenzie, both the trial court and this Court have ignored the issues, and instead simply imposed their own views of what the evidence disclosed, rather than relying on what was actually found or not found. Without reaching the issues raised by McKenzie, the majority states:

-129-

"In McKenzie III, 608 P.2d at 459, as the District Court noted in considering petitioner's application for post-conviction relief, we found the evidence on the issue of intent to be overwhelming, uncontradicted and permitting of but one rational conclusion--that McKenzie intended to kidnap and kill the victim." 38 St.Rep. at 1759.

The trial record does not support this statement. First, this statement assumes that the jury or judge made these necessary findings. That is not the case. Second, this statement does not accurately reflect the evidence. The evidence on the question of intent was not uncontradicted. A psychiatrist testified that McKenzie could neither appreciate the criminality of his acts nor conform his conduct to the requirements of law. This question surely goes to the issue of criminal intent--and criminal responsibility. Criminal responsibility can arise only if criminal intent exists. Third, the majority's statement ignores the fact that the State's case was aided mightily by a barrage of unconstitutional Sandstrom-type instructions which allowed the jury to presume criminal intent.

Regardless of what the majority perceived the evidence to be, the simple fact is that the majority is not the fact-finder. That is the function of the jury. And regardless of what the evidence shows, the fact is that the record does not demonstrate that the jury in fact found that McKenzie possessed the intent to kill. The fault may lie with the jury instructions or with the verdict forms, but that does not alter the situation. The jury did not make the findings necessary for the imposition of the death sentence.

In criticizing this Court for usurping the power of the jury and serving as a fact-finder, Justices Marshall and Brennan stated:

"But what evidence did the court [the Montana
Supreme Court] find sufficient to overcome the
constitutional error of directing the jury to
presume the presence of the requisite criminal
intent from the nature of the acts committed?
The Montana court itself relied solely on 'the
vicious manner in which the crimes were committed'
in concluding that petitioner 'purposely and
knowingly intended' to commit the crimes.  Id., at 450,
459.  I cannot help but be shocked that in taking
this approach, the Montana court simply applied
the forbidden presumption.  In so doing, the court
neglected to perform its task on review:  it
failed to examine whether the disapproved instructions
could have infected the jury verdict.  Instead,
the court served as another factfinder, again
impermissibly placing the burden on petitioner to
disprove that the nature of his acts established
the requisite criminal intent.  It surely cannot
be that a verdict following an unconstitutional
instruction  permitting the jury to presume
criminal intent can be immunized from reversal
because the reviewing court also impermissibly
presumes criminal intent."  ___ U.S. ___, 101
S.Ct. 626, at 628-29, 66 L.Ed.2d 507, at 509.
(Emphasis added.)

Not only did this Court erroneously apply the forbidden

presumption in reaching the conclusion that proof on the

question of intent was overwhelming, but it again has overlooked

the even more important fact that the jury was never directly

told to determine as part of its verdict the question of

whether McKenzie deliberately took the victim's life.  The

jury found only that the aggravated kidnapping resulted in

the victim's death.

Nor can we read into the jury's verdict an implied

finding that McKenzie deliberately took the victim's life

in the course of committing the aggravated kidnapping.  None

of the instructions on aggravated kidnapping (instructions

no. 25, 29-V and 36) required the jury to find that McKenzie

deliberately took the victim's life.  The only other instruction

involved concerns the special finding the jury was to make

if it found McKenzie guilty of aggravated kidnapping--the

jury was then to determine if the aggravating kidnapping

resulted in the victim's death.  (Instruction no. 54-III.)

This instruction does not tell the jury that it must, before making that finding, determine that McKenzie deliberately took the victim's life.

The next question is whether the sentencing judge, in the absence of a jury finding that McKenzie deliberately took the victim's life, could make that finding himself as part of the sentencing process. In this case, finding no. 4, supra, is so vague that I cannot determine whether the sentencing judge made that independent determination or not. But if I had to interpret this finding, I would say that the sentencing judge simply relied on what he considered to be the jury's finding--a totally misplaced reliance because the jury did not make the findings that the Court said it did.

Assuming arguendo, however, that the sentencing judge did make independent findings that McKenzie deliberately took the victim's life, it is my position that this function, as a prelude to imposing a sentence of death, can only be made by a jury, and that such a finding by the sentencing judge is constitutionally prohibited. See my dissents in Coleman II, 605 P.2d at 1045; Coleman III, 633 P.2d at 660-61; and Fitzpatrick III, 38 St.Rep. at 1465FF-65GG.

I would adhere to the trial record's showing of what the jury found, as opposed to the majority's conclusion of what the evidence shows. Based on the absence of a finding that McKenzie deliberately took the victim's life, I would vacate the death sentence since it is based in part on the jury's finding that the aggravated kidnapping "resulted in the death of the victim."

DELIBERATE HOMICIDE: ABSENCE OF A JURY FINDING THAT MCKENZIE DELIBERATELY TOOK THE VICTIM'S LIFE

Although the jury made no finding that McKenzie intended to kill his victim, the real problem with this conviction is

that McKenzie has been convicted of a nonexistent offense
(see part IV of this dissent). Beyond this, however, the
majority has failed to mention this issue in its opinion--
another example of the "tender legal care"--that the majority
claims it has given McKenzie in reviewing his convictions
and death sentences.

Since the jury convicted McKenzie of deliberate homicide
by means of torture, the only result is that the conviction
must be reversed with directions to dismiss that charge since no
such offense exists. But if the jury did convict McKenzie
of deliberate homicide based on either subsections 94-5-102(a)
or (b), R.C.M. 1947, the question then arises as to which
subsection the jury convicted him of. If the jury used subsection
(a), and therefore decided that McKenzie "purposely or know-
ingly" took the victim's life, its decision would be constitution-
ally sufficient. On the other hand, if the jury applied the
felony-murder rule of subsection (b), there would be no finding
that McKenzie deliberately took the victim's life and therefore
its decision would be unconstitutional.

Assuming that the jury did convict McKenzie under either sub-
sections 94-5-102 (a) or (b), R.C.M. 1947, McKenzie argues
that the record fails to reveal which theory of criminal
responsibility the jury applied, and therefore the death
penalty cannot be imposed. The certainty required in death
penalty cases means that the defendant must be given the
benefit of any doubt arising from the proceedings. Since it
cannot be determined whether the jury used subsection (a) or
subsection (b) in reaching its conviction, this doubt, McKenzie
argues, means that he cannot constitutionally be sentenced to
death.

Unfortunately, the majority opinion is silent on this issue. I assume, however, that had the opinion dealt with the issue, it would have done so in the same way that it dealt with the aggravated kidnapping issue--that is, that the evidence was overwhelming and uncontradicted. And, of course, my arguments would be the same here as they are on the aggravated kidnapping issue. The evidence on the question of intent is certainly <u>contradicted</u> by the psychiatrist testifying on behalf of McKenzie, and was impacted by the use of the unconstitutional <u>Sandstrom</u>-type instructions. The majority had no right to determine the facts itself. The <u>jury</u> either found that McKenzie deliberately took the victim's life or it did not.

McKenzie relies again on <u>Lockett,</u> supra, and the concurring opinions of Justices White and Marshall in arguing that, miniminally, the Eighth Amendment requires a jury finding that the defendant had the purpose to take the victim's life. If this is the law, then McKenzie cannot be executed.

The homicide conviction is complicated by several factors. As I have already explained, the jury verdict cannot be read in isolation from the instructions, but rather, can only be understood in relation to them. The verdict returned by the jury stated:

> "A.  We, the jury in the above entitled cause find the defendant guilty of the offense of Deliberate Homicide as Charged.
>
> "B.  We further find that the Deliberate Homicide (was) (was not) by Means of Torture.
>
> "(Strike out the bracketed word or words which do not apply.)

In part IV, of this dissent, I have explained how this returned verdict was tied directly into the explanation and definition of the nonexistent offense of deliberate

homicide by means of torture, and that the jury had no choice but to use this guilty verdict form, for it was provided with no others.

But to set aside the conviction of a nonexistent offense, the findings in this verdict must still be explained by the instructions. Finding A says that the jury found McKenzie guilty of "Deliberate Homicide as Charged." The fact is that McKenzie was charged with deliberate homicide under the two theories contained in section 94-5-202, R.C.M. 1947. The first theory, subsection (a), requires that the jury find the defendant "purposely or knowingly" killed the victim. The second theory, subsection (b), is a statement of the felony-murder rule and does not require finding that the defendant "purposely or knowingly" killed the victim or that he intended to do so. The jury was instructed alternatively on these theories and its verdict does not state which theory it applied in reaching its decision.

Nor can Finding B support an implication that the jury found McKenzie intended to take the victim's life. The only instructions defining the word "torture" or "by means of torture" are contained in the instructions defining the nonexistent offense of "deliberate homicide by means of torture." In each of these instructions the jury was expressly told that in order to find McKenzie guilty of deliberate homicide by means of torture, it did not have to find that he intended to kill the victim. (Instructions no. 23, 29-II and 34.)

Specifically, instruction no. 23 stated in part:

". . . is guilty of the offense of Deliberate Homicide by Means of Torture, whether or not it was the purpose or intention of the assailant to cause such death." (Emphasis added.)

And instruction no. 34 repeated this same language:

> "And if you find one or more of said particular
> purposes to have been proved beyond a reasonable
> doubt and that the defendant killed her while
> purposely so inflicting cruel suffering upon
> her, he has committed the offense of Deliberate
> Homicide by means of Torture, <u>whether it was or
> was not his purpose or intention to kill her</u>."
> (Emphasis added.)

Surely it cannot be determined from these instructions --the only ones defining "by means of torture"--that the jury found McKenzie intended to kill his victim. The most that can be said is that the jury was free to reach a verdict without ever considering whether McKenzie <u>intended</u> to kill. It is possible, of course, that the jury subjectively decided that McKenzie did possess the intent to kill, but nowhere is that decision revealed or implied. If, before a death penalty can be constitutionally imposed, the jury must find and the record must reveal that the defendant intended to kill the victim, it is manifestly clear that here the death sentence cannot constitutionally be imposed. Neither the returned verdicts nor the instructions required the jury to make this decision. Whether the jury subjectively reached this decision is another question, but obviously a death penalty cannot be imposed based on what a jury subjectively thought.

I believe that <u>only a jury</u> can make the decision of whether a person can live or die, and <u>only a jury</u> can make the underlying decisions as well. Accordingly, if the sentencing judge made the findings himself, this would amount to a usurpation of the function of the jury, and the judge's findings could not constitutionally stand.

But I am not certain that the sentencing judge himself made an independent finding concerning an intentional taking of life. Rather, it appears that he relied on the jury's determination, yet realized that the jury had not made that determination. Again, the only finding on this issue stated:

> "4. The evidence in the case, and as found
> by the jury discloses a brutal, conscienceless,
> torture, rape and deliberate killing of a human
> being." (Emphasis added.)

This finding, if it can be called that, is ambiguous at best. Did the sentencing court make its own findings on the facts stated, or did it rely on the jury's decision on these issues? By eliminating the words--"and as found by the jury"--it would appear that the sentencing court made its own findings. On the other hand, with the words--"and as found by the jury"--it would appear that the sentencing court was merely repeating the facts which it believed the jury to have found. This being a capital case, I believe that finding no. 4 is so ambiguous that it cannot stand as one of the foundations on which the death penalty can be imposed. Nonetheless, the finding is filled with error.

First assuming that the sentencing court was merely relying on the jury's decision, finding no. 4 is flatly wrong in several respects. First, the jury did not expressly or impliedly find that McKenzie intended to kill the victim. If the sentencing court used this finding as foundation on which to impose the death penalty, then the death sentence cannot stand.

Second, although the jury did determine that the homicide occurred "by means of torture," the jury only could have decided this issue by using the deliberate homicide by means of torture instructions (instructions no. 23, 29-II and 34). This again means that the jury found McKenzie guilty of a nonexistent offense.

Third, the jury did not find that McKenzie had raped the victim. Although McKenzie was charged with rape and evidence was presented that the victim had been raped, the jury, because

of the trial court's instructions, did not reach that charge. The trial court expressly told the jury that if it found McKenzie guilty of aggravated kidnapping or deliberate homicide by means of torture, or both, it would not have to consider the lesser charges because they were classified as lesser-included offenses (See instruction no. 54, part III). That is precisely what happened and the trial court accepted the jury's verdicts. Obviously, because of the alternative charges, an implied finding of rape was not necessary to either an aggravated kidnapping or deliberate homicide conviction.

Fourth, there is a real question concerning whether the victim was tortured within the definition of torture given to the jury. This is also an issue that McKenzie has continually raised but this Court has consistently avoided. There is no doubt that the victim was brutally murdered, but a brutal murder does not mean that it was a murder by torture. McKenzie argues that there is not substantial evidence to support a finding that the victim was tortured. (See part V of this dissent.)

Because I believe that the jury in fact convicted McKenzie of the nonexistent offense of deliberate homicide by means of torture, much of my discussion is unnecessary. On the other hand, because the majority has not only ignored this issue but also the issue relating to whether the jury found that McKenzie deliberately took the victim's life, I feel compelled to express my views. Clearly, the jury did not expressly or impliedly find that McKenzie deliberately killed his victim. This being so, the death penalty cannot be imposed.

Even assuming that the deliberate homicide by means of torture conviction does not have to be reversed and dismissed

because there is no such crime, I would in any event, because
of my views expressed here, remand the case for resentencing
with instructions that the death penalty is not to be
considered.

G. AN EVIDENTIARY HEARING IS REQUIRED TO DETERMINE
WHETHER THE DEATH PENALTY IN MONTANA IS IMPOSED ARBITRARILY,
WANTONLY, FREAKISHLY AND DISCRIMINATORILY

In upholding the death penalty as an abstract principle,
the United States Supreme Court left the door open for the
factual claim that the death penalty may be imposed arbitrarily,
wantonly, freakishly, and discriminatorily. McKenzie has
attacked the Montana death penalty on precisely this ground
and has set forth in a supporting affidavit facts which he
claims an evidentiary hearing will prove. He alleges that
no person has been executed in this state since 1943, and
that now the only persons on death row are himself, Coleman
and Fitzpatrick. He claims that he and the other defendants
have been arbitrarily selected to receive the death penalty,
and that scores of defendants before and since have been
convicted of capital crimes but have not received the death
penalty.

In Gregg, supra, the United States Supreme Court,
extremely conscious that its holding in Furman, supra, had
been misinterpreted, attempted to distill what it considered
to be the essence of Furman. In Gregg, the Court explained
that part of its Furman holding invalidating Georgia's death
penalty, was that the death penalty was being imposed
discriminatorily, wantonly and freakishly, and so infrequently
that any given death sentence was cruel and unusual. Gregg
(White J., concurring), 428 U.S. 220-221. This conclusion
in Furman was reached after considering the result of capital
sentencing practices in fact, rather than by simply examining

-139-

the abstract statutes on the books. Furman, 408 U.S. at 256-257 (Douglas, J., concurring); 408 U.S. 293-295 (Brennan, J., concurring); 408 U.S. at 309-310 (Stewart, J., concurring); 408 U.S. at 311-314 (White, J., concurring).

The Furman holding is simply an application of the long-established rule that a statute valid on its face can be administered in a manner violative of the Constitution:

> "The generality of a law inflicting capital punishment is one thing. What may be said of the validity of a law on the books and what may be done with the law in its application do, or may, lead to quite different conclusions." 408 U.S. at 242 (Douglas, J., concurring).

In Gregg, then, once having set forth what it considered its holding in Furman to be, the Supreme Court upheld the death penalty statutes then on the books in Georgia. The Court expressly recognized that the allegation that the new death penalty statutes were still imposed arbitrarily and discriminatorily was "unsupported by any facts." (Emphasis added.) 428 U.S. at 225 (White, J., concurring). In the absence of supporting facts, the Supreme Court declined to assume that the kind of arbitrary and discriminatory sentencing found in Furman had carried over to the new Georgia statutes and their application.

But a different situation exists here. McKenzie alleged facts in his petition and supporting affidavit that directly challenged the assumption on which Gregg was based, and he offered to prove these facts at an evidentiary hearing. If proved, these facts would establish that the death penalty scheme was not just arbitrary and discriminatory on its face, but just as important, that it was arbitrary and discriminatory as applied. These allegations are clearly sufficient to require an evidentiary hearing.

In refusing to order an evidentiary hearing on these claimed constitutional violations, the trial court and this Court have subverted the purpose of the post-conviction relief statutes and have taken from McKenzie any opportunity to show in our state court system that the application of these statutes is unconstitutional. McKenzie has been deprived of a state remedy and a state forum to present his constitutional claims.

H. AN EVIDENTIARY HEARING IS REQUIRED TO DETERMINE THE CLAIM THAT THE DEATH PENALTY IN MONTANA IS SO INFREQUENTLY IMPOSED THAT IT NO LONGER SERVES A VALID STATE INTEREST AND THEREFORE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Closely connected to McKenzie's claim of the arbitrary, wanton, freakish, and discriminatory application of Montana's death penalty is his claim that its infrequent use leads to the conclusion that it no longer serves a valid state interest, and is therefore cruel and unusual punishment.

Again, neither the District Court nor this Court ruled directly on this claim despite the fact that McKenzie has alleged evidentiary facts in support of his contention.

In Furman, supra, the United States Supreme Court merely held that the death penalty is not per se unconstitutional, but the Court recognized certain limitations. Those limitations have been raised in this case, yet this Court has refused to permit an evidentiary hearing on the claim. In Furman, Justice White clearly pointed out in his concurring opinion that ". . . as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attentuated to be of substantial service to criminal justice." 408 U.S. at 313. Justice White also stated:

> ". . . At the moment that [the death penalty] ceases realistically to further these purposes, however, the emerging question is whether its imposition

in such circumstances would violate the Eighth
Amendment.   It is my view that it would,
for its imposition would then be the point-
less and needless extinction of life with
only marginal contributions to any discernible
social or public purposes.  A penalty with such
negligible returns to the State would be patently
excessive and cruel and unusual punishment violative
of the Eighth Amendment."  408 U.S. at 312.

McKenzie alleged in his petition for post-conviction relief, and more particularly in his supporting affidavit, that just that point has been reached in Montana--that the death penalty, because of the infrequency of its imposition over the years, serves no valid state interest, and therefore constitutes cruel and unusual punishment violative of the Eighth Amendment.

He has alleged the irrefutable facts that no one has been executed in Montana since 1943, despite the fact that scores of persons have been convicted of crimes where a death penalty could have been imposed.  (The period in which the status of the death penalty's constitutionality was held in limbo by the United States Supreme Court is excluded.)  But now, in the early 1970's, McKenzie argues that three defendants (McKenzie, Coleman, and Fitzpatrick) have been selected to receive the death penalty, despite the fact that during this same time period many other persons were convicted of capital crimes but not given the death penalty.  He alleges that because the death penalty is infrequently imposed in Montana, the threat of execution is too remote to be of any value to the criminal justice system. Lacking this valid state interest, he claims that the death penalty in Montana has, in the words of Justice White, become ". . . patently excessive and cruel and unusual punishment violative of the Eighth Amendment." Furman, 408 U.S. at 312.

-142-

Both the trial court and this Court have ignored this challenge to the _application_ of Montana's death penalty statutes. As justification for its decision, the majority has seized on the language in _Gregg_, supra, that the death penalty, as an abstract principle, can be justified on principles of retribution and deterrence. But the majority has subverted _Gregg_ by converting it into a general holding that if death penalty statutes are constitutional on their face, their application is permissible under principles of retribution and deterrence. The question the majority evades is whether one is entitled to an evidentiary hearing to prove his claim that the death penalty is imposed so infrequently that it no longer serves as either retribution or deterrence, and therefore results in ". . . the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." _Furman_, 408 U.S. at 312.

Obviously, these questions cannot be decided in a factual vacuum, and that is precisely why an evidentiary hearing is required. Retribution and deterrence may indeed be justifications which can withstand an Eighth Amendment challenge, but any statutory system of capital punishment can still be unconstitutional in its application. The majority's holding here has foreclosed any attempt to prove this claim in our state court system. This Court cannot delegate to the legislature the responsibility of ensuring that a system of capital punishment is constitutionally applied. The question of whether _in fact_ a certain punishment violates the Eighth Amendment is a question solely for the courts.

McKenzie has alleged facts, that, if proved, would fall clearly within _Furman's_ restraining language. He is entitled

to a hearing to present his proof supporting his allegations. The question of whether the death penalty has been unconstitutionally applied to him is not a question for the legislature, but clearly a judicial duty to see that the law is not only constitutional on its face, but that it is also constitutionally applied.

I. AN EVIDENTIARY HEARING IS NECESSARY TO DETERMINE WHETHER THE DELAY BETWEEN THE SENTENCING AND THE EXECUTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT VIOLATIVE OF THE EIGHTH AMENDMENT

In paragraph 10(n) of McKenzie's petition for post-conviction relief, McKenzie alleged that "his death sentence was unconstitutional because . . . the excessive cruelty involved in the extinction of a defendant's life after a prolonged period of waiting did not serve any valid state interest in fact." (Emphasis added.) McKenzie's Appellate Brief at pp. 39-42. Somehow the majority, in rendering "tender legal care" to McKenzie, omitted any discussion of this issue.

The trial court, however, did rule on the question, but missed the point. It merely relied on the general holding in Gregg, supra, that the death penalty is not cruel and unusual punishment, and it therefore concluded that McKenzie does not have a right to claim that the death penalty as in fact applied to him is unconstitutional.

McKenzie again relies on language in Furman, supra, and in Gregg, supra, in which the Supreme Court left open the right to contend that the death penalty as applied is unconstitutional. McKenzie alleges that delay and infrequency in carrying out a death penalty deprive it from serving as a deterrent, and he also claims that this delay and infrequency add an element of mental anguish not present

-144-

with other forms of punishment. He primarily relies on District Atty. for Suffolk Dist. v. Watson (Mass. 1980), 411 N.E.2d 1274, which held in part that a death penalty defendant's ordeal between sentencing and death converts the death penalty into a form of cruel and unusual punishment. McKenzie claims that he should be allowed to present the more persuasive evidence which would demonstrate that excessively cruel capital punishment in reality serves no valid state interest.

This argument, by itself, does not carry much intrinsic merit because almost invariably it is the defendant who is seeking to postpone his own death, and because the United States Supreme Court has mandated expedited appellate review before the execution can take place. Nonetheless, this argument, when combined with the claims of arbitrary imposition of the death penalty, certainly requires that the trial court hold an evidentiary hearing. A death penalty defendant who raises these constitutional claims must struggle against the judicial system to stay alive until they have been answered.

J. AN EVIDENTIARY HEARING IS REQUIRED TO DETERMINE WHETHER DEATH BY HANGING CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

McKenzie's last claim directly attacking the death penalty is the allegation that death by hanging constitutes cruel and unusual punishment violative of the Eighth Amendment. He pleaded facts which stated the nature of the suffering by one who must hang by the neck until dead, and sought an evidentiary hearing in support of these allegations.

He again relies on restraining language in Furman, supra, and Gregg, supra, stating that death penalty statutes, although constitutional on their face, may, as applied, constitute cruel and unusual punishment. He relies directly on State v. Frampton (1981), 95 Wash.2d 469, 627 P.2d 922, in which

-145-

the Washington Supreme Court expressly ruled that death by hanging constitutes cruel and unusual punishment.

In omitting this as an issue on appeal, the majority has once again undermined its gratuitous statement that in all of the annals of criminal law history in the State of Montana, no defendant has ever received more "tender legal care" than McKenzie.

I believe that McKenzie is entitled to an evidentiary hearing to present evidence of this claimed violation of his constitutional rights.

X.  CONCLUSION

In summarizing those issues where the majority
has either ignored the issue entirely or misstated the
issue or the nature of the problem presented, I again must
emphasize that this is a death penalty case that requires
the closest appellate court scrutiny.  The United States
Supreme Court has mandated this of all appellate courts,
but even if it did not, our own sense of duty should compel
the most careful and painstaking review.  We have failed
miserably in that obligation.

To begin, in Coleman III and Fitzpatrick III, this
Court adopted one standard to determine whether issues raised
is a post-conviction relief petition are res judicata.  But
here the majority has adopted a different and more restrictive
standard than was applied in Coleman III and Fitzpatrick III.
The difference is more than cosmetic; the different test
applied to McKenzie meant that the majority could avoid
determining whether any issue decided on the merits was
correctly decided on the merits.  (See part II of this dissent.)

McKenzie made three equal protection arguments concerning
this Court's uneven application of the law to McKenzie's
previous appeals:  (1) that we applied search and seizure
standards contrary to the law and applied them only in his
case; (2) that this Court's holding that he was not entitled
to a lesser-included offense instruction on mitigated deliberate
homicide was based on an application of the law which ignored
the evidence and which was applied only in his case; (3)
that this Court adopted an impermissible harmless error test
(the overwhelming evidence test) to determine the impact of
the eight unconstitutional Sandstrom-type instructions.  The
majority opinion ignored all three of these issues.  (See
part VI of this dissent.)

-147-

McKenzie again claims that this Court has consistently failed to meet the issue of whether the State established probable cause that seizable items were located at McKenzie's home. This Court again has ignored this issue. (See part VI of this dissent.)

On the plea bargain issue, McKenzie has always maintained that this Court ignored the trial record and instead relied solely on the State's appellate briefs, where, for the first time, the State asserted that no plea bargain existed. This Court has never addressed his contention in later appeals that we ignored the trial record. Further, the opinions have misstated the record. The majority held that the trial court found against McKenzie on the factual question of whether a plea bargain existed but the record is devoid of any such finding by the trial court, and, in fact, no evidentiary hearing on this issue was ever held. In fact, the trial court was a party to the plea bargain agreement. The majority stated that McKenzie had not alleged that the prosecutors had acted in bad faith when they backed out of the plea bargain agreement. But the record shows that McKenzie has consistently alleged that the prosecutors acted in bad faith. Finally, the majority misstated the record in concluding that McKenzie's claim of detrimental reliance was unfounded. (See part III of this dissent.)

The opinions have consistently ignored the deliberate homicide by means of torture issues raised by McKenzie. They have ignored the claims that the jury was instructed that McKenzie was charged with the substantive offense of deliberate homicide by means of torture, that the jury was instructed on the elements of deliberate homicide by means of torture as a substantive offense, and that deliberate homicide by means of

-148-

torture is not an offense defined by Montana law. In fact, not only was the jury erroneously instructed on these matters, but the probability is great that the jury did convict McKenzie of this nonexistent offense. (See part IV of this dissent.)

Furthermore, the opinions, in concluding that the victim was tortured, fail to set forth the evidence which would support a jury finding that the victim met her death by means of torture. (See part IV of this dissent.) This Court also ignored the issue of whether the victim was tortured, within the meaning of the statute setting out the aggravated circumstance of "deliberate homicide by means of torture," and within the meaning of the jury instructions defining torture. This Court in fact failed to give any substantive meaning to the phrase "deliberate homicide by means of torture." (See part V of this dissent.)

The majority's rulings on the death penalty issues are similarly deficient. This Court ignored the issues of whether it can be determined from the record whether the jury found that McKenzie deliberately took the victim's life. (See part IV of this dissent), whether from the instructions an appellate court could determine that the jury was required to find that McKenzie deliberately took the life of the victim. (See part VI of this dissent.)

Further, this Court ignored the related issue of whether the jury convicted McKenzie of deliberate homicide by applying sections 94-5-102(a) or (b), R.C.M. 1947--each subsection creates a different theory of criminal responsibility for homicide. Under subsection (a) the jury must determine that a defendant purposely or knowingly took the victim's life. Under subsection (b), the felony-murder rule, the

jury is not required to make such a determination before finding a defendant guilty of deliberate homicide. (See part IV of this dissent.)

In fact, the majority has misstated the records on a nonrelated issue in concluding that McKenzie was convicted of "purposely or knowingly" causing the death of Lana Harding. At 608 P.2d at 452-53, the majority states:

> "There are three types of criminal homicide. Defendant <u>was</u> <u>charged</u> <u>with</u>, <u>and</u> <u>convicted</u> <u>of</u>, <u>deliberate</u> <u>homicide</u>, a <u>criminal</u> <u>homicide</u> <u>committed</u> <u>purposely</u> <u>or</u> <u>knowingly</u>. Section 95-5-102 (1) (a), R.C.M. 1947 . . ." (Emphasis added.)

As I have shown in parts IV and V of this dissent, McKenzie was charged also with felony-murder, a theory which does not require that a jury find he purposely or knowingly took the victim's life; it is impossible to tell from the record which theory the jury applied in finding McKenzie guilty. The majority's unsupported assumption reflects the inadequate review that has characterized each of the <u>McKenzie</u> appeals.

This Court ignored the issue of whether sections 94-5-501(1) and 94-5-403, R.C.M. 1947, impermissibly shift the burden to the defendant to dissuade the sentencing court from imposing a death sentence. (See part IX of this dissent.) This Court ignored the issue of whether the sentencing court should have notified McKenzie before the sentencing hearing that it intended to rely on nonstatutory aggravating factors. (See part IX of this dissent.) Further, on a related issue, this Court side-stepped the issue of whether section 94-5-105, R.C.M. 1947 permits the weighing of aggravating factors against mitigating factors. (See part IX of this dissent.)

This Court failed to directly rule on the claim that the death penalty is imposed so infrequently and imposed so arbitrarily and discriminatorily, it no longer serves any valid state purpose and is therefore cruel and unusual

punishment violative of the Eighth Amendment.  (See part IX of this dissent.)  This Court further ignored a claim that the lapse of time between the sentence and the actual execution causes extreme mental agony and that no valid state interest is served by the death penalty, amounts to cruel and unusual punishment violative of the Eighth Amendment. (See part IX of this dissent.)  And this Court ignored the claim that death by hanging constitutes cruel and unusual punishment.  (See part IX of this dissent.)

Finally, one issue demonstrates as well as any the quality of review we have given McKenzie.  In McKenzie II and III, the majority held that after we decided his appeal, he could still have his death sentence reviewed by the Sentence Review Board.  But then Dewey Coleman asked the Sentence Review Board to review his death sentence and that board turned him down.  Coleman then asked this Court to compel the Sentence Review Board to review his death sentence. Coleman relied on the McKenzie decision for authority, but this Court turned him down and agreed with the Sentence Review Board that it had no authority to review a death sentence.

In his appeal from the District Court's denial of post-conviction relief, McKenzie asked this Court to reconsider its McKenzie II and III rulings that the Sentence Review Board could review his death sentence.  Had we ruled on this issue, and properly ruled, our decision would be that the Sentence Review Board could not review McKenzie's death sentence. Such a decision would mean, however, that McKenzie's death sentence could not stand, because the procedural safeguards after conviction did not contain sufficient protection to meet the mandates of United States Supreme Court decisions. In regard to these obviously inconsistent holdings in McKenzie

-151-

and Coleman with regard to the Sentence Review Board's authority to review death sentences, this Court chose to ignore the issue. By ignoring the issue, McKenzie still stands sentenced to death. (See part IX of this dissent.)

This concludes my third dissent to this Court's McKenzie opinion. United States Supreme Court Justices Marshall and Brennan have already strongly criticized this Court for its uneven treatment of McKenzie and for its failure to comply with the mandates of the United States Supreme Court. In fact, both Justices felt so strongly that McKenzie's rights had been violated that they recommended that McKenzie seek federal habeas corpus relief. 449 U.S. at 1056, 101 S.Ct. at 630, 66 L.Ed.2d at 510. It is not often that dissenting justices of the United States Supreme Court go so far as to suggest that a defendant continue to press his case by seeking federal habeas corpus relief. Such a recommendation can only arise because the dissenting justices have an abiding believe that this Court has utterly failed to recognize and protect McKenzie's constitutional rights.

Now we can add yet another chapter to what I stated in McKenzie III which would be a fitting title for a story on McKenzie's appeals: The McKenzie Rules: Not For General Application--Apply Sparingly. The theme has not changed; my review of this appeal has convinced me beyond any doubt that a defendant sentenced to death in this state has no chance to obtain fair, adequate, and meaningful review.

I must again allude to the statement in the majority opinion that in all the annals of criminal law history in this State, no defendant has been given more "tender legal care." I believe that my dissent demonstrates precisely the contrary. Never in the annals of criminal law history

in this State has a defendant ever been the victim of such a consistent and wholesale denial of fundamental rights. Only a federal court can now give the fair and even-handed review that the Court has so consistently refused to give.

_Daniel J. Shea_
Justice

Mr. Justice Frank B. Morrison, Jr., concurring:

The purpose of this comment is to fulfill a commitment made to my brother, Justice Daniel J. Shea. I was to review his dissent at its conclusion and add my judicial blessing to any portions with which I could agree. The review is complete. My comments follow.

Justice Shea's dissent is one of the most scholarly and lucid professional works I have ever read. With keen analysis he has laid bare the travesty known as State v. McKenzie. The investigation was bungled; the plea bargain was broken; the trial was a mockery; the sentence was predetermined; the appellate review was more illusory than real.

Justice Shea sounds an alarm which rings loudly in the citizen ear. We must act to preserve our constitutional system and that action rightfully preempts any compulsion to punish, no matter how heinous the crime. Every citizen must receive equal justice before the law. There are no exceptions. In this case, our system of justice has been twisted, torn, and at times, ground asunder.

An appellate court must vigilantly protect the structure from mob assault. This Court, in McKenzie, has failed miserably.

I concur in Justice Shea's dissent.

_____
                 Justice

IN THE DISTRICT COURT OF THE EIGHTH JUDICIAL DISTRICT OF THE STATE

OF MONTANA, IN AND FOR THE COUNTY OF CASCADE

THE STATE OF MONTANA,

　　　　　　　　Plaintiff,

　　vs.

DUNCAN PEDER McKENZIE,

　　　　　　　　Defendant.

) Criminal Action No. 6593A

) OBJECTIONS TO PRELIMINARY
) INSTRUCTIONS

) FILED

) JAN 3 1975

FLORENCE McGIBONEY

DEPUTY

Plaintiff herein, The State of Montana, through its attorneys, objects to the PRELIMINARY INSTRUCTIONS submitted by the Court and proposed to be given prior to the submission of any evidence for the following reasons:

That said PRELIMINARY INSTRUCTIONS are not within the intent of Section 95-1910, R.C.M. 1947, ORDER OF TRIAL; and that said PRELIMINARY INSTRUCTIONS go beyond the instructing of the jury as to it's duties as provided for in Section 95-1910(a).

That said PRELIMINARY INSTRUCTIONS are misleading and would tend to prejudice the Defendant's right to a fair trial.

That said PRELIMINARY INSTRUCTIONS place undue emphasis on presumptions and inferences and would tend to direct the jury to seek out and search for such presumptions and inferences while listening to testimony and observing exhibits.

That said PRELIMINARY INSTRUCTIONS would confuse the jury and instill in the jurors minds facts not yet presented to the jury and not yet proven.

That said PRELIMINARY INSTRUCTIONS include mis-statements of the law, and are confusing and redundant.

That said Preliminary Instructions give no citation as to source or authorities.

Plaintiff specifically objects to the following numbered Preliminary Instructions:

2.　　　That Preliminary Instruction No. 2 incorrectly refers

APPENDIX　-154-　　　　Ann 18 2

to "defendant's plea of "Not Guilty"." As is correctly stated in Preliminary Instruction No. 6 the Court entered a plea of "Not Guilty" on behalf of the Defendant when he stood mute and refused to plead.

6. That pursuant to Section 95-1910(b), R.C.M. 1947, a statement of the case is to be made by the County Attorney. See State vs. Gall, 135 Mont. 131,337 P2d. 932. However, there appears to be no statutory authority for counts of the Information to be read to the jury by the District Judge, as a part of Preliminary Instructions under "Statement of the Case".

23. That the title "Deliberate Homicide by Means of Torture" incorrectly states the crime charged, which is "Deliberate Homicide". Section 94-5-102. The matter of torture arises under the punishment statute, Section 94-5-105 (1) (d). That the use of the title Deliberate Homicide By Means of Torture" is misleading.

24. That the title "Deliberate Homicide by Means of Lying in Wait or Ambush" incorrectly states the crime charged, which is Deliberate Homicide", Section 94-5-102. The matter of lying in wait or ambush arises under the punishment statute, Section 94-5-105(1) (e). That the use of the title "Deliberate Homicide by Means of Lying in Wait or Ambush" is misleading. That the use of the terms "killing" and "kill" is improper. Such terms are not found in any applicable statute. That the proper term is "causes the death of", as stated in Section 94-5-101.

28. That the use of the term "the killing" is improper, as stated in Plaintiff's objection to No. 24.

29. That the statement "All persons are of sound mind who are not insane," is not supported by legal authority.

30. That the use of examples of "A" and "B" involving violence, injury and blood are improper, inflammatory, and confusing and would tend to obscure or color facts not yet inevidence.

32 - 38 That the repeated restatement of situations involving

the allegations against the defendant are inflammatory and prejudicial

34.    Same objection as to No. 28, concerning the terms "killing", "killed" and "kill".

That such Preliminary Instructions are contrary to accepted practice and procedure and in their total effect would be prejudicial to Defendant.

That there appears to be no sound reason why such instructions need be given in this case prior to the submission of evidence, juries for the centuries having been able to properly weigh evidence without the use of such Preliminary Instructions.

That although various of the instructions proposed would be proper as instructions to be submitted to the jury after the evidence has been submitted the Plaintiff believes that it would be reversible error to give such instructions prior to the submission of any evidence.

Respectfully submitted,

_____
David H. Nelson
Pondera County Attorney

_____
Douglas Anderson
Special Prosecutor for Pondera County